## **DESCRIPTION**

**EXHIBIT**

Unpublished Cases.................................................................................................................... A

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2006 WL 2736105 (C.D.Ill.)

**(Cite as: 2006 WL 2736105 (C.D.Ill.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
C.D. Illinois,
Urbana Division.
**UNITED STATES** of America, Plaintiff,
v.
Denny R. **PATRIDGE**, Defendant.
**No. 04-CR-20031.**

Sept. 25, 2006.

Hilary W. Frooman, U.S. Atty., Urbana, IL, Lea A. Carlisle, U.S. Dept of Justice Tax Division WCES, Washington, DC, for Plaintiff.

### *OPINION*

MICHAEL P. McCUSKEY, Chief District Judge.

**\*1** On June 30, 2005, following a jury trial, Defendant, Denny R. Patridge, was found guilty of two counts of tax evasion, two counts of wire fraud and two counts of money laundering. Defendant was found not guilty of one count of filing a false tax return. This court entered a judgment of conviction as to Counts 2-7 and scheduled a sentencing hearing on November 21, 2005. The sentencing has been continued on numerous occasions and is now scheduled to commence on September 25, 2006, at 9:30 a.m.

Defendant filed several motions related to the sentencing hearing and the underlying convictions on August 18, 2006, August 30, 2006, and September 5, 2006. One of the issues raised in Defendant's Memorandum in Support of Motion to Dismiss Superseding Indictment (# 182) was that his Sixth Amendment right to confront and present witnesses in his own behalf was violated when various defense witnesses, including Brent Winters, invoked their Fifth Amendment rights and did not testify at

Defendant's trial. As far as Brent Winters, Defendant attached a copy of an Informational Notice filed by the Government on August 17, 2006, in Case No. 06-CR-20023,*United States v. Kenton W. Tylman, Brent A. Winters, and Debra J. Hills.*Defendant contended that, based upon the Informational Notice, this court provided information which led to the investigation of Brent Winters, and, thus argued that it was "reasonable to conclude Defendant was denied the right to Mr. Winters' testimony solely because of this Court's complaint against Mr. Winters."

A hearing was held on Defendant's motions on September 6, 2006. Following the hearing, this court entered an Order (# 190) which denied all of the motions. This court concluded that Defendant had not shown any basis for dismissing the indictment against him at this late date, following conviction and just prior to sentencing. This court stated that any errors Defendant perceived in the way the trial was handled or any perceived insufficiency of evidence may be raised on appeal to the Seventh Circuit Court of Appeals. As far as Brent Winters' failure to testify in this case, this court stated that its recollection was that it allowed Mr. Winters to assert his Fifth Amendment privilege against self-incrimination. This court noted that the Seventh Circuit has stated that "[m]any cases hold that the sixth amendment does not entitle a defendant to testimony that the witness has a fifth amendment privilege not to give." *Liegakos v. Cooke,* 106 F.3d 1381, 1387 (7th Cir.1997). Accordingly, when a potential witness indicates that he will likely invoke his privilege against self-incrimination, the district court should ensure that the witness cannot possibly incriminate himself. *United States v. Mabrook,* 301 F.3d 503, 506 (7th Cir.2002). If a witness's testimony may make him vulnerable to prosecution, the trial court may allow him to invoke his privilege and refuse to testify. *Mabrook,* 301 F.3d at 506. In addition, a defendant is not allowed to call a witness for the purpose of having the witness assert his

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2736105 (C.D.Ill.)
(Cite as: 2006 WL 2736105 (C.D.Ill.))

Fifth Amendment privilege. *Mabrook,* 301 F.3d at 507. Therefore, this court stated that it believed that its ruling regarding Mr. Winters was consistent with the applicable case law and perfectly proper.

**\*2** This court also found that Defendant had not shown any legitimate basis for continuing the sentencing hearing in this case. Defendant had not shown that pending civil litigation had any bearing on the tax loss calculation that this court must determine at sentencing. This court stated that this was especially true since the tax court had ruled against Defendant. This court further stated that the underlying documents relied upon by the Probation Office in making its recommended tax loss calculations had been made available to Defendant. Following the entry of this court's Order, the sentencing hearing remained scheduled before this court on September 25, 2006, September 26, 2006, and, if necessary, the morning of September 27, 2006.

On September 19, 2006, less than one week prior to the scheduled sentencing hearing, Defendant filed a Motion for Recusal (# 191), a Memorandum in Support (# 192) and a Certificate of Counsel (# 193). Defendant also filed a Motion for New Trial Regarding Issue of Recusal (# 194) and a Memorandum in Support (# 195). In his Motions, Defendant argued that, based upon the Government's Informational Notice filed in Case No. 06-CR-20023, and this court's recusal in that case, this court was required to recuse itself in Defendant's case based upon 28 U.S.C. §§ 144 and 455(b). Defendant attached his affidavit, dated September 19, 2006, which relied upon the information included in the Government's Informational Notice. Defendant stated in his affidavit that this court was both the reason Mr. Winters was being investigated as well as the reason he was not allowed to testify at Defendant's trial. Defendant stated, "I would have asked for recusal had I known Chief Judge Michael P. McCuskey sat in this capacity, which I believe demonstrates bias and prejudice against me and my witnesses."Defendant also argued that he is entitled to a new trial.

On September 19, 2006, this court entered a text order and directed the Government to respond to Defendant's Motions by September 21, 2006. On September 20, 2006, Defendant filed an Objection to Text Order (# 196). In his Objection, Defendant argued that, because he has complied with 28 U.S.C. § 144, this court must recuse itself and take no further action in this case. Defendant therefore argued that it was error for this court to direct the Government to respond to his Motion for Recusal. In fact, the Government has not filed a Response to Defendant's Motions. However, this court does not agree with Defendant that he has complied with 28 U.S.C. § 144 and also does not agree that recusal is required in this case.

Section 144 provides:

Whenever a party to any proceeding in a district court makes and files a *timely and sufficient* affidavit that the judge before whom the matter is pending has a personal bias or prejudice against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

**\*3** The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

28 U.S.C. § 144 (emphasis added). The Seventh Circuit has stated that the requirements of this statute are to be strictly construed to prevent abuse. *United States v. Sykes,* 7 F.3d 1331, 1339 (7th Cir.1993). Under the terms of the statute, a judge is allowed to pass on the timeliness and sufficiency of the affidavit filed, accepting the factual averments as true. *United States v. Balistrieri,* 779 F.2d 1191, 1200 (7th Cir.1985). A judge is presumed to be impartial and a party seeking recusal bears a heavy

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 2736105 (C.D.Ill.)
**(Cite as: 2006 WL 2736105 (C.D.Ill.))**

burden. *Balistrieri,* 779 F.2d at 1199.

"A section 144 affidavit is not timely filed unless filed 'at the earliest moment after [the movant acquires] knowledge of the facts demonstrating the basis for such disqualification.'" *Sykes,* 7 F.3d at 1339,*quoting United States v. Patrick,* 542 F.2d 381, 390 (7th Cir.1976). In this case, Defendant is relying on facts included in the Government's Informational Notice, which was filed in the *Tylman* case on August 17, 2006. On August 30, 2006, Defendant attached a copy of this Informational Notice to his Memorandum in Support of Motion to Dismiss Superseding Indictment (# 182), showing that he was aware of the contents of the document at least as of that date, more than three weeks ago. Defendant's Motion for Recusal, filed more than one month after the filing of the Informational Notice, and less than one week prior to the scheduled sentencing hearing, clearly was not filed at the "earliest moment" and is not timely. *See Sykes,* 7 F.3d at 1339.

Moreover, this court also concludes that the affidavit is not sufficient. Defendant is correct that, "in passing on the legal sufficiency of the affidavit, the judge must assume that the factual averments it contains are true, even if he knows them to be false." *Balistrieri,* 779 F.2d at 1199. However, the "only facts in such an affidavit that must be credited ... are those that are 'sufficiently definite and particular to convince a reasonable person that bias exists; simple conclusions, opinions, or rumors are insufficient.'" *United States v. Boyd,* 208 F.3d 638, 647 (7th Cir.2000), *vacated on other grounds* in *Boyd v. United States,* 531 U.S. 1135, 121 S.Ct. 1072, 148 L.Ed.2d 949 (2001), *quoting Sykes,* 7 F.3d at 1339. The factual averments "must show that the bias is personal." *Balistrieri,* 779 F.2d at 1199. "The negative bias or prejudice from which the law of recusal protects a party must be grounded in some personal animus or malice that the judge harbors against him, of a kind that a fair-minded person could not entirely set aside when judging certain persons or causes." *Balistrieri,* 779

F.2d at 1201. Therefore, "[s]atisfactory evidence of bias or prejudice must show this element of personal animus or malice." *Balistrieri,* 779 F.2d at 1201. "[W]here the judge forms opinions in the courtroom, either in the current or a prior proceeding, such opinions 'do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *In re Huntington Commons Assocs.,* 21 F.3d 157, 158 (7th Cir.1994), *quoting Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

*4 In this case, Defendant's affidavit does not include any factual assertions which show that this court has any personal bias or prejudice against Defendant. Defendant's affidavit is not "even remotely sufficient evidence of the required deep-seated and unequivocal antagonism that would render fair judgment impossible."*See Huntington Commons,* 21 F.3d at 159. Accordingly, Defendant's affidavit is not "sufficient" and recusal is not required under 28 U.S.C. § 144.

This court further concludes that Defendant has not raised any basis for recusal under 28 U.S.C. § 455(b). *See Balistrieri,* 779 F.2d at 1202 (appropriate standard of proof is the same for § 455 and § 144); *United States v. Marino,* 1999 WL 39008, at *6 (N.D.Ill.1999) (standard of "personal bias or prejudice" bears the same meaning under both 28 U.S.C. §§ 144 and 455). This court fully set out its reasons for recusal at the hearing held in the *Tylman* case on August 23, 2006. A transcript of that hearing will be filed as part of the record in this case. The statements made at the *Tylman* hearing show that there is no basis for concluding that this court has any personal bias or prejudice against Defendant and also show there is no basis for concluding that this court has any reason at all for recusal in this case.

IT IS THEREFORE ORDERED THAT:

(1) The clerk is directed to file the transcript from the August 23, 2006, proceeding in Case No.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2736105 (C.D.Ill.)
**(Cite as: 2006 WL 2736105 (C.D.Ill.))**

Page 4

06-CR-20023,*United States v. Tylman et al.,* as part of the record in this case.

(2) Defendant's Motion for Recusal (# 191) is DENIED.

(3) Because there is no basis for recusal in this case, there is also no basis for granting Defendant's request for a new trial. Accordingly, Defendant's Motion for New Trial (# 194) is DENIED.

(4) This case will proceed to sentencing on September 25, 2006, at 9:30 a.m. as previously ordered.

C.D.Ill.,2006.
U.S.v. Patridge
Not Reported in F.Supp.2d, 2006 WL 2736105 (C.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 1727334 (N.D.Ill.)
**(Cite as: 2002 WL 1727334 (N.D.Ill.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
**UNITED STATES** OF AMERICA
v.
Fowobi **GEORGE**
**No. 00 CR 589-3.**

July 24, 2002.

After being convicted of check counterfeiting, bank
fraud, and money laundering, defendants moved for
judgment of acquittal or for a new trial. The District
Court, Pallmeyer, J., held that: (1) evidence was
sufficient to support convictions; (2) failure to per-
mit codefendant to call witness did not support re-
quest for a new trial; (3) renewal of pre-trial mo-
tions did not warrant reversal; and (4) downward
departure in codefendant's sentencing was not war-
ranted.

Affirmed.

West Headnotes

**[1] United States 393 ☞34**

393 United States
    393I Government in General
        393k34 k. Mints, Assay Offices, Coinage,
and Money. Most Cited Cases
Evidence was sufficient to convict defendant on
money laundering and other charges, even though
witness was shown to have lied in prior testimony;
witnesses' testimony as to money laundering charge
was corroborated by defendant's fingerprints found
on packing materials, phone records, and receipt for
vehicle downpayment, bank fraud charge was sup-
ported by testimony of four witnesses, and check
counterfeiting charge was supported by testimony
of two witnesses, and jury was entitled to believe
witness who lied in prior testimony. 18 U.S.C.A. §
513(a).

**[2] Banks and Banking 52 ☞509.25**

52 Banks and Banking
    52XI Federal Deposit Insurance Corporation
        52k509 Offenses and Penalties
            52k509.25 k. Prosecutions. Most Cited
Cases

**United States 393 ☞34**

393 United States
    393I Government in General
        393k34 k. Mints, Assay Offices, Coinage,
and Money. Most Cited Cases
Evidence was sufficient to support conviction on
check counterfeiting and bank fraud charges; jury
chose to believe three witnesses' testimony and
concluded that defendant was source of information
used to create counterfeit checks drawn on accounts
of several of his business associates.

**[3] Criminal Law 110 ☞918(2)**

110 Criminal Law
    110XXI Motions for New Trial
        110k918 Errors and Irregularities in Conduct
of Trial
            110k918(2) k. Irregularities Affecting
Witnesses. Most Cited Cases
New trial was not required, in conviction on check
counterfeiting and bank fraud charges, by fact that
defendant was not permitted to call witness who
had recanted much of testimony he gave before
grand jury; trial court had no power to direct gov-
ernment to extend immunity to witness, and witness
could not be called solely for purpose of having
him take the Fifth Amendment before the jury.
U.S.C.A. Const.Amend. 5.

**[4] Sentencing and Punishment 350H ☞860**

350H Sentencing and Punishment
    350HIV Sentencing Guidelines
        350HIV(F) Departures
            350HIV(F)3 Downward Departures

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1727334 (N.D.Ill.)
(Cite as: 2002 WL 1727334 (N.D.Ill.))

350Hk859 Offender-Related Factors
350Hk860 k. In General. Most Cited Cases

In sentencing for check counterfeiting and bank fraud, downward departure on basis of onerous conditions of confinement was not warranted even though defendant was a deportable alien; defendant had been living and working in the United States for several years and had family and loved ones in the country who could visit him in prison.

*MEMORANDUM OPINION AND ORDER*

PALLMEYER, J.

**\*1** On February 21, 2002, a jury found Defendants Fowobi George and Ola Mustapha guilty on charges of check counterfeiting, bank fraud, and money laundering. Both Defendants have moved for a judgment of acquittal or for a new trial. In this opinion, the court sets forth its reasons for denying those post-trial motions. In addition, the court will address issues relating to Defendant George's sentencing.

*DISCUSSION*

I. Post-Trial Motions

Both Defendants' motions for acquittal or new trial focus chiefly on the sufficiency of the evidence. Such challenges are notoriously difficult, particularly where, as here, Defendants contend key witnesses were not credible. The court applies a standard that generously favors the jury's determination:

The test that the court must use is whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government ... bear[ing] in mind that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and

draw reasonable inferences."

*United States v. Reed,* 875 F.2d 107, 111 (7th Cir.1989), quoting *United States v. Marquardt,* 786 F.2d 771, 780 (7th Cir.1986). In this case, both Defendants focus their attention on the credibility of four witnesses, Jason Libson, Samsuideen Giwa, Biola Alawode, and Alyson Verploeg, three of whom (Libson, Giwa, and Alawode) were co-Defendants who pleaded guilty and cooperated with the government at the trial in this case.

A. Sufficiency of the Evidence-Mustapha

**[1]** Defendant Mustapha was convicted of money laundering, bank fraud, and counterfeiting. He challenges the sufficiency of the evidence in support of each of the jury's findings. With respect to Count VIII, in which Mustapha was charged with money laundering, the government offered evidence that, soon after the arrest of another co-Defendant, Abiola Amin, Defendant Mustapha removed boxes of computer chips from Amin's home. Verploeg testified that she was in Amin's apartment at the time that Mustapha took the chips, and Alawode and Giwa described incidents in which Mustapha acknowledged that the computer chips were in his possession. Mustapha now argues that the testimony of these witnesses was largely uncorroborated. In fact, however, there was evidence that boxes and packing materials were found in the garage behind Amin's residence only a few hours after their contents were removed by Mr. Mustapha, and that those boxes and trays bore Mustapha's finger and palm prints. Phone records reflected that within days of Mustapha's removal of the chips, he had phone contacts with convicted co-Defendants Libson, whom he had never met before this, and Giwa, who had no significant prior contact with Mustapha.

The jury found Mustapha used these illegally obtained assets to make a $15,000 downpayment for the purchase of a 1998 Lincoln Navigator in August 2000. FBI Agent Laura Miller testified that

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1727334 (N.D.Ill.)
**(Cite as: 2002 WL 1727334 (N.D.Ill.))**

Page 3

Mustapha was present in the courtroom during proceedings involving Amin, where he could have learned that Amin himself obtained the chips through fraud. In any event, Mustapha's legitimate earnings for the year 2000 were at that time approximately $5,000, and his own records indicated he had purchased another car only three months earlier, at a much lower price, a portion of which he had to finance. This evidence, much of it independent of the witnesses Mustapha discredits, was sufficient to support the inference that Mr. Mustapha purchased the Navigator with illegally obtained assets. Although Mustapha suggested his cash deposit for the Navigator was less than $10,000, the government presented a receipt that bore notations reflecting two amounts: $9,000 and $6,000. Mustapha now argues that the court erred by declining to instruct the jury that there were two separate cash transactions (Mustapha's Post-Trial Motion for a New Trial, at ¶ 8), but the court believes this is a matter of inference from the facts, which Mustapha was free to, and did, argue to the jury in closing. Finally, the government is not required to prove, as Mustapha now suggests it must (Mustapha's Motion for Judgment of Acquittal, ¶ 5), that Mustapha himself was involved in the illegal activity that generated the funds he used to purchase the car.

**\*2** Mustapha was also convicted of bank fraud, charged in Counts XIII, XV, XVI, and XVII. The testimony in support of those counts came from Samuel Evans, Lecoylia Willis, Edward Bryan Phillips, and Shari Garland, witnesses whose credibility Mr. Mustapha does not challenge. Each of these witnesses described encounters in which Mustapha solicited them to negotiate counterfeit checks through their respective accounts. Except for Garland, each yielded to Mustapha's temptation, following his instructions regarding how and when to deposit the checks and then make withdrawals against the fraudulently-obtained assets.

Finally, Mustapha was convicted on a single count of check counterfeiting, Count XVIII. The check involved, in the amount of $45,999, was drawn

against the account of co-Defendant Fowobi George's insurer, payable to Samuel Evans. Jason Libson testified that he created the check for Fowobi George; Mustapha argues that Libson's testimony was not credible (Defendant Mustapha's Motion for Judgment of Acquittal, at ¶ 6), but on cross-examination, defense counsel successfully demonstrated that Libson lied in prior testimony. The jury heard that impeachment but was entitled nevertheless to believe Libson. In any event, Samuel Evans, whose credibility Mustapha does not attack, testified that he received the check from Mr. Mustapha, with whom he had no prior relationship. Mustapha provided Evans with instructions on how and when to deposit and withdraw funds against it for delivery to Mustapha. This evidence was sufficient to establish that Defendant Mustapha had "possess[ed] ... a forged security ... of an organization, with intent to deceive another person ..." in violation of 18 U.S.C. § 513(a).

### B. Sufficiency of the Evidence-George

The jury found Defendant George guilty of nine counts of check counterfeiting (Counts XII, XVIII, XIX, XX, XXI, XXII, XXIII, XXIV, and XXV) and two counts of bank fraud (Counts XVI and XVII). His sufficiency of the evidence challenges fare no better than did Defendant Mustapha's. First, as the government notes, his challenges to the credibility of witnesses Alawode, Libson, and Verploeg are requests that the court second-guess the jury's determinations, which is not permissible.[FN1]

> FN1. In his post-trial motion, George reported he was investigating claims by other MCC inmates that Libson had told them he gave perjured testimony to incriminate George because he believed George had directed authorities to Libson. George promised he would seek a hearing if these claims were confirmed (George's Motion for Judgment of Acquittal, at 3), but to date has not done so.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1727334 (N.D.Ill.)
**(Cite as: 2002 WL 1727334 (N.D.Ill.))**

Page 4

[2] Cooperating Defendant Jason Libson, a self-proclaimed expert in the "art" of creating phony checks, testified that George provided him with checking account information for a number of George's entities with which George transacted business, either individually or on behalf of the cleaning service Mr. George operated. As the government notes, common sense defeats the notion that coincidence could explain the fact that so many of George's business associates were victimized by identical criminal conduct during a short time frame. (Government's Consolidated Opposition to Defendants' Motions, at 4-5.) The jury was entitled to conclude that George was the source of information used to create counterfeit checks drawn on the accounts of several of his own business associates. The fact that George's business and personal finances were depleted furnished a motive for the charged conduct.

**\*3** The jury returned a verdict against George concerning two of the checks used by Mr. Mustapha in a bank fraud scheme (identified in Counts XVI and XVII) and one check used by Mr. Amin in a mail fraud scheme (identified in Count XII). Jason Libson admitted manufacturing those three counterfeit checks, and his only connection with Mr. Mustapha and Mr. Amin was through Defendant George. Again, the notion that George had no involvement in the unlawful conduct would require remarkable coincidence.

C. Unavailability of Abiola Amin

Co-Defendant Abiola Amin pleaded guilty and received a significant sentencing reduction in return for his cooperation and truthful testimony. Shortly before the trial, Amin nevertheless recanted much of the testimony he gave before the grand jury concerning Defendant George's involvement in providing checks that Amin used to purchase computer chips. In his recantation, Amin asserted that George was the source, not of all, but of only one of the checks Amin had used in that scheme-that is, the counterfeit TCF National Bank check written to

Neutron, Inc. in the amount of $262,000 (described in Count XII). As a result of the recantation, the government withdrew a number of the charges against George and withdrew Amin's name from its witness list.

Defendant George then sought to call Mr. Amin as a witness himself, although he had not identified Amin as his own witness nor had he taken any steps to secure Amin's presence. At the court's direction, the government arranged for Amin to be transported to the courtroom and be questioned outside the presence of the jury. On the advice of counsel, Amin exercised his Fifth Amendment right to decline to testify. In light of the fact that Amin had given contradictory sworn statements, one to the grand jury and another to a government officer, the possibility that his testimony might incriminate him was indeed genuine.

Defendant George asked the court to order the government to confer use immunity on Amin or, at a minimum, to require Amin to take the stand and invoke his privilege against self-incrimination in the jury's presence. The court denied those requests, and George argues this ruling was error. He urges that Amin's immunized testimony would constitute *"Brady* material" and that Amin's exercise of his Fifth Amendment privilege before the jury would "have formed the basis for impeaching Alowade and Verploeg whose trial testimony demonstrably tracked Amin's recantation."(George's Motion for Judgment of Acquittal or, in the Alternative, for New Trial, at 2.)

[3] The court is uncertain what George means by his assertion that Alowade's and Verploeg's testimony "tracked Amin's recantation." As noted, because Amin recanted certain statements that incriminated George, the government withdrew those counts. Witnesses Alawode and Verploeg testified concerning only the one check that Amin continued to assert came from George. Further, the court does not share Mr. George's confidence that Amin's testimony would have helped him. All that the court is certain of is that Amin does not tell the truth. Even

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1727334 (N.D.Ill.)
(Cite as: 2002 WL 1727334 (N.D.Ill.))

Page 5

if the court were able to compel his testimony, neither Mr. George nor the prosecution could know which version of Amin's own previous statements (if any) he might offer from the witness stand. George could not properly call him merely to impeach his testimony, and the government's interests would surely not be served by putting a known perjurer on the witness stand.

**\*4** In any event, the court had reservations at trial concerning the procedure proposed by George and, on further reflection, concludes it acted properly both in refusing to order the government to confer immunity and in refusing to require Amin to take the stand merely to assert his Fifth Amendment privilege. First, the law in this circuit is clear that the right to grant immunity to a witness is delegated "solely to the executive branch of government." *United States v. Taylor,* 728 F.2d 930, 934 (7th Cir.1984), citing 19 U.S.C. §§ 6002, 6003; *accord, United States v. Hooks,* 848 F.2d 785, 798 (7th Cir.1988) The government is not required to extend immunity to a defense witness, *Hooks,* 848 F.2d at 799, and trial courts have no power to direct the government to do so, absent "substantial evidence showing that the prosecutor's actions amounted to a clear abuse of discretion violating the due process clause."*Id.,* citing *United States v. Frans,* 697 F.2d 188, 191 (7th Cir.1983) and *Taylor,* 728 F.2d at 935, Nor is *Brady* implicated here; the government met its *Brady* obligations by promptly disclosing Amin's recantation. It also acted properly in withdrawing charges that Amin's conduct rendered it unable to prove.

George's alternative proposal-that the court direct Mr. Amin to exercise his Fifth Amendment privilege from the witness stand-is also foreclosed by case authority. Significantly, Mr. George's co-Defendant, Ola Mustapha, vigorously objected to this proposal. The court expressed concern that the procedure proposed by George might suggest to the jury that Amin's unwillingness to testify supported a negative inference about his own character or conduct. The court doubted the propriety of any

such suggestion in a criminal trial. As the court has now determined, it is in fact well-established that neither the government nor the defense may call a witness solely for the purpose of having that witness take the Fifth before the jury. *United States v. Castorena-Jaime,* 285 F.3d 916, 930-31 (10th Cir.2002); *United States v. Swanson,* 9 F.3d 1354, 1359 (8th Cir.1993); *United States v. Pitts,* 918 F.2d 197, 200 (D.C.Cir.1990); *United States v. Lyons,* 703 F.2d 815, 818 (5th Cir.1983). The purpose of this rule is precisely the one identified by this court at trial: " '[T]he jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense." ' *Castorena-Jaime,* 285 F.3d at 931, citing *United States v. Nunez,* 668 F.2d 1116, 1123 (10th Cir.1982); *Bowles v. United States,* 439 F.2d 536, 541 (D.C.Cir.1970).

Because Amin was not "available" to testify for the government, and there was no way to determine that his testimony would have been helpful to the jury, the court declined to give the "missing witness" instruction requested by Mustapha. (Mustapha's Post-Trial Motion for a New Trial, ¶ 7.) [FN2] Instead, the court opted to advise the jury, without any further elaboration, that Mr. Amin was not available to testify. The court continues to believe this was the appropriate course of conduct. *Cf. Harmon v. McVicar,* 95 F.3d 620, 623 (7th Cir.1996) (prosecution had announced its intention to call two witnesses who later asserted the privilege against self-incrimination; on habeas review, court finds no prejudice from a jury instruction that the witnesses would not be called, where there was no mention of the witnesses' invocation of the privilege and the jury knew the witnesses had been convicted for the same offense for which petitioner was on trial). At a minimum, the failure to permit Mr. George to call Mr. Amin to the witness stand does not support the request for a new trial.

> FN2. Mustapha's request for such an instruction is ironic, in light of his repeated

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1727334 (N.D.Ill.)
(Cite as: 2002 WL 1727334 (N.D.Ill.))

Page 6

and emphatic objection to Amin's being called as a witness by anyone.

D. Mustapha's Renewal of Pre-Trial Motions

**\*5** Defendant Mustapha has renewed his pre-trial motions, including his motion to dismiss the indictment, his motion to bar the testimony of the government's fingerprint expert, and a motion for attorney-conducted *voir dire*.(Mustapha's Post-Trial Motion for New Trial, ¶ 5.) The court stands by its pre-trial rulings. With respect to the motion to dismiss Count VIII, the court noted in a minute order that the government had explained the basis for its contention that Mustapha's purchase of the Lincoln involved more than $10,000; the jury has now reached that conclusion, which finds support in the evidence, as explained above. The court adhered to Seventh Circuit precedent in denying Mustapha's motion to bar the fingerprint expert. The court's written rulings on those motions are attached and incorporated here.

With respect to Mustapha's motion for attorney-conducted *voir dire,* the court is puzzled; this court routinely allows attorneys to conduct voir dire examination of potential jurors, even without a formal motion, and believes it followed that practice in this case.

Finally, the court required the prosecutor to explain its reasons for challenging one of two African-American jurors, and as stated in open court, was satisfied that the government's explanation for this challenge was not based on race.

II. Sentencing Issues-Defendant George

As explained in the Presentence Investigation Report, the 1998 Sentencing Guidelines, in effect at the time of the offense conduct, were used because they yield a more favorable result for Mr. George than do the 2001 Guidelines. Specifically, the 2001 Guidelines eliminate a two-level enhancement for more than minimal planning (§ 2F1.1(b)(2)(A)), but

direct a 14-level increase based upon the amount of intended loss resulting from all of Mr. George's offense conduct, three levels higher than called for under the earlier manual. *See* § 2B1.1(b)(1). Because the court must use the Guideline Manual as a whole, see § 1B1.11(b)(2), the net effect is that the 2001 Guidelines would result in a total offense level of 20, one level higher than under the 1998 Guidelines.

[4] Under those Guidelines, Mr. George's total offense level is 19 and his criminal history category is 1. Mr. George has had no prior convictions and has had a successful business and legitimate employment. Although the amount of intended loss is great, Mr. George's conduct actually resulted in a much lower amount of loss. The court concludes that a sentence at the bottom of the Guideline range of 30 to 37 months is appropriate. Mr. George has moved for a downward departure; he argues that his status as a deportable alien will result in more onerous conditions of confinement than a non-alien would face. The court declines to depart downward. Mr. George has been living and working in the United States for several years, and does not face the particularly harsh and lonely circumstances of an alien who has no contacts here and entered the country in connection with the offense conduct or just before his arrest. The court presumes he will have visitors, including family members and loved ones in the United States. At his request, the court will recommend placement in a "boot camp" setting. Particularly if that recommendation is accepted, the conditions of Mr. George's confinement will not result in unusual or exceptional hardship.

N.D.Ill.,2002.
U.S. v. George
Not Reported in F.Supp.2d, 2002 WL 1727334 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy                                                          Page 1
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
Thomas SEBASTIAN, Plaintiff,
v.
CITY OF CHICAGO, Dan Allen, Chris Kozicki,
and Stan-Lee Kaderbek, Defendants.
**No. 05 C 2077.**

July 24, 2008.

Shelly Byron Kulwin, Jeffrey R. Kulwin, Kulwin,
Masciopinto & Kulwin, LLP, Chicago, IL, for
Plaintiff.

Kenneth Charles Robling, Timothy L. Swabb, Mar-
cela D. Sanchez, Patrick D. Daly, City of Chicago
Law Department, James Francis Botana, Jackson
Lewis LLP, Laura Katherine Kendall, Jackson
Lewis LLP, Chicago, IL, for Defendants.

**MEMORANDUM OPINION AND ORDER**

VIRGINIA M. KENDALL, District Judge.

**\*1** Plaintiff Thomas Sebastian ("Sebastian" or
"Plaintiff") filed suit against Defendants City of
Chicago (the "City"), Dan Allen ("Allen"), Chris
Kozicki ("Kozicki"), and Stan-Lee Kaderbek
("Kaderbek") (collectively "Defendants") under
Title VII of the Civil Rights Act of 1964 ("Title
VII"), 42 U.S.C. § 1983 (" § 1983"), and 745 ILCS
10/9-102. Sebastian alleges that: (1) the City dis-
criminated against him on the basis of his national
origin and race in violation of Title VII; (2) the
City retaliated against him in violation of Title VII;
and (3) Defendants failed to promote him in viola-
tion of the First Amendment and § 1983. Sebastian
seeks indemnification from the City on the § 1983
claim pursuant to 745 ILCS 10/9-102. All Defend-

ants moved for summary judgment on all claims.
For the reasons set forth below, Defendant Allen's
Motion For Summary Judgment is granted with re-
spect to Counts I and II and denied with respect to
Count III. The City Defendants' Motion For Sum-
mary Judgment is granted with respect to Counts II
and III and denied with respect to Counts I and IV.
Finally, Sebastian's Motion to Strike portions of
Defendants' reply pleadings is granted in part and
denied in part consistent with this Opinion.

**STATEMENT OF UNDISPUTED FACTS**

Sebastian is an electrical sign inspector for the
City's Electrical Bureau (the "EB Department") of
the Department of Buildings (the "Department"),
where he has worked since 1987.[FN1] (Pl. Resp.
56.1 ¶ 5.) Sebastian claims that he was qualified to
be promoted to the position of a supervising elec-
trical inspector and that he was passed over by oth-
er politically connected candidates due to his race,
national origin, and because he was not politically
active. Sebastian earned a Supervising Electrician's
license in 1985, is a member of the International
Brotherhood of Electrical Workers ("IBEW"), Loc-
al 134, and has over thirty years of experience in
the electrical industry. (Allen Resp. 56.1 ¶¶ 1-2;
City Defs. Resp. 56.1 ¶¶ 1-2; Pl. Resp. 56.1 ¶ 5.)

> FN1. Citations to "Plaintiff's Response to
> Defendant's Local Rule 56.1(a)(3) State-
> ment" have been abbreviated to "Pl. 56.1
> Resp." Citations to the exhibits supporting
> "Plaintiff's Sur-response in Opposition to
> Defendants' Motions For Summary Judg-
> ment" have been abbreviated to "Pl. Sur-
> response, Ex." Citations to "Defendant Al-
> len's Objections and Responses to
> Plaintiff's 56.1(b)(3)(B) Statement of
> Facts" have been abbreviated to "Allen
> 56.1 Resp." Finally, citations to "City De-
> fendants' Objections and Responses to
> Plaintiff's 56.1(b)(3)(B) Statement of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 2
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

Facts" have been abbreviated to "City Defs. 56.1 Resp."

The Court notes with considerable displeasure that the parties have failed to comply with L.R. 56.1. That rule allows a party opposing summary judgment to file a statement of undisputed material facts consisting of "short numbered paragraphs." Ignoring that obligation, Sebastian has filed a statement of undisputed material facts that contains numerous lengthy paragraphs that one cannot characterize as "short." To be sure, over one-third of the 91 numbered paragraphs contained in Sebastian's Local Rule 56.1(b)(3) (B) statement violate the "short numbered paragraphs" limitation. Making matters worse, several statements within the paragraphs misrepresent the facts and either contain no citation to the record or an incorrect citation to the record. Sebastian's submission violates not only the letter, but also the spirit of Local Rule 56.1. While not as egregious, Defendants have also failed to comply with L.R. 56.1. For instance, both Allen and the City Defendants include several numbered paragraphs that exceed the "short paragraph" restriction. In addition, Allen and City Defendants have admitted and/or denied certain statements, but then improperly included additional facts and arguments in their response paragraphs. The City Defendants (and Allen at least) have also included a general authenticity objection in response to several of Sebastian's citations to the record without properly explaining or supporting the objections.

The Court granted several requests for extensions to discovery and briefing schedules. Nevertheless, the parties failed to use this additional time to sort through non-issues and present only material facts to the Court, or properly draft and format their filings. Instead, the parties abused the Court's generosity by forcing the Court to wade through convoluted, noncompliant Local Rule 56.1 submissions on the eve of trial.

Nonconformity with the Local Rules and the standing orders of the Court is not without consequence. *Green v. Harrah's Illinois Corp.,* No. 03 C 2203, 2004 U.S. Dist. LEXIS 7569, at *8 (N.D.Ill. Apr. 29, 2004) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1). The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform Servs., Inc.,* 368 F.3d 809, 817 (7th Cir.2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees,* 233 F.3d 524, 527 (7th Cir.2000))."A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56. 1, the court chooses to ignore and not consider the additional facts that a litigant has proposed." *Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803, 809-10 (7th Cir.2005). Accordingly, this Court will not consider portions of the parties' submissions that do not contain proper support from the parties' citations to the record. In addition, the Court denies Defendants' general authenticity objections to the extent that they failed to properly develop such arguments. Finally, the Court strikes any additional facts or arguments improperly included in their response paragraphs or summary judgment memoranda. Consistent with this conclusion, the Court will not consider any arguments that rely upon the excluded

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

evidence.

During his tenure with the EB Department, Sebastian held responsibility in several EB functions: field wiring inspections, electrical plan examination, court case team inspections, and electrical sign inspections. (Allen Resp. 56.1 ¶ 3; City Defs. Resp. 56.1 ¶ 3.) One of his previous supervisors, Rochester Bailey ("Bailey"), described Sebastian as: (1) an excellent inspector; (2) a specialist of the EB Department's switchboards and switchgears work; (3) excellent with the task of load calculations; (4) very knowledgeable with regard to the Electrical Code (the "Code"); and (5) one who was prompt, stayed late to finish jobs, and never refused assignments.[FN2] (Allen Resp. 56.1 ¶ 4; City Defs. Resp. 56.1 ¶ 4; Pl. 56.1 Resp., Ex. 4, Bailey Dep. 41-42, 69-70, 76-78, 130, 163.) In 1991 and 2004, Chief Electrical Inspector Timothy Cullerton ("Cullerton") and Deputy Commissioner Milt Patterson ("Patterson"), respectively, commended Sebastian for "consistently excellent" performance and a "high degree of professionalism." (Allen Resp. 56.1 ¶ 3; City Defs. Resp. 56.1 ¶ 3; Pl. 56.1 Resp. Ex. 1, Bid Application.) In 1994, Sebastian received a Commissioner's Special Service Award. (Allen Resp. 56.1 ¶ 3; City Defs. Resp. 56.1 ¶ 3.)

> FN2. Throughout Sebastian's 56.1(b)(3)(B) Statement of Facts and his Response to Defendant's Local Rule 56.1(a)(3) Statement, Sebastian cites to the testimony of individuals without laying the proper foundation to establish that the individuals had the requisite personal or firsthand knowledge. *See* Fed.R.Evid. 602. To the extent that Sebastian has failed to comply with Local Rule 56(e) and Fed.R.Evid. 602, such statements will not be considered by the Court. Additionally, the Court notes that Sebastian also attempts to support his statements of facts and/or denials with several conclusory assertions made by himself and others, without supporting the assertions with specific facts.

Such conclusory opinions are also insufficient to create a genuine issue of material fact and, therefore, will also be disregarded by the Court. *See Burks v. Wisconsin Dept. of Trans.,* 464 F.3d 744, 752 (7th Cir.2006).

*Stan-Lee Kaderbek*

*2 Kaderbek is a civil engineer who served as the Deputy Commissioner/Chief Engineer of the City's Department of Transportation Bureau of Bridges and Transit from 1993 through 2003. (Pl. Resp. 56.1 ¶ 70.) In August 2003, Kaderbek joined the City's Department of Transportation as the First Deputy Commissioner. In June 2004, he became the Commissioner of the Department of Buildings, where he was charged with the enforcement of the City's Building Code. (*Id.*) Kaderbek resigned as Commissioner in 2005. (Allen Resp. 56.1 ¶ 9; City Defs. Resp. 56.1 ¶ 9.) In 1996, Kaderbek volunteered to do political work. (Allen Resp. 56.1 ¶ 10; City Defs. Resp. 56.1 ¶ 10.) Kaderbek explained that he was interested in volunteering because, in predisciplinary hearings, employees would use their political work as an excuse for inadequate performance. (Allen Resp. 56.1 ¶ 10; City Defs. Resp. 56.1 ¶ 10; Pl. 56.1 Resp., Ex. 20, 103-04.) Kaderbek thought it would help him to respond to employees because he could "look them straight in the face and say, you know what, I do it too and I still do my job."(Pl. 56.1 Resp., Ex. 20, 103-04.)

*Chris Kozicki*

Kozicki began his career as an assistant to family friend, 11 th Ward Alderman Patrick Huels ("Huels"). (Allen Resp. 56.1 ¶ 8; City Defs. Resp. 56.1 ¶ 8; Pl. 56.1 Resp. Ex. 15, 20-22.) Kozicki worked as a volunteer for the 11 th Ward Democratic organization and ultimately became a political coordinator for the 11th Ward where he organized and directed political volunteers. (Allen Resp. 56.1 ¶ 8; City Defs. Resp. 56.1 ¶ 8.) In 1993, Ko-

Slip Copy
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

zicki was appointed to work for Mayor Daley's brother, John Daley, who then recommended him to Mayor Daley's Chief of Staff for a position as assistant commissioner/project manager for the Department. (Allen Resp. 56.1 ¶ 8; City Defs. Resp. 56.1 ¶ 8.) Kozicki was appointed to an Assistant Commissioner position with the Department in 1995, appointed to a Deputy Commissioner position in the Department in 1997, and appointed to a Managing Deputy Commissioner in the Department of Buildings in 2003. (Pl. Resp. 56.1 ¶ 71; Allen Resp. 56.1 ¶ 8; City Defs. Resp. 56.1 ¶ 8.) As a Managing Deputy Commissioner under Kaderbek, Kozicki had the daily responsibility of ensuring the performance of inspections. (Pl. Resp. 56.1 ¶ 71.) In 2006, Kozicki became a Deputy Commissioner in the City's Department of Planning and Development. (*Id.*)

*Dan Allen*

Allen is the Chief Electrical Inspector of the EB Department and began working in the EB Department in 1980.[FN3] (Pl. Resp. 56.1 ¶ 4.) Prior to joining the EB Department, he had never been employed as a paid mechanic electrician. (Allen Resp. 56.1 ¶ 5; City Defs. Resp. 56.1 ¶ 5; Pl. 56.1 Resp., Ex. 8, Allen Dep. 21-26.) Allen subsequently applied for and was promoted to supervising electrical inspector in 2000 and to his current position in October 2003. (Pl. Resp. 56.1 ¶ 4.)

> FN3. At the time of Allen's hiring, his brother-in-law, Cullerton, held the Chief Electrical Inspector position. (Allen Resp. 56.1 ¶ 5; City Defs. Resp. 56.1 ¶ 5; Pl. 56.1 Resp. Ex. 10, Allen Dep. 60.)

**\*3** Allen is the brother of 38th Ward Alderman Thomas Allen ("Alderman Allen"). (Allen Resp. 56.1 ¶ 5; City Defs. Resp. 56.1 ¶ 5; Pl. 56.1 Resp. 7; Pl. 56.1 Resp. Ex. 10, Allen Dep. 60.) From 1994 to the present, Sebastian and his wife have received mailings at their home from "Citizens for Tom Allen," an organization that raises money for Alder-

man Allen's political campaigns. (Pl. Resp. 56.1 ¶¶ 6-7; Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. 12, Sebastian Dep. 24-38, 44-47, 221-23.) From 1994 through 2002, Sebastian donated to "Citizens for Tom Allen." (Pl. Resp. 56.1 ¶ 7; Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7.) When Sebastian first donated in 1994, he and Dan Allen were electrical inspectors in the EB Department. (Pl. Resp. 56.1 ¶ 7.)

Sebastian stated that Allen first asked him to provide political contributions to Alderman Allen's political campaigns in 1994 and that Sebastian continued to do so until 2003.[FN4] (Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. 12, Sebastian Dep. 24.) Sebastian further testified that, in 2001, one year after Allen became a supervising electrical inspector, Allen told him that his 2001 contribution to Alderman Allen's campaign was insufficient. (Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. 12, Sebastian Dep. 37-38.) As a result, Sebastian made a second contribution. (Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. 12, Sebastian Dep. 37-38.) In 2002, Sebastian donated to Alderman Allen's campaign and told Allen that he did not want to make any more political contributions to the campaign. (Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. 12, Sebastian Dep. 43-45.) According to Sebastian only, Allen then told Sebastian he was a "cheap Indian." (Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; Pl. 56.1 Resp. Ex. 12, Sebastian Dep. 43-45.) Allen denies the conversation and maintains that he never solicited political contributions from Sebastian or any other City employee. (Allen Resp. 56.1 ¶ 7; City Defs. Resp. 56.1 ¶ 7; City Defs. 56.1 Resp., Allen Aff. ¶ 4.)

> FN4. Allen and the City Defendants argue that Sebastian's testimony regarding Allen's alleged political solicitations and statements directly contradicts his prior statements and, therefore, should be disregarded or stricken. Having considered the cited testimony in the context of Se-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                          Page 5
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

bastian's prior statements, the Court concludes that Sebastian's testimony does not directly contradict his prior statements and create a "sham" issue of fact; rather, Sebastian's statements create an issue of credibility that is best left to the trier of fact. *See Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638-40 (7th Cir.2004).

*2004 Supervising Electrical Inspector Promotion*

According to Kozicki, the Department used the following procedure to fill openings within the EB Department in 2004:(1) bid notices listing the minimum qualifications for the job were posted; (2) interested applicants bid on the job by submitting the required materials to the personnel department; (3) the personnel department determined if a particular candidate was qualified; (4) the Department obtained a list of qualified applicants; (5) the Department configured an interview panel; (6) the interview panel conducted the interviews; (7) the commissioner approved the recommended individuals; (8) the list went back to personnel; and (9) the final hires were sent to main personnel. (Allen Resp. 56.1 ¶ 11; City Defs. Resp. 56.1 ¶ 11; Pl. 56.1 Resp., Ex. 15, Kozicki Dep. 182; Pl. 56.1 Resp., Ex. 20, Kaderbek Dep. 58-59; Allen 56.1 Resp., Ex. I, Kaderbek Dep. 70-75.) In addition, Kaderbek, as Commissioner of the Department, signed a form certifying that, to the best of his understanding, political considerations did not play a role in the hiring decision. (Allen Resp. 56.1 ¶ 11; City Defs. Resp. 56.1 ¶ 11; Pl. 56.1 Resp., Ex. 21, Shakman Referral List/Certification.) Kaderbek retained final decision-making authority for employment decisions made within the Department. (Allen Resp. 56.1 ¶ 11; City Defs. Resp. 56.1 ¶ 11.) He was not, however, authorized to set policies or procedures regarding the hiring and/or firing of City employees and had no role in determining who would be interviewed, which candidates were eligible for interview, or how candidates were evaluated. (Pl. Resp. 56.1 ¶ 81.) The City's Department of Human Resources was responsible for establishing hiring-re-

lated policies and procedures. (*Id.*)

*4 In 2004, the EB Department posted three openings for supervising electrical inspectors. (Pl. Resp. 56.1 ¶ 9.) The minimum qualifications for the position included: (1) successful completion of an approved electrician apprentice training program supplemented by two years of journeyman experience, including one year of electrical inspection experience; (2) considerable knowledge of the laws, codes, and ordinances governing electrical installations; (3) considerable knowledge of the Code. (Pl. Resp. 56.1 ¶ 72.) Duties for the position included: (1) supervising and coordinating work assignments of electrical inspectors to ensure compliance with the building code; (2) supervising the inspection of electrical installation; (3) supervising the issuance of certain notices; (4) meeting with inspectors, contractors, and the public to interpret building code requirements; (5) conducting field inspections to check quality of work; (6) reviewing daily inspection reports; and (7) maintaining records and preparing reports. (*Id.*) Additionally, when the employment decision was governed by IBEW Collective Bargaining Agreement (the "CBA"), section 14.8 of the CBA required the City to "select the most qualified applicant" and, when "applicants [we]re equally qualified," to "select the most senior employee." (Allen Resp. 56.1 ¶ 12; City Defs. Resp. 56.1 ¶ 12; Pl. 56.1 Resp., Ex. 22, CBA.)

At some point after the positions became available, former Building Department Commissioner Norma Reyes appointed John Hammersmith ("Hammersmith") to serve as an Acting Supervisor until the EB Department supervisor positions were permanently filled. (Allen Resp. 56.1 ¶ 14; City Defs. Resp. 56.1 ¶ 14.) Sebastian believed that Mike Reynolds ("Reynolds") acted and served unofficially as an Acting Supervisor during the EB Department's supervisor hiring sequence.[FN5] (Allen Resp. 56.1 ¶ 14; City Defs. Resp. 56.1 ¶ 14; Pl. 56.1 Resp., Ex. 2, Sebastian Dep. 108-13.)

> FN5. The parties also dispute whether Hammersmith and Reynolds made com-

ments indicating that they would be promoted to the permanent supervisor position and whether Hammersmith claimed that the vacant position was his "spot" and that he was "supposed to get" the position. (Allen Resp. 56.1 ¶ 14; City Defs. Resp. 56.1 ¶ 14; Pl. 56.1 Resp., Ex. 25, Gibbons Dep. 108-10; Pl. 56.1 Resp., Ex. 5, Simmons Dep. 63; Pl. 56.1 Resp., Ex. 12, Sebastian Dep. 108-09; City Defs. 56.1 Resp., Ex. M, Hammersmith Dep. ¶ 6; City Defs. 56.1 Resp., Ex. N, Reynolds Dep. ¶ 6.)

Sebastian, for the first time since he began working for the EB Department, applied for the supervising electrical inspector position by submitting an application. (Pl. Resp. 56.1 ¶ 10; Allen Resp. 56.1 ¶ 12; City Defs. Resp. 56.1 ¶ 13.) After submitting his application, Sebastian met with Allen to inform him that he had applied for the position (the "May 2004 conversation"). (Allen Resp. 56.1 ¶ 15; City Defs. Resp. 56.1 ¶ 15.) The parties dispute what occurred during the meeting. According to Sebastian, Sebastian met with Allen to provide him with his credentials for the promotion. (Allen Resp. 56.1 ¶ 15; City Defs. Resp. 56.1 ¶ 15; Pl. 56.1 Resp., Ex. 2, Sebastian Dep. 10-11, 46-49.) The first time Sebastian was deposed, he testified that, after he informed Allen of his qualifications, Allen told him, "Tom, you are Indian. You will never get promoted."(Pl. 56.1 Resp., Ex. 2, Sebastian Dep. 10-11, 48.) Subsequently, the fourth time he was deposed, Sebastian testified that, Allen told him, " 'Tom, you are Indian. You're never going to get promoted because you are not politically involved.' " (City. 56.1, Ex. I, Sebastian Dep. 693-94.)

*5 Allen denies that he met with Sebastian to discuss Sebastian's qualifications and denies that he ever told Sebastian that Sebastian's national origin or political activity would impact his ability to obtain the promotion. According to Allen, Sebastian came to him, informed him that he was applying for the promotion, and told him that Patterson had told

Sebastian that Sebastian was going to be promoted. (Allen Resp. 56.1 ¶ 15; City Defs. Resp. 56.1 ¶ 15; Pl. 56.1 Resp., Ex. 8, 190-94.) Sebastian then laid cancelled checks on Allen's desk and made comments regarding how he had contributed to political funds. (Allen Resp. 56.1 ¶ 15; City Defs. Resp. 56.1 ¶ 15; Pl. 56.1 Resp., Ex. 8, Allen Dep. 190-94.) Allen said that he told Sebastian to pick up the checks, displaying the checks was inappropriate, and that "none of [that] ha[d] anything to do with" who would be promoted. (Allen Resp. 56.1 ¶ 15; City Defs. Resp. 56.1 ¶ 15; Pl. 56.1 Resp., Ex. 8, 190-94.)

On May 23, 2004,[FN6] Sebastian sent a letter regarding his application to Kaderbek, copying Mayor Richard Daley, Sheila O'Grady (identified as Mayor Daley's Chief of Staff), and Alderman Bernard Stone (identified as "Building Committee Chairman"). (Pl. Resp. 56.1 ¶ 10.) In the letter, Sebastian identified himself as a candidate for the promotion, detailed his qualifications, and provided copies of his resume, work commendations, electrical licenses, and credentials. (Allen Resp. 56.1 ¶ 17; City Defs. Resp. 56.1 ¶ 17; Pl. 56.1 Resp., Ex. 27, May 5, 2004 Letter.)

> FN6. In Sebastian's combined response to Defendants' statements of fact, Sebastian admits that he sent the letter on May 23, 2004. In support of this assertion, Defendants cite to Sebastian Deposition Exhibit 31, which is a letter dated May 3, 2004, and to testimony from Sebastian in which he confirms that he sent the letter on or about May 23, 2004. (Pl. 56.1 Resp. ¶ 10; Allen 56. 1, Ex. D, Sebastian Dep. Exs., Ex. 31.) In Allen's and the City Defendants' respective responses to Sebastian's statement of additional facts, Sebastian states and Defendants admit that Sebastian wrote a letter to Kaderbek on May 3, 2004 and ultimately sent it to Kaderbek and others. (Allen Resp. 56.1 ¶ 17; City Defs. Resp. 56.1 ¶ 17.) In support of this state-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

ment, Sebastian cites to a letter that is identical to Sebastian Deposition Exhibit 31. (Pl. 56.1 Resp. 27.) Thus, consistent with Sebastian's testimony, the Court assumes the letter was sent on or about May 23, 2004.

### The Interviews

The City determined that fifteen of the applicants, including Sebastian, Hammersmith, and Reynolds, were eligible for the interview. (Allen Resp. 56.1 ¶ ¶ 13, 28; City Defs. Resp. 56.1 ¶¶ 13, 28.) Kaderbek did not participate in the interview process; instead he delegated the interviews to Kozicki and other bureau chiefs. (Pl. Resp. 56.1 ¶ 80; Allen Resp. 56.1 ¶ 18; City Defs. Resp. 56.1 ¶ 18; Pl. 56.1 Resp., Ex. 20, Kaderbek Dep. 34.) On the evening of July 26, 2004, Kozicki called Allen and informed Allen that he would be participating in the interviews alongside Kozicki. (Pl. Resp. 56.1 ¶¶ 11-12.)

Kaderbek expected Kozicki to use a standard written list of questions for all of the interviews to ensure that the interviews remained impartial. (Allen Resp. 56.1 ¶ 18; City Defs. Resp. 56.1 ¶ 18; Pl. Resp. 56.1, Ex. 20, Kaderbek Dep. 43-47.) At Kozicki's request, Allen prepared a list of eight questions to test the applicants' technical knowledge of the Code and a "quick template" that listed brief answers to the questions (the "Code questions"). (Pl. Resp. 56.1 ¶ 11; Allen Resp. 56.1 ¶ 19; City Defs. Resp. 56.1 ¶ 19.) Allen based the answers on the template solely on his personal knowledge of the Code. (Allen Resp. 56.1 ¶ 19; City Defs. Resp. 56.1 ¶ 19.) The interviews took place on July 27, 2004 and August 3, 2004. (Pl. Resp. 56.1 ¶ 12.) Kozicki and Allen conducted the July 27th interviews, while Kozicki and Kevin Bush ("Bush"), then a Deputy Commissioner in the EB Department, conducted the August 3rd interviews.(Id.) Allen was the only individual on any of the interview panels who had electrical experience or knowledge of the Code. (Def. Allen 56.1 Resp. ¶ 21; City Defs. 56.1

Resp. ¶ 21.) As a result, Kozicki relied on Allen and Bush and asked them how the candidates performed to determine whether the applicants answered the Code questions correctly. (Def. Allen 56.1 Resp. ¶ 21; City Defs. 56.1 Resp. ¶ 21; Pl.Ex. 15, Kozicki Dep. 198-201, 209.)

**\*6** Sebastian was one of eleven candidates interviewed by Kozicki and Allen on July 27. (Pl. Resp. 56.1 ¶¶ 12, 15.) Kozicki first asked each candidate a series of non-technical questions relating to the candidate's qualifications, ideas, and opinions about the Department. (Pl. 56.1 Resp. ¶ 14.) The parties dispute some details regarding the interviews, such as the length of time of each interview, whether the applicants were given the Code questions to review, and whether Kozicki and Allen took notes during all of the interviews. (Allen 56.1 Resp. ¶¶ 22, 24-25; City Defs. 56.1 Resp. ¶¶ 22, 24-25.) They dispute whether Allen asked Sebastian all eight Code questions, whether he asked Sebastian different technical questions as compared to other candidates, and whether he and Kozicki took notes regarding Sebastian's answers. (Def. Allen 56.1 Resp. ¶¶ 24-25; City Defs. 56.1 Resp. ¶¶ 24-25; Sebastian Dep. 57-66, 103-06; Allen 56.1 Resp., Ex. H, Interview Evaluations; Ex. J, George Dep. 23-33.) Sebastian believes that Allen asked him different questions than those included on the Code questions list. (Def. Allen 56.1 Resp. ¶ 25; City Defs. 56.1 Resp. ¶ 25; Sebastian Dep. 103-06.) Allen told Kozicki that Sebastian provided incorrect answers to a few of the Code questions. (Allen Resp. 56.1 ¶ 27; City Defs. Resp. 56.1 ¶ 27.) Kozicki and Allen did not ask Sebastian any questions regarding his political activities or lack thereof during the interview. (Pl. Resp. 56.1 ¶ 79.)

Kozicki formulated his own opinions and then held a meeting with Bush and Allen during which the three men discussed their opinions and came to a conclusion as to who the best candidates were. (Def. Allen Resp. 56.1 ¶ 26; Def. City Defs. Resp. 56.1 ¶ 26; Pl. 56.1 Ex. 15, Kozicki Dep. 194-96, 247-52.) Kozicki then rated the candidates. (Pl.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 8
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

56.1 Ex. 15, Kozicki Dep. 194-96, 247-52.) Allen denies that he attended the meeting. (Pl. 56.1 Resp. ¶ 16.) Allen says that he completed his score sheets immediately after they completed the interviews on July 27, 2004 and never met with Kozicki, Kaderbek or Bush regarding the scoring. (*Id.*)

The three interviewers used standardized forms to rate the candidates for the supervisor position on a scale of one through five in the following four categories: (1) training; (2) experience; (3) communication skills; and (4) technical knowledge. (Pl. Resp. 56.1 ¶ 13.) Each category was to be equally weighted. (Pl. Resp. 56.1 ¶ 13; City Defs. Resp. 56.1 ¶ 18; Allen 56. 1, Ex. H.) While the interviewers for the 2004 supervisor promotions could have looked at "anything" when evaluating the candidates, they did not review the candidates' applications or disciplinary histories. (City Defs. 56.1 Resp. ¶ 26; Allen 56.1 Resp. ¶ 26.)

Of the eleven candidates interviewed on July 27, 2004, Allen evaluated Sebastian at an overall average score of 2.75, which placed Sebastian eleventh out of the eleven candidates interviewed on that date. (Pl. 56.1 Resp. ¶ 15.) Kozicki evaluated Sebastian at an overall average score of 3.25, placing him at a tie for eighth out of the eleven people interviewed on July 27, 2004 and tenth out of the fifteen total candidates. (*Id.*) Bush did not interview Sebastian or any of the three successful candidates. (Pl. Resp. 56.1 ¶ 18.) Ultimately, when the scores were tallied and averaged, Sebastian tied with three other candidates for the lowest average score of 3.0. (*Id.*)

*7 Allen and Kozicki had each ranked the three successful candidates-Reynolds, Hammersmith, and Keith Hall ("Hall")-as first, second, and third. (Def. Allen Resp. 56.1 ¶ 28; Def. City Defs. Resp. 56.1 ¶ 28; Pl. 56.1 Resp. ¶ 18.) The three individuals received the three highest scores and, ultimately, the promotion. (Def. Allen Resp. 56.1 ¶ 28; Def. City Defs. Resp. 56.1 ¶ 28.) While Kozicki, Allen, and Bush gave different technical ability scores for more than half of the unsuccessful candidates, Ko-

zicki and Allen both gave Hammersmith, Reynolds, and Hall perfect "5" ratings for technical knowledge. (Allen Resp. 56.1 ¶ 27; City Defs. Resp. 56.1 ¶ 27; Allen 56.1 Resp., Ex. H.) Allen gave Sebastian a score of "2" on the technical knowledge portion. (Allen Resp. 56.1 ¶ 27; City Defs. Resp. 56.1 ¶ 27; Allen 56.1 Resp., Ex. H.)

Kaderbek approved the 2004 promotions, relying on the recommendations of the individuals who interviewed the candidates. (Pl. 56.1 Resp. ¶ 80.) Typically, Kaderbek would review the documents in the packet as well as the numerical ratings and identify the three candidates with the highest average scores. (Pl. Resp. 56.1 ¶ 17; Allen 56.1 Resp., Ex. I, Kaderbek Dep. 70-73.) Kaderbek would then sign, date, and send a referral list and final employment decision form to Mary Ann Ciaravino [FN7] ("Ciaravino"). (Pl. Resp. 56.1 ¶ 17; Allen 56.1 Resp., Ex. I, Kaderbek Dep. 70-85.) Upon receipt of this form, Ciaravino would generate letters informing the candidates whether or not they had been selected. (Allen 56.1 Resp., Ex. I, Kaderbek Dep. 78-79.) On or about August 19, Kozicki gave Ciaravino a document that listed the numerical scoring results from the July 27 and August 3 interviews. (Allen Resp. 56.1 ¶ 28; City Defs. Resp. 56.1 ¶ 28.) The referral list and final employment decision form that Kaderbek gave to Ciaravino also noted a date of August 19, 2004 next to Kaderbek's signature. (Allen 56.1 Resp., Ex. I, Kaderbek Dep. 85-86, Kaderbek Dep. Ex. 5.) While Kaderbek speculated that he gave the referral list and final employment decision form to Ciaravino on August 19, 2004, he also testified that the date did not appear to be in his handwriting and he had no reason-one way or another-to doubt the accuracy of the date. (Allen 56.1 Resp., Ex. I, Kaderbek Dep. 85-86, Kaderbek Dep. Ex. 5; City Defs. 56.1 Resp, Ex. T, Kaderbek Dep. 223-25.) However, the letters notifying Hammersmith, Hall, and Reynolds that they received the supervisor promotion, which were signed by Kaderbek, are dated August 18, 2004. (Allen Resp. 56.1 ¶ 28; City Defs. Resp. 56.1 ¶ 28; Pl. 56.1 Resp., Ex. 33, Supervisor Promotion Let-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

Page 9

ters.) Ciaravino asserted her Fifth Amendment right when asked whether "the letters, advising Mr. Reynolds, Hammersmith and Hall that they were getting the job, went out a day before Mr. Kozicki ever gave you the scores and the results from the interviews for these jobs isn't that right?"(Allen 56.1 Resp. ¶ 29; City Defs. 56.1 Resp. ¶ 29.) Allen had no communication with Ciaravino regarding the 2004 supervisor promotions. (Pl. 56.1 Resp. ¶ 16.)

> FN7. The parties dispute whether Ciaravino occupied the role of Director of Personnel or Director of Administration for the Department. (City Defs. 56.1 Resp. ¶ 30; Allen 56.1 Resp. ¶ 30.) In their Rule 26(a)(1)(a) disclosure, the City Defendants initially identified Ciaravino as an individual who likely possessed "knowledge regarding the procedures followed in filling open positions, including those sought by Sebastian."(City Defs. 56.1 Resp. ¶ 30; Allen 56.1 Resp. ¶ 30.) Allen subsequently adopted this disclosure by reference. (City Defs. 56.1 Resp. ¶ 30; Allen 56.1 Resp. ¶ 30.) At her deposition, Ciaravino asserted her Fifth Amendment right against self incrimination and refused to answer any substantive questions posed to her about the procedures followed in filling open positions within the Department and the specific promotion decisions at issue in the current action. (City Defs. 56.1 Resp. ¶ 30; Allen 56.1 Resp. ¶ 30.) Ciaravino was granted immunity to testify in the *United States v. Sorich* criminal trial. (City Defs. 56.1 Resp. ¶ 30; Allen 56.1 Resp. ¶ 30.)

*Defendants' Scoring Explanations*

**\*8** In his deposition, Kozicki explained that he sought someone with knowledge of the Code who could "handle themselves well on their feet," handle pressure and stress, communicate well with

the inspectors, and "get things done" in a "very high stressed environment" and "a difficult job." (Pl. Resp. 56.1 ¶ 73.) He did not look at any of the candidates' discipline files.(*Id.*) Kozicki said that Sebastian "did a very poor job in the interview" and answered questions poorly. (Pl. Resp. 56.1 ¶ 74.) Kozicki knew that Sebastian was a sign inspector and believed that "the perception in the [D]epartment" was that sign inspectors were not considered to be as "good" as general electrical inspectors. (*Id.*) In contrast, Kozicki testified that, among other things: (1) Hall interviewed well; (2) Kozicki believed that Hammersmith was a hard worker, Hammersmith was familiar with all of the aspects of the departments because he had worked in three different bureaus, and others within the Department thought well of him; and (3) Reynolds "[g]ave an excellent interview," "handled himself well," used examples well during the interview, had years of experience in management, and had done an excellent job in the Certificate of Occupancy unit. (Pl. Resp. 56.1 ¶ 75.)

Allen stated that he rated each candidate in terms of training, experience, communication skills, and technical knowledge. (Pl. Resp. 56.1 ¶ 76.) He took into account the responsiveness and quality of each candidate's responses to the non-technical questions and the accuracy of their responses to the technical questions. (*Id.*) Because the successful candidates would be reporting directly to him, he was mindful of each candidate's ideas about improving the Department and ability to efficiently lead and manage the inspectors. (*Id.*) Allen stated that Sebastian answered some of the technical questions incorrectly and did not "respond directly and fully to several technical questions" or provide concrete examples of his experiences with and ideas for the Department, although he was specifically asked to do so. (Pl. Resp. 56.1 ¶ 77.)

In contrast, Allen stated that Hammersmith, Reynolds, and Hall performed better than Sebastian during their respective interviews. (Pl. Resp. 56.1 ¶ 78.) According to Allen, the other candidates inter-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                  Page 10
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
(Cite as: 2008 WL 2875255 (N.D.Ill.))

acted with the interviewers and conveyed their ideas for the Department. (*Id.*) Based on their performance, Allen believed that Hammersmith, Hall, and Reynolds would be better able to understand Department operations on a larger scale and to manage other employees, as compared to Sebastian. (*Id.*)

### The Promoted Individuals

Shortly before his promotion, Hammersmith worked as an electrical inspector in the Certificate of Occupancy team task force.[FN8] (Allen 56.1 Resp. ¶ 31; City Defs. 56.1 Resp. ¶ 31.) In either the late 1970's or early 1980's, Hammersmith took, but did not pass, the Supervising Electrician's License Code exam. (Allen 56.1 Resp. ¶ 31; City Defs. 56.1 Resp. ¶ 31; City Defs. 56.1 Resp., Ex. B, Hammersmith Dep. 131.) Hammersmith has not attempted to obtain a license because he believes it is a "conflict of interest" to hold the license and work for the EB Department. (City Defs. 56.1 Resp., Ex. B, Hammersmith Dep. 131.)

> FN8. In his statement of additional facts, Sebastian asserts that Hammersmith "did not work in the more complicated plan review function nor sign inspections."(City Def. 56.1 Resp. ¶ 31; Allen 56.1 Resp. ¶ 31.) In support of this statement, Sebastian cites to Hammersmith's 2004 bid application as well as Sebastian's own belief regarding Hammersmith's prior experience. (*Id.*) Neither source properly supports his assertion. Hammersmith's bid application provides no indication that Hammersmith had not previously performed these tasks. (Pl. 56.1 Resp., Ex. 37, Hammersmith Bid Application.) Further, Sebastian has failed to lay the proper foundation to establish that he had the requisite personal or firsthand knowledge. *See* Fed.R.Evid. 602. Thus, the Court will not consider this assertion, or any other fact based on similarly deficient evidence, for the purposes of

summary judgment.

*9 Hammersmith grew up in "the same area" as Allen's family. (Allen 56.1 Resp. ¶ 32; City Defs. 56.1 Resp. ¶ 32; Pl. 56.1 Resp., Ex. 24, Hammersmith Dep. 88-89; City Defs. 56.1 Resp., Ex. M, Hammersmith Dep. ¶ 4.) Hammersmith met Alderman Allen for the first time at a party some time between 2004 and 2006. (Allen 56.1 Resp. ¶ 32; City Defs. 56.1 Resp. ¶ 32; Pl. 56.1 Resp., Ex. 24, Hammersmith Dep. 88-89.) Hammersmith has a long history of performing political work for Alderman Allen's campaigns, Allen's former alderman father-in-law, and certain candidates endorsed by the Local 134 electrician's union. (Allen 56.1 Resp. ¶ 32; City Defs. 56.1 Resp. ¶ 32; Pl. 56.1 Resp., Ex. 24, Hammersmith Dep. 8-16, 88-92.) Hammersmith has signed petitions, contributed money, put campaign signs on his lawn, walked in parades, and walked picket lines. (Allen 56.1 Resp. ¶ 32; City Defs. 56.1 Resp. ¶ 32.) With respect to Alderman Allen specifically, Hammersmith has passed out literature, signed petitions, worked the polls, and gone door to door. (Allen 56.1 Resp. ¶ 32; City Defs. 56.1 Resp. ¶ 32; Pl.Ex. 24, Hammersmith Dep. 87-91.)

Reynolds joined the City in 2000 and worked in the Certificate of Occupancy unit until shortly before his promotion. (Allen 56.1 Resp. ¶ 33; City Defs. 56.1 Resp. ¶ 33.) Reynolds grew up in the same neighborhood as State Representative Kevin Joyce, son of Jeremiah Joyce, and has known him since the 1970's. (Allen 56.1 Resp. ¶ 34; City Defs. 56.1 Resp. ¶ 34; Pl. 56.1 Resp., Ex. 30, Reynolds Dep. 261-62.) According to Sebastian, Jeremiah Joyce works as a political strategist for Mayor Daley. (Pl. 56.1 Resp., Ex. 12, Sebastian Dep. 52.) Reynolds began his political activity in 2002. (Allen 56.1 Resp. ¶ 34; City Defs. 56.1 Resp. ¶ 34.) In Fall 2005, Reynolds became a precinct captain for the 19th Ward. (Allen 56.1 Resp. ¶ 34; City Defs. 56.1 Resp. ¶ 34; Pl. 56.1 Resp., Ex. 30, Reynolds Dep. 270.) Reynolds was responsible for "get[ting] the vote out" in his precinct and working for the can-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

Page 11

didates endorsed by the 19th Ward. (Allen 56.1 Resp. ¶ 34; City Defs. 56.1 Resp. ¶ 34; Pl. 56.1 Resp., Ex. 30, Reynolds Dep. 263, 286.) In 2006, Reynolds coordinated the South Side Irish parade. (Allen 56.1 Resp. ¶ 34; City Defs. 56.1 Resp. ¶ 34.)

Hall is an ordained associate minister at the Apostolic Faith Church in Chicago. (Allen 56.1 Resp. ¶ 35; City Defs. 56.1 Resp. ¶ 35; Pl. 56.1 Resp., Hall Dep. 270.) Hall testified that there have been a few occasions when elected officials have been in attendance at the church. (Allen 56.1 Resp. ¶ 35; City Defs. 56.1 Resp. ¶ 35; Pl. 56.1 Resp., Hall Dep. 270-72.) Specifically, Hall recalled that State Senator Barack Obama attended a church service "a number of years ago" (before becoming a senator), as did Alderwoman Dorothy Tillman at some point. (Allen 56.1 Resp. ¶ 35; City Defs. 56.1 Resp. ¶ 35; Pl. 56.1 Resp., Hall Dep. 270-72; Allen 56.1, Ex. JJ 406-07.) In addition, while a number of Local 134 electricians (fewer than ten) have attended his church, Hall is not aware of any Department employees who have been in attendance. (Allen 56.1 Resp. ¶ 35; City Defs. 56.1 Resp. ¶ 35; Pl. 56.1 Resp., Hall Dep. 316-17.) In the mid-90's, Hall volunteered to do some political work, which included knocking on doors and handing out flyers, for a candidate named "Lightfoot." (Allen 56.1 Resp. ¶ 35; City Defs. 56.1 Resp. ¶ 35; Pl. 56.1 Resp., Hall Dep. 262, 264.) Hall took the Supervising Electrician's License Code exam on one occasion, but did not pass. (Allen 56.1 Resp. ¶ 37; City Defs. 56.1 Resp. ¶ 37; Pl. 56.1 Resp., Ex. 3, Hall Dep. 344-45.)

**\*10** Sebastian previously provided Hall with a training (lasting no more than one day) regarding sign inspections. (Allen 56.1 Resp. ¶ 38; City Defs. 56.1 Resp. ¶ 38; Pl. 56.1 Resp., Ex. 2, Sebastian Dep. 160-61.) Sebastian also claims that he trained Hammersmith, Reynolds, and Allen; the City denies this. (Allen 56.1 Resp. ¶ 38; City Defs. 56.1 Resp. ¶ 38; Pl. 56.1 Resp., Ex.4, Bailey Dep. 90-92; City Defs. 56.1 Resp., Ex. J, Allen Dep. 100; City Defs. 56.1 Resp., Ex. M, Hammersmith Aff. ¶ 12;

City Defs. 56.1 Resp., Ex. N, Reynolds Aff. ¶ 9.)

*Sebastian's EEOC Charge and Subsequent Events*

On August 24, 2004, Sebastian was notified that he did not receive the supervising electrical inspector position. (Pl. 56.1 Resp. ¶ 21; Allen 56.1, Ex. E, Sebastian Dep. Ex. 37.) Two days later, on August 26, he sent a letter to Michael Fitzgerald ("Fitzgerald"), identified as a business manager for IBEW, requesting to file a grievance and alleging that he had been discriminated against on account of his national origin because he had not been promoted. (Pl. 56.1 Resp. ¶ 22; Allen 56. 1, Ex. E, Sebastian Dep. Ex. 38.) Sebastian copied Michael Nugent ("Nugent") (identified as an IBEW business agent) and Gary Parks ("Parks") (identified as an IBEW union steward) on the letter. (Pl. 56.1 Resp. ¶ 22; Allen 56. 1, Ex. E, Sebastian Dep. Ex. 38.)

On August 30, 2004, Sebastian sent a letter to Kaderbek-with copies to Mayor Richard Daley, Sheila O'Grady, Gene Lee ("Lee") (identified as Mayor Daley's Deputy Chief of Staff), Alderman Bernard Stone (identified as Buildings Committee Chairman), Ciaravino, and the IBEW-alleging that he had not been promoted because he was Asian American. (Pl. 56.1 Resp. ¶ 23; Allen 56. 1, Ex. E, Sebastian Dep. Ex. 39.) In response, Lee contacted and subsequently met with Sebastian. (Pl. 56.1 Resp. ¶ 24.) During the meeting, the two discussed Sebastian's qualifications and Sebastian voiced his concerns that he had been discriminated against on account of his national origin. (Pl. 56.1 Resp. ¶ 24; Allen 56.1, Ex. A, Sebastian Dep. 118-22.)

On September 8, 2004, Sebastian informed Allen that he planned to file a union grievance regarding his failure to be promoted. (Pl. 56.1 Resp. ¶ 22.) Allen encouraged him to do so. (*Id.*) With Parks's assistance, Sebastian prepared a formal union grievance, which he filed on September 10, 2004. (*Id.*) After the grievance was processed and denied, the union declined its option under the CBA to pursue arbitration. (*Id.*)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                           Page 12
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
(Cite as: 2008 WL 2875255 (N.D.Ill.))

*Alleged Retaliation*

On September 17, 2004, Sebastian filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that he had been denied a promotion on the basis of his race (Asian) and national origin (Indian) ("EEOC charge"). (Pl. 56.1 Resp. ¶ 25.) Sebastian claims that, subsequent to the EEOC charge and as a result of this charge (as well as his April 2005 lawsuit), the City engaged in a number of retaliatory acts. The following is a timeline of the events that occurred subsequent to the filing of his EEOC charge, placing the alleged retaliatory acts in the context of the EEOC investigation as well as the progression of his lawsuit.

*11 On September 29, 2004, Scott Loeff ("Loeff"), the City's Assistant Commissioner of Labor Relations, sent the EEOC charge to Kozicki via email and copied Kaderbek. (City Defs. 56.1 Resp. ¶ 71; Allen 56.1 Resp. ¶ 71; (Pl. 56.1 Resp. ¶ 45; Pl. 56.1 Resp., Ex. 51, Kozicki Sept. 29, 2004 E-mail; City Defs. 56.1 Resp., Ex. FF, Loeff Aff. ¶ 3.) Nine days later, on October 8, 2004, Allen assigned Sebastian to work on the strategic task force ("STF") for the first time.[FN9] (City Defs. 56.1 Resp. ¶ 71; Allen 56.1 Resp. ¶ 71; Pl. 56.1 Resp. ¶ 35.) STF was one of several projects in which electrical and other types of inspectors in the Department were assigned as a team to complete field inspections of different classes of buildings. (Pl. 56.1 Resp. ¶ 34.) The teams often went to dangerous areas in the City and, when necessary, were accompanied by armed police officers. (City Defs. 56.1 Resp. ¶ 72; Allen 56.1 Resp. ¶ 72.) While some electrical inspectors considered STF work safer than solo field inspections because they worked with a team and police escorts, others considered the work dangerous and a punishment. (City Defs. 56.1 Resp. ¶ 72; Allen 56.1 Resp. ¶ 72; Pl. 56.1 Resp., Ex. 5, Simmons Dep. 188-89; Pl. 56.1 Resp., Ex. 52, Browning Dep. 28-29; City Defs. 56.1 Resp., Ex. AA, Simmons Dep. 86-87; City Defs. 56.1 Resp., Ex. G, Cunningham Aff. ¶ 11, Gallagher Aff. ¶ 12, Podbielski Aff.

¶ 12.)

> FN9. In their respective responses to Sebastian's statement of additional facts, Allen and the City Defendants deny that this was Sebastian's first STF assignment. Defendants affirmatively assert that Sebastian previously worked "court case team inspection[s]" at an unspecified time and that this type of inspection is a function of STF. (City Defs. 56.1 Resp. ¶ 71; Allen 56.1 Resp. ¶ 71.) In support of the latter assertion, Defendants cite to the deposition of Steven Browning ("Browning"), in which Browning explained that, in an unspecified time frame, STF had a "court team." (City Defs. 56.1 Resp., Ex. CC, Browning Dep. 77.) Defendants provide no evidence to support the proposition that the "court case team inspection" performed by Sebastian was performed in conjunction with the "court team" that the STF maintained during the unspecified time frame discussed by Browning. Thus, the Court deems this fact admitted for the purposes of summary judgment. *See* L.R. 56.1.

On January 12, 2005, EEOC investigator Joshua George ("George") conducted a phone interview with Sebastian regarding the EEOC charge. (Pl. 56.1 Resp. ¶¶ 26-28; Allen 56.1, Ex. J, George Dep. 21-33.) During the interview, Sebastian admitted to giving certain answers contained in Allen's notes. (Pl. 56.1 Resp. ¶ 28; Allen 56. 1, Ex. J, George Dep. 21-33.)

On April 8, 2005, Sebastian filed his original complaint in the United States District Court for the Northern District of Illinois, alleging race and national origin discrimination[FN10] (the "First Complaint"). (Pl. 56.1 Resp. ¶ 30.)

> FN10. This case was originally assigned to another district court judge, but was transferred to this Court as part of its Initial Calendar.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                      Page 13
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

Over two months later, on June 15, 2005, Sebastian attended a predisciplinary hearing with Nugent, Loeff, Hall, and Allen regarding Sebastian's failure to report to work on June 10, 2005, a day he was assigned to work STF ("June 2005 predisciplinary hearing"). (Pl. 56.1 Resp. ¶ 45.) Because Sebastian produced evidence that he had visited a doctor on June 10, Loeff determined that no violation of City policy had been established. (*Id.*) Sebastian did not receive a reprimand or other sanction as a result of the incident. (*Id.*)

On July 1, 2005, the last work day preceding the Independence Day holiday in 2005, Sebastian worked a "skeleton crew" shift from 2:00 p.m. to 3:30 p.m. (City Defs. 56.1 Resp. ¶ 82; Allen 56.1 Resp. ¶ 82; Pl. 56.1 Resp. 46.) The "skeleton crew" is a group of employees that remains at work for approximately one to one and one-half hours (to finish a normal work day) when the City grants early dismissal to a majority of the employees on days preceding major holidays. (Pl. 56.1 Resp. ¶ 46.) Sebastian claims he was assigned to work the shift by Allen; Allen claims he volunteered. (City Defs. 56.1 Resp. ¶ 82; Allen 56.1 Resp. ¶ 82; City Defs. Ex. V, Reynolds Dep. 218-19; Pl. 56.1 Resp., Ex. 12, 126-30.) Non-supervisory EB Department inspectors Cheryl Palombizio ("Palombizio"), Dan Lynch, and Tom Podbielski worked the skeleton crew shift on the preceding Christmas Eve 2003, New Year's Eve 2003, and July 4, 2004, respectively.[FN11] (Pl. 56.1 Resp. ¶ 46.)

> FN11. In his 56.1(b)(3)(B) Statement of Facts, Sebastian submits that he was the only non-supervisory employee assigned to work the skeleton crew since Allen became Chief Electrical Inspector. (City Defs. 56.1 Resp. ¶ 82; Allen Defs. 56.1 Resp. ¶ 82.) This proposition is not supported by Sebastian's citation to the record, which indicates that three non-supervisory employees were assigned to "skeleton crew" from the time Allen became Chief Electrical Inspector in October 2003. Thus, the Court

will not consider this statement. *See* L..R. 56.1.

**\*12** According to the Department's general rules, sign inspectors are permitted to spend only one day each week in the Department's offices and must spend the remaining four days in the field conducting inspections. (Pl. 56.1 Resp. ¶ 48.) At some point in October 2005, Hammersmith approached Sebastian and instructed Sebastian to leave the office to begin his field work. (Pl. 56.1 Resp. ¶ 49.) Sebastian told Hammersmith that he needed another thirty minutes to complete his paperwork, which Hammersmith permitted. (*Id.*)

In late 2005 or early 2006, Sebastian attended an informal meeting with Bush, Hall, and Allen regarding an incident in which Hall had informed Sebastian that Sebastian was assigned to STF the following day and Sebastian responded that he could not work STF because he was taking a sick day for a doctor's appointment. (Pl. 56.1 Resp. ¶ 52.) Sebastian did not submit a sick time request slip for the doctor's appointment prior to advising Hall that he could not work STF because he was taking the day off. (*Id.*) No discipline resulted from the incident. (*Id.*)

At some point in 2006, Hall approached Sebastian when Sebastian was in the office for his second day in one week and instructed Sebastian to report to work in the field. (Pl. 56.1 Resp. ¶ 50.) When Sebastian told Hall that he had paperwork to complete, Hall allowed him to stay in the office with the understanding that the day would be Sebastian's last office day for the week. (*Id.*)

From October 2004 until April 2006, Sebastian, as well as other electrical inspectors, were periodically assigned to work STF on several occasions. (Pl. 56.1 Resp. ¶ 36.) At some point during the interim, Sebastian complained to Allen that sign inspectors with less seniority should be assigned to work STF. (*Id.*) As a result, Allen assigned two less-senior sign inspectors-Bernard Simmons and Glenn Ford-to work on STF in rotation with Sebastian. (*Id.*)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

On January 10, 2006 at 9:05 a.m., Allen directed Hall to assign Sebastian to STF that day because the permanently assigned STF inspector was unavailable to work. (City Defs. 56.1 Resp. ¶ 73; Allen 56.1 Resp. ¶ 73.) Approximately two months later, on March 7, 2006, Allen sent an email to EB supervisors requesting that they select an inspector to work STF the following day. (City Defs. 56.1 Resp. ¶ 74; Allen 56.1 Resp. ¶ 74.) Sebastian was selected and the parties dispute how he was selected. (City Defs. 56.1 Resp. ¶ 74; Allen 56.1 Resp. ¶ 74; Allen 56.1 Resp., Ex. B, Sebastian Dep. 164; City Defs. 56.1 Resp., Ex. B, Allen Aff. ¶ 8.)

On March 22, 2006, this Court granted Sebastian leave to file an amended complaint in which he alleged, for the first time, that the City retaliated against him in violation of Title VII by, among other things, assigning him to STF. (City Defs. 56.1 Resp. ¶ 75; Allen 56.1 Resp. ¶ 75.) On April 7, 2006, Allen issued a memorandum in which he first announced that the EB would rotate inspectors to perform STF inspections. (City Defs. 56.1 Resp. ¶ 75; Allen 56.1 Resp. ¶ 75.) According to the rotating schedule, inspectors from all bureaus and assignments in the Department would work STF in two-week shifts. (Pl. 56.1 Resp. ¶ 37.) Sebastian admitted that, from the time that he complained to Allen about the lack of less-senior inspectors assigned to STF through April 2006, Allen rotated sign inspectors, but not other inspectors, on the STF assignment.[FN12] (City Defs. 56.1 Resp. ¶ 75; Allen 56.1 Resp. ¶ 75; Allen 56.1 Resp., Ex. B, Sebastian Dep. 148-52.)

> FN12. In his 56. 1(b)(3)(B) Statement of Facts, Sebastian submits that, "[n]o electrical inspector who interviewed for the supervisor position-excluding Martin Willis who was permanently assigned to STF-was assigned to work more STF inspections than Sebastian." (City Defs. 56.1 Resp. ¶ 76; Allen 56.1 Resp. ¶ 76.) In support of this statement, Sebastian cites to his own affidavit, in which he states that he has re-

viewed the EB Department STF time sheets produced by the City as well as his time sheets. (Pl. 56.1 Resp., Ex. 76, Sebastian Aff. ¶ 1.) Attached to affidavit as "Exhibit A" is a chart, presumably created by Sebastian, that allegedly lists the number of STF days worked by all of the 2004 supervisor candidates, as reflected in the time sheets produced by the City. (Pl. 56.1 Resp., Ex. 76, Sebastian Aff. ¶ 2, Ex. A.) Sebastian has failed to lay a proper foundation as to the admissibility of the documents upon which the chart is allegedly based or to show that the summary is accurate. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec,* Nos. 07-1660, 07-2116, 2008 U.S.App. LEXIS 11771, at *21 (7th Cir. June 3, 2008) (*quoting United States v. Briscoe,* 896 F.2d 1476, 1495 (7th Cir.1990)) ("The admission of a summary under Fed.R.Evid. 1006 requires 'a proper foundation as to the admissibility of the material that is summarized and ... [a showing] that the summary is accurate.' ").

**\*13** On April 14, 2006, Sebastian filed a First Amended Complaint, alleging race and national origin discrimination, retaliation, and violation of Sebastian's First Amendment right to freedom of association. (Pl. 56.1 Resp. ¶ 31; First Am. Compl.)

In November 2006, Sebastian requested to change an office day from Friday to Thursday. (Pl. 56.1 Resp. ¶ 50.) While Hall refused his request, he allowed Sebastian to take compensatory time off from work on the Friday at issue.(*Id.*)

For the purposes of assigning sign inspections, the Department divides the area within the City limits into thirty-nine districts. (Pl. 56.1 Resp. ¶ 60.) Each sign inspector in the Department covers several districts. (*Id.*) In late 2006 or early 2007, Hall advised Sebastian to cover a new district because Palombizio began performing sign inspections in District 4, a district that both Sebastian and Palombizio had

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

covered in the past. (*Id.*)

On or about February 15, 2007, Tom Ryan, a supervisor in the Department, shouted at Sebastian and told Sebastian as well as EB Department inspector Don Gibson ("Gibson") that they should not discuss "personal matters" during work time. (Pl. 56.1 Resp. ¶ 65.)

On February 22, 2007, Sebastian attended an informal meeting with Hall and Allen, where he received a verbal warning regarding the length of time it took for him to respond to a February 5, 2007 call on his mobile work phone. (Pl. 56.1 Resp. ¶ 61.) The parties dispute whether Hall had the authority to issue this verbal warning. (City Defs. 56.1 Resp. ¶ 79; Allen 56.1 Resp. ¶ 79.) Nevertheless, Allen, rather than Hall, gave the verbal warning. (City Defs. 56.1 Resp. ¶ 79; Allen 56.1 Resp. ¶ 79.) On February 23, 2007, Sebastian wrote a letter to Allen, copying several others, regarding the verbal warning. (Pl. 56.1 Resp. ¶ 61.) In the letter, Sebastian asked Allen to obtain the phone records regarding the timing of when Sebastian received and responded to Hall's calls.[FN13] (City Defs. 56.1 Resp. ¶ 78; Allen 56.1 Resp. ¶ 78; Pl. 56.1 Resp., Ex. 61, Sebastian Feb. 23, 2007 Letter.) Sebastian did not lose any compensation, assignments, or employment opportunities as a result of this incident or the verbal warning. (Pl. 56.1 Resp. ¶ 61.)

> FN13. Sebastian further maintains that Allen never asked Hall to verify the timing, nor did he obtain the phone records. Sebastian fails to support this proposition with a citation to the record and, therefore, the Court will not consider the statement. The Court further notes that, in their respective responses to Sebastian's statement of facts, Defendants denied that Allen never asked Hall to substantiate the timing and, citing to affidavits by Allen and Loeff, affirmatively stated that Allen forwarded Sebastian's request to Loeff, who subsequently obtained the phone records and confirmed Sebastian's delayed response. (City Defs. 56.1 Resp. ¶ 79; Allen 56.1 Resp. ¶ 79.) Sebastian then countered with arguments as to why Loeff's investigation provides further evidence of retaliation (namely, a statement from Sebastian's attorney during Loeff's deposition that Defendants never produced any such phone records). (Pl. Sur-response Mem. 13-14.) In light of the Court's conclusion not to consider Sebastian's unsupported assertion that Hall did not fulfill Sebastian's request for verification and resulting failure to create a dispute of fact, the Court need not and will not consider the additional extrinsic evidence submitted by the parties in support of their respective positions.

On the afternoon of March 15, 2007, Hall received an emergency call regarding a dangerous sign flapping from a high rise (the "March 15, 2007 incident"). (Pl. 56.1 Resp. ¶ 62.) Hall called Sebastian, who was in the field, and asked him to investigate the sign immediately.[FN14] (*Id.*) According to Hammersmith, in an emergency situation, they "may" pull the inspector closest to the area to respond. (City Defs. 56.1 Resp. ¶ 80; Allen 56.1 Resp. ¶ 80; Pl. 56.1 Resp., Ex. 24, Hammersmith Dep. 75.) Sebastian went to the scene, communicated with Hall over his radio, left the scene, and clocked out at approximately 3:47 p.m. (Pl. 56.1 Resp. ¶ 62.) Seeking further information regarding the state of the emergency situation, Hall called Sebastian at approximately 5:00 p.m. (*Id.*) The next morning, Hall requested that Sebastian prepare a report regarding the emergency situation. (Pl. 56.1 Resp. ¶ 63.) After Sebastian prepared the report, Allen called Sebastian to a meeting with Bush and Hall, where he was questioned regarding details not contained in the report. (Pl. 56.1 Resp. ¶ 63; Allen 56.1 Resp., Ex. C, Sebastian Dep. 337-38.) On March 19, 2007, Sebastian wrote a letter regarding the March 15, 2007 incident[FN15] to Jamia McDonald, the acting Commissioner of the Department, copying several others. (Pl. 56.1 Resp. ¶ 63.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

Page 16

FN14. In his 56.1(b)(3)(B) Statement of Facts, Sebastian submits that, when Hall dispatched Sebastian to the emergency, there were at least five other inspectors who were positioned closer than Sebastian to the scene of the emergency and could have attend the emergency. (City Defs. 56.1 Resp. ¶ 80; Allen 56.1 Resp. ¶ 80.) In support of this proposition, Sebastian cites to his own affidavit, in which he states that he reviewed the time sheets for March 15, 2007 and arrived at this conclusion. (Pl. 56.1 Resp., Ex. 75, Sebastian Aff. ¶ 3.) While Sebastian also includes a copy of the five electrical inspectors' time sheets as an exhibit to the affidavit, his testimony is based entirely upon hearsay rather than his own personal knowledge. Because Sebastian has failed to lay a proper foundation to establish the admissibility of the documents relied upon, the Court strikes this statement.

FN15. The parties do not include any additional details regarding the March 15, 2007 incident in their Local Rule 56.1 submissions. As such, the Court will limit its analysis with respect to the incident to the facts above.

**\*14** On April 27, 2007, Sebastian requested two days of educational leave in May to attend a seminar. (Pl. 56.1 Resp. ¶ 56; City Defs. 56.1 Resp. ¶ 89; Allen 56.1 Resp. ¶ 89.) Allen forwarded the request to Bush, who did not approve the request. (City Defs. 56.1 Resp. ¶ 89; Allen 56.1 Resp. ¶ 89.) Bush subsequently told Allen that he did so because Sebastian had previously failed to attend an event after receiving educational leave for the event.[FN16] (Pl. 56.1 Resp. ¶ 56.)

FN16. In his 56. 1(b)(3)(B) Statement of Facts, Sebastian states that after Bush disapproved Sebastian's leave request, "Allen ... signed the form indicating that he had purportedly approved the request."(City

Defs. 56.1 Resp. ¶ 89; Allen 56.1 Resp. ¶ 89.) In support of his proposition, Sebastian cites to two similar education leave request forms, one purportedly signed by Allen (and not Bush) approving the request and a second purportedly signed by Bush (and not Allen) disapproving the request. (Pl. 56.1 Resp., Ex. 69.) The record is unclear, however, as to when Allen signed the former request form. Allen testified that he probably submitted a request form to Bush and could not think of a reason why Bush would have generated a copy without Allen's signature. (City Defs. 56.1 Resp., Ex. J, Allen Dep. 332, 334, 336-39.)

On July 17, 2007, Sebastian attended a disciplinary hearing regarding the March 15, 2007 incident where he relayed his account of the events at issue to Allen, Hall, Loeff, Nugent, and "Marlene Hopkins," whom Sebastian identified as "the new deputy commissioner." (Pl. 56.1 Resp. ¶ 64.) Approximately three weeks later, Loeff gave Sebastian an oral reprimand regarding the incident, but Sebastian refused to acknowledge receipt. (*Id.*) Sebastian has not alleged that he lost pay, has been suspended, or suffered any tangible employment effect from this oral reprimand. (*Id.*)

In August 2007, when Sebastian, Hall, and Reynolds, requested permission to attend an electrical inspectors convention, Allen e-mailed the request to the acting Commissioner for approval, noting, among other things, that the program was an "excellent training forum." (Allen 56.1 Resp. ¶ 90; City Defs. 56.1 Resp. ¶ 90.)

That same month, Allen also assigned Sebastian to work District 17 (the Loop area), which, according to Sebastian, was so disorganized that Sebastian spent seven days in the office organizing and updating the paperwork. (City Defs. 56.1 Resp. ¶ 83; Allen 56.1 Resp. ¶ 83; Pl. 56.1 Resp., Ex. 63, Sebastian August 27, 2007 Correspondence; Allen 56.1 Resp., Ex. C, Sebastian Dep. 307-08, 321.)

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
(Cite as: 2008 WL 2875255 (N.D.Ill.))

Page 17

Sebastian believes that he was denied opportunities to work overtime for generator testings on Saturdays in 2007 and that Parks and the union "probably" conspired to deprive him of the overtime. (Pl. 56.1 Resp. ¶ 58.) This belief is founded upon four or five conversations between Department employees regarding Saturday overtime that Sebastian overheard.[FN17] (Id.) In 2007, Sebastian worked generator testing overtime on one occasion, was offered other types of overtime, and turned down certain overtime opportunities. (Pl. 56.1 Resp. ¶¶ 58-59.) Sebastian has never complained to anyone at the City regarding the overtime. (Id.)

> FN17. Sebastian also submits that he was denied overtime in 2006. Specifically, Sebastian asserts that the only "substantive" overtime work is generator testing and that he was never offered generator testing overtime in 2006. (City Defs. 56.1 Resp. ¶ 77; Allen 56.1 Resp. ¶ 77.) In support of the first proposition, Sebastian cites to a document that seemingly lists emergency generator overtime performed by certain individuals in 2006. (Pl. 56.1 Resp., Ex 58, Overtime Reimbursement.) He fails, however, to establish a proper foundation for the document, provide any explanation regarding the information contained therein, or elaborate on how this document supports his proposition that the only "substantive" overtime was generator testing. In support of the latter proposition, Sebastian cites to a document entitled "Overtime Inspections," but again, fails to lay a proper foundation or provide any explanation in support of his statement. The Court further notes that, while Sebastian initially cites to the document in support of his allegation regarding overtime, he later attacks the reliability of the information contained therein in his sur-response. (Pl. Sur-response Mem. 13-14.) This argument, however, is moot as Sebastian has ultimately failed to cite to any evidence in

support of his proposition that he was never offered overtime in 2006. Thus, because these statements are not supported by Sebastian's citations to the record, the Court will not consider these statements. See L.R. 56.1.

On three occasions in 2007, Sebastian had difficulty reaching Hall when he phoned in to advise Hall that he was sick. (Pl. 56.1 Resp. ¶ 67.) In all three instances, Sebastian received the sick leave he sought. (Id.)

*Miscellaneous Alleged Retaliatory Acts*[FN18]

> FN18. In his statement of additional facts, Sebastian submits that Sebastian's doctor attempted to call and speak with Sebastian at work, but "was told that he could not speak to Sebastian nor could he leave a message for him."(Allen 56.1 Resp. ¶ 88; City Defs. 56.1 Resp. ¶ 88.) Because this statement relies upon inadmissible hearsay and Sebastian has not laid a proper foundation to establish an exception to hearsay rules, the Court will not consider this statement. *See Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir.1996) ("[A] party may not rely upon inadmissible hearsay ... to oppose a motion for summary judgment.").

In addition to the events outlined above, Sebastian believes the following occurrences constitute retaliatory acts:

• he believes that, beginning in 2004, he has been followed and chased by unidentified people, but has not identified what connection these people have to Allen or the City. (Pl. 56.1 Resp. ¶ 39.)

*15 • Since October 2004 he has been required to fill out paperwork to request vacation time and to provide medical documentation for sick time, but does not know if other City employees have had

Slip Copy                                                        Page 18
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
(Cite as: 2008 WL 2875255 (N.D.Ill.))

to follow the same procedures. (Pl. 56.1 Resp. ¶ 40.)

• On several occasions in 2005, Hall told Sebastian that he did not have any office supplies for Sebastian when Sebastian asked for supplies, including Wite-Out, stationary material, or a pencil. (Pl. 56.1 Resp. ¶ 44.) Sebastian did not speak with anyone else about office supplies or ask anyone else where he might find them. (*Id.*)

• Sebastian unsuccessfully requested business cards from Hall in 2005 and again in 2006; Hall gave EB Department inspector Gibson business cards. (Pl. 56.1 Resp. ¶ 54.) Sebastian is not aware of any other sign inspectors who have received business cards. (*Id.*)

• At an unspecified point in 2005, unidentified supervisors in the Department of Buildings invited other inspectors, but not Sebastian, to a seminar conducted by "Weldy/Lamont Associates, Inc." (Pl. 56.1 Resp. ¶ 47.)

• In mid-2005, Allen completed Sebastian's midyear review using a 1 to 5 rating system that defined a "3" as "satisfactory performance," a "4" as "excellent performance," and a "5" as "outstanding performance." (Pl. 56.1 Resp. ¶ 43.) Sebastian received four 5s, four 4s, two 3s, and no 2 or 1 ratings.[FN19] (*Id.*) Subsequently, on Sebastian's 2005 year-end review, Hall gave Sebastian two 5s, four 4s, two 3s, and no 2 or 1 ratings. (*Id.*) Neither evaluation affected his pay or resulted in discipline. (*Id.*)

> FN19. Sebastian also testified that Allen gave Sebastian a "lower" performance review as part of his 2004 year-end performance evaluation. (Pl. 56.1 Resp. ¶ 42.) However, he failed to produce the review or explain how the 2004 yearend evaluation was lower than his previous evaluations. (Pl. 56.1 Resp. ¶ 42.)

• On two occasions, one in 2005 and a second in

2006, Hall assigned Sebastian to complete inspections of citizen complaints on the same day that he gave Sebastian the assignment. (Pl. 56.1 Resp. ¶ 57.)

• While Sebastian worked a total of three to four hours of overtime in November 2005 and April 2006, processing for the overtime payments was delayed until October 2006. (Pl. 56.1 Resp. ¶ 53.) Sebastian discussed the matter with Parks and filed a grievance regarding the payment of overtime, but never informed Allen of the payment delays. (*Id.*) Sebastian has yet to receive compensation for forty-three minutes of overtime worked between March 2007 and July 2007, and has worked with his union steward to recover payment. (*Id.*)

*Alleged Witness Retaliation*

Sebastian believes that certain witnesses he intended to call to support his claim were retaliated against by the City. Specifically, he claims that Mohammed Sayeed ("Sayeed"), Bernard Simmons ("Simmons"), Donald Gibson ("Gibbons"), and James Hopkins ("Hopkins") experienced retaliation.

As for Sayeed, in October 2007, Sebastian withdrew Sayeed from his list of potential witnesses because Sebastian says he was actively avoiding service. (Allen 56.1 Resp. ¶ 84; City Defs. 56.1 Resp. ¶ 84.) Nothing more is contained in the record.

**\*16** As for Simmons, at his deposition Simmons testified as to his belief that certain people began to "giv[e] ... him a hard time" after he met with the City Defendants' attorneys. (Allen 56.1 Resp. ¶ 85; City Defs. 56.1 Resp. ¶ 85; Pl. 56.1 Resp., Ex. 5, Simmons Dep. 183.) Specifically, Simmons claimed that, after the meeting, Hall threatened him with, among other things, physical violence. (Pl. 56.1 Resp., Ex. 5, Simmons Dep. 272-73.) In addition, Simmons claims that Hammersmith told Simmons that he wanted to put Simmons in STF per-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 19
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

manently. (Allen 56.1 Resp. ¶ 85; City Defs. 56.1 Resp. ¶ 85; Pl. 56.1 Resp., Ex. 5, Simmons Dep. 271-72.) Subsequently, Simmons explained that he believed Hammersmith was putting him there so he "could save his people from going" to STF. (Allen 56.1 Resp. ¶ 85; City Defs. 56.1 Resp. ¶ 85; Pl. 56.1 Resp., Ex. 5, Simmons Dep. 271-72.) Simmons could not recall whether this alleged conversation with Hammersmith occurred prior to or after his meeting with the City Defendants' attorneys. (Allen 56.1 Resp. ¶ 85; City Defs. 56.1 Resp. ¶ 85; Pl. 56.1 Resp., Ex. 5, Simmons Dep. 271-72.) Both Hammersmith and Hall deny making such comments or threats. (City Defs. 56.1 Resp., Ex. M, Hammersmith Aff. ¶ 14, Ex. P, Hall Aff. ¶ 11.)

Sebastian also identified Donald Gibson as a potential witness in this action. (Allen 56.1 Resp. ¶ 86; City Defs. 56.1 Resp. ¶ 86.) At his deposition, Gibson testified as to his belief that, after he met with the City Defendants' lawyers, people tried to fire him and that his supervisor, Tom Ryan, harassed him, gave him increased paperwork, and gave him "lame duck" assignments. (Allen 56.1 Resp. ¶ 86; City Defs. 56.1 Resp. ¶ 86; Pl. 56.1 Resp., Ex. 25, Gibson Dep. 271-72.) Gibson was subsequently terminated in 2007. (Allen 56.1 Resp. ¶ 86; City Defs. 56.1 Resp. ¶ 86.) Loeff denies that Gibson was terminated because Sebastian identified him as a witness and submits that he was terminated because of a series of performance issues and insubordination resulting in progressive discipline. (Allen 56.1 Resp. ¶ 86; City Defs. 56.1 Resp. ¶ 86; City Defs. 56.1 Resp., Ex. FF, Loeff Aff. ¶ 8.) Sebastian asserts, however, that a majority of the discipline occurred at some point after Gibson met with the City Defendants' attorneys. (Pl. Sur-Response Mem. 15; Pl. Sur-Response, Ex. 24, Notice of Progressive Discipline; Pl. 56.1 Resp., Ex. 25, Gibson Dep. 160.)

Finally, Sebastian also identified James Hopkins, an electrical inspector for the Aviation Department, as a potential witness. (Allen 56.1 Resp. ¶ 87; City Defs. 56.1 Resp. ¶ 87.) On October 31, 2005, the

City withdrew a previously extended job offer to Hopkins that would have allowed him to move from the Aviation Department to the EB Department. (Allen 56.1 Resp. ¶ 87; City Defs. 56.1 Resp. ¶ 87.) Loeff maintains that he withdrew the offer because he discovered that Hopkins was also working outside the City as an electrical inspector and had falsely certified that he fixed certain violations. (Allen 56.1 Resp. ¶ 87; City Defs. 56.1 Resp. ¶ 87; City Defs. 56.1 Resp., Ex. FF, Loeff Aff. ¶ 7.) In his deposition, Loeff testified that he arrived at this conclusion as a result of his conversations with Allen and Hopkins as well as his review of certain documents. (Pl. Sur-response Mem. 14-15; Pl. Sur-response, Ex. 23, Loeff Dep. 138-65, 180-81, 249-50, 269-74.) He could not recall the source of his information regarding Hopkins' allegedly false certification. (Pl. Sur-response, Ex. 23, Loeff Dep. 145-65, 249-50, 269-74.) According to Hopkins, on September 14, 2007, the City also imposed a twenty-nine day suspension upon Hopkins because Hopkins had unpaid parking tickets and had allegedly failed to execute a Parking Ticket Payment Agreement Plan. (Allen 56.1 Resp. ¶ 87; City Defs. 56.1 Resp. ¶ 87.) Six days later, the suspension was unexpectedly rescinded.[FN20] (Allen 56.1 Resp. ¶ 87; City Defs. 56.1 Resp. ¶ 87.)

> FN20. In his statement of additional facts, Sebastian further submits that the City rescinded the suspension "[t]hree days after the lawyers in this case appeared at a status hearing and obtained additional time to take discovery on, among other things, Hopkins' suspension."(Allen 56.1 Resp. ¶ 87; City Defs. 56.1 Resp. ¶ 87.) This proposition is not supported by Sebastian's citation to the record and, therefore, will not be considered by the Court.

### United States v. Sorich

**\*17** In 2006, the United States Attorneys Office prosecuted Robert Sorich ("Sorich") as well as others, for participating in a scheme that provided City

Slip Copy                                                                                                        Page 20
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

jobs and promotions in exchange for campaign work or other favored statuses. (Allen 56.1 Resp. ¶ 38; City Defs. 56.1 Resp. ¶ 38; Pl. 56.1 Resp., Ex.40, Indictment.) At the criminal trial, Patricia Molloy ("Molloy"), Mary Jo Falcon ("Falcon"),[FN21] and Daniel Katalinic ("Katalinic") testified extensively about certain hiring practices they observed during the course of their employment with the City.[FN22] (Allen 56.1 Resp. ¶¶ 40-66; City Defs. 56.1 Resp. ¶¶ 40-66.)

> FN21. Molloy and Falcon asserted their Fifth Amendment right against self-incrimination during their respective depositions in this matter. (Allen 56.1 Resp. ¶¶ 40, 46; City Defs. 56.1 Resp. ¶¶ 40, 46.)

> FN22. In his 56.1(b)(3)(B) Statement of Facts, Sebastian devotes twenty-six lengthy paragraphs to the discussion of Molloy, Falcon, and Katalinic's testimony and/or other participation in the Sorich criminal trial. Because this information is largely irrelevant to the facts of Sebastian's case (as discussed in detail below), the Court has chosen to include a synopsis of the facts contained therein. It has, however, considered all the supported and admissible facts contained within the twenty-six paragraphs.

Molloy worked as Sorich's secretary at the Mayor's Officer of Intergovernmental Affairs ("IGA") until Sorich left the office. (Allen 56.1 Resp. ¶¶ 40-41; City Defs. 56.1 Resp. ¶¶ 40-41.) At the Sorich criminal trial, Molloy testified that, from 1993 onwards, she compiled a database of information regarding job or promotion requests from coordinators, wards, or unions for over 5,734 individuals (the "Clout List"). (Allen 56.1 Resp. ¶¶ 42-44; City Defs. 56.1 Resp. ¶¶ 42-44.) Molloy would delete names from the database if the individual for whom the job was requested died or moved, or if the political coordinator or other individual who requested the job for the individual no longer wanted the person to obtain the job. (Allen 56.1 Resp. ¶ 43; City

Defs. 56.1 Resp. ¶ 43.) Molloy also maintained paper index card files that documented similar information. (Allen 56.1 Resp. ¶ 45; City Defs. 56.1 Resp. ¶ 45.) In 2002, Sorich told Molloy to shred the paper files regarding the job seekers. (Allen 56.1 Resp. ¶ 45; City Defs. 56.1 Resp. ¶ 45; Pl.Ex. 45, Falcon Test. 4111.) When asked at her deposition for the current action as to whether she observed various personnel officers from different city departments meet with Sorich, Molloy asserted her Fifth Amendment right not to testify. (Allen 56.1 Resp. ¶ 45; City Defs. 56.1 Resp. ¶ 45; Pl. 56.1 Resp., Ex. 44, Molloy Dep. 64-65.)

At the Sorich criminal trial, Falcon testified extensively about her experiences manipulating the hiring process while serving as Director of Personnel for the Department of Sewers and Department of Water Management. (Allen 56.1 Resp. ¶¶ 49-59; City Defs. 56.1 Resp. ¶¶ 49-59.) For instance, Falcon explained that, during her transition period into the Department of Sewers position, Falcon's predecessor told her that the mayor's office, not the department commissioner, was her boss with respect to the hiring process, that Sorich was her point of contact at the IGA and if anyone asked about IGA's involvement in the hiring process, Falcon should always deny the existence of such involvement. (Allen 56.1 Resp. ¶ 52; City Defs. 56.1 Resp. ¶ 52.) Falcon also testified that the IGA became involved in many of the hiring sequences she participated in, that she met with Sorich several times, that she received names of certain individuals from IGA, and that, during some of the meetings, Sorich would refer to note cards or a list with typewritten names (given to Sorich by Molloy) when giving Falcon the names. (Allen 56.1 Resp. ¶¶ 51-56; City Defs. 56.1 Resp. ¶¶ 51-56; Pl. 56.1 Resp., Ex. 39, Falcon Test. 272-73.) Falcon would then manipulate the hiring process (including interviews and ratings) to ensure that the identified people received the open positions. (Allen 56.1 Resp. ¶¶ 56-57; City Defs. 56.1 Resp. ¶¶ 56-57.)

*18 Katalinic, who was a full-time City employee

Slip Copy                                                                                              Page 21
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

from 1970 through 2003, was the Deputy Commissioner of Street Operations for the Streets & Sanitation Department from 2000 through 2003. (Allen 56.1 Resp. ¶ 61; City Defs. 56.1 Resp. ¶ 61.) From 2000 through 2004, Katalinic was also the head of a political organization that included City employees and assisted in campaign efforts for certain political candidates (the "Katalinic organization"). (Allen 56.1 Resp. ¶ 61; City Defs. 56.1 Resp. ¶ 61; Pl. 56.1 Resp., Ex. 41, Katalinic Revised Plea Agreement; Pl. 56.1 Resp., Ex. 47, Katalinic Test.2000-01, 2005-08.) During the *Sorich* criminal trial and in his revised plea agreement, Katalinic explained: how he submitted lists to Sorich that contained requests for City jobs and promotions for his political workers; his understanding that the interview process would be manipulated through Sorich and other IGA officials in favor of politically-affiliated candidates; and his knowledge that IGA communicated with the Streets & Sanitation Commissioner's office about who would be hired, and that the personnel department would then implement those selections. (Allen 56.1 Resp. ¶¶ 64-66; City Defs. 56.1 Resp. ¶¶ 64-66.)

### *Hiring Within the Department of Buildings*

Allen testified that he does not know and never had any communication regarding the 2004 supervisor interviews with Falcon or with Sorich. (Pl. 56.1 Resp. ¶ 19.)

At the *Sorich* criminal trial, Kozicki testified that, on one occasion in 2004, he changed his rating form during a hiring sequence to fill seven building inspector positions for the Department of Buildings. (Allen 56.1 Resp. ¶ 60; City Defs. 56.1 Resp. ¶ 60.) Specifically, Kozicki testified that, prior to the interviews, Kaderbek made it clear to Kozicki that Kaderbek wanted two individuals-Andrew Ryan ("Ryan") and Kevin Sexton-hired. (Allen 56.1 Resp. ¶ 60; City Defs. 56.1 Resp. ¶ 60.) According to Kozicki, Kaderbek advocated for the two individuals, both of whom were the sons of important union officials, because he believed that they would

help with union negotiations and to accomplish some other goals they were trying to achieve. (Allen 56.1 Resp. ¶ 60; City Defs. 56.1 Resp. ¶ 60; Pl. 56.1 Resp., Ex. 75, Kozicki Test. 3070; Pl. 56.1 Resp., Ex. 15, Kozicki Dep. 132-33.) At some point after the interviews and the rating scores were tallied, Ciaravino told Kozicki that Ryan's scores did not place him in the top seven candidates and that Kozicki had two choices: change his score and re-submit the paperwork or re-interview the candidates. (Allen 56.1 Resp. ¶ 60; City Defs. 56.1 Resp. ¶ 60; Pl. 56.1 Resp., Ex. 75, Kozicki Test. 3099; Pl. 56.1 Resp., Ex. 15, Kozicki Dep. 133-34.) Kozicki chose the former option, changed his scores, and Ryan was ultimately hired. (Allen 56.1 Resp. ¶ 60; City Defs. 56.1 Resp. ¶ 60; Pl. 56.1 Resp., Ex. 15, Kozicki Dep. 133-34.)

### *STANDARD OF REVIEW*

*19 Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir.2001); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees,* 233 F.3d 524, 529 (7th Cir.2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir.2001); *Drake*

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

Page 22

*v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 887 (7th Cir.1998) (" 'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence the truth of the matter asserted.' ").

### DISCUSSION

I. *Evidentiary Issues and Sebastian's Motion to Strike*

As a preliminary matter, the Court must address two issues raised by the parties in conjunction with their respective summary judgment submissions.

First, Sebastian has filed a Motion to Strike portions of Allen's and City Defendants' reply pleadings, asserting, among other things, that they impermissibly raised new arguments in their respective reply briefs. Having considered the parties' arguments, the Court grants in part and denies in part Sebastian's Motion to Strike consistent with this Opinion. Specifically, the motion is denied to the extent that Defendants' arguments respond to the arguments raised by or evidence presented by Sebastian in his response to Allen's and the City Defendants' motions for summary judgment. The motion is granted with respect to new matters raised by Defendants that could have been introduced in their opening briefs and cannot be characterized as "responsive." *See TAS Distrib. Co. v. Cummins Engine Co.,* 491 F.3d 625, 630-31 (7th Cir.2007) ("[A]rguments first made in the reply brief are waived"); *Autotech Techs., Ltd. P'ship v. Automationdirect. com, Inc.,* No. 05 C 5488, 2008 U.S. Dist. LEXIS 23499, at *18-21 (N.D.Ill. Mar. 25, 2008).

Second, Allen and the City Defendants argue that Sebastian's testimony regarding the May 2004 conversation-specifically, Allen's alleged comments regarding Sebastian's national origin and political activity-should be disregarded or stricken because they directly contradict Sebastian's prior state-

ments. Having considered the cited testimony in the context of Sebastian's prior statements, the Court concludes that Sebastian's testimony creates an issue of credibility that is best left to the trier of fact. *See Flannery v. Recording Indus. Ass'n of Am.,* 354 F.3d 632, 638-40 (7th Cir.2004). With respect to the first statement-regarding national origin alone-City Defendants point out that Sebastian's testimony contradicts his sworn statements to the EEOC, sworn interrogatory answers, and statements in various interviews with and letters to the EEOC, the union, and City officials, certainly making the statements questionable. Such statements, however, standing alone, do not create the inherent inconsistency that necessitates striking his subsequent deposition testimony. *See id.(quoting Bank of Illinois v. Allied Signal Safety Restraint Sys.,* 75 F.3d 1162, 1169-70 (7th Cir.1996)) (" '[A] definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.' ").

**\*20** The second statement-regarding national origin and political activity-presents a closer question for the Court due to its tenuous nature. In his first deposition, Sebastian testified as follows with respect to the May 2004 conversation:

Q: Did [Allen] say anything then?

A: He told me right away Tom, you are Indian. You will never get promoted.

Q: Did you say anything?

A: No, that is it. That is what he told me.

Q: That was the end of the conversation?

A: Yes.

(Pl. 56.1 Resp., Ex. 2, Sebastian Dep. 48.) Subsequently, in his second set of interrogatories, when asked by the City "to state each fact ... supporting the allegation that [each individual defendant] ... was personally involved in violating Sebastian's

Slip Copy
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
(Cite as: 2008 WL 2875255 (N.D.Ill.))

Page 23

freedom of association," Sebastian made no reference to the alleged May 2004 conversation. (Pl. 56.1 Resp. ¶ 85.) In his fourth deposition, however, when asked if he remembered anything else about the May 2004 conversation, aside from the alleged national origin statements, Sebastian replied, "No. [Allen] said, 'Tom, you are Indian. You're never going to get promoted because you are not politically involved.'Something he mentioned to me."(City Defs. 56.1, Ex. I, Sebastian Dep. 693-94.) Finally, the Court notes that, when asked about the May 2004 conversation in his deposition, Allen testified that Sebastian told Allen he was applying for the promotion and that Patterson told Sebastian that Sebastian would receive the promotion. (Pl. 56.1 Resp., Ex. 8, 190-194.) Allen also recalled that Sebastian then began to lay what appeared to be cancelled checks on Allen's desk and commented on how he had contributed to political funds. (Pl. 56.1 Resp., Ex. 8, 193-94.)

It is well-established that "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with [statements] that contradict their prior depositions." *Bank of Illinois v. Allied Signal Safety Restraint Sys.,* 75 F.3d 1162, 1168 (7th Cir.1996). The Court is mindful however, that it must "appl[y] this doctrine with great caution"; "[a] definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence." *Flannery,* 354 F.3d at 638 (internal quotations omitted). In this case, under either party's account of what occurred, the testimony illustrates that there was more to the 2004 conversation than Sebastian initially recalled. If the jury believes Sebastian, they could conclude that Allen commented on Sebastian's national origin, the level of his political activity, or both characteristics. If the jury believes Allen, however, they could conclude that Sebastian, not Allen, commented on his own political contributions before Allen ended the discussion. Thus, while it is true that Sebastian's statements may be said to create the type of contradiction that would warrant this Court striking the

subsequent statements, Allen's testimony transforms the issue into one of credibility. Because "[c]redibility and weight are issues of fact for the jury," the Court will not "usurp the jury's role" in making such determinations. *Id.* at 638.For the reasons stated above, the Court will not strike Sebastian's testimony regarding the May 2004 conversation and deems these facts disputed.

## II. *Race and National Origin Discrimination Under Title VII (Count 1)*[FN23]

> FN23. Allen also moves for summary judgment with respect to Counts I and II, asserting that Sebastian cannot maintain a Title VII claim against Allen because Allen and the other individual defendants are not amenable to suit in their personal capacity under Title VII. The allegations within Counts I and II of Sebastian's Second Amended Complaint are directed at the City, not the individual defendants. Nevertheless, the Court notes that, to the extent that Sebastian has attempted to assert discrimination or retaliation claims against Allen, Kaderbek, or Kozicki in their individual capacity, such claims would fail because Title VII does not impose individual liability on supervisory employees. *See Silk v. City of Chicago,* 194 F.3d 788, 797 n. 5 (7th Cir.1999).

*21 Sebastian maintains that the City discriminated against him on the basis of his national origin (Indian) and race (Asian) by failing to promote him to the supervisor position in 2004 in violation of Title VII. For the reasons set forth below, City Defendants' Motion for Summary Judgment is denied with respect to Sebastian's national origin and race discrimination claims.

### A. *Discrimination Based on National Origin*

A plaintiff may prove employment discrimination under Title VII if he either: (1) presents sufficient

Slip Copy
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

Page 24

evidence of discriminatory motivation to create a triable issue of fact (the "direct method") or (2) establishes a *prima facie* case of discrimination under the "burden shifting" method articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (the "indirect method"). *Sublett v. John Wiley & Sons,* 463 F.3d 731, 736-37 (7th Cir.2006).

Under the "direct method," a plaintiff may use two different kinds of evidence to demonstrate that the employment was the result of discrimination: (1) "direct evidence" or (2) "circumstantial evidence." *Phelan v. Cook County,* 463 F.3d 773, 779 (7th Cir.2006). Direct evidence of discrimination is evidence which, if believed by the trier of fact, "will prove the particular fact in question without reliance or inference or presumption." *Miller v. Borden, Inc.,* 168 F.3d 308, 312 (7th Cir.1999) (*quoting Cowan v. Glenbrook Sec. Servs., Inc.,* 123 F.3d 438, 443 (7th Cir.1997)) (internal quotation omitted). The typical direct evidence situation is an admission by the decision maker that he acted upon the discriminatory animus. *Phelan,* 463 F.3d at 779 (7th Cir.2006). Nevertheless, direct evidence "does not require 'a virtual admission of illegality' " or an explicit reference to the plaintiff's protected status. *Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1044 (7th Cir.1999).

Sebastian argues that he has presented sufficient evidence under the direct method to establish a question of fact regarding the City's discriminatory intent. Specifically, Sebastian contends that Allen's statement and actions constitute direct evidence of discrimination and that this discriminatory animus may be imputed to the City. Words, actions, and motivations of an employee without formal authority to materially alter the terms and conditions of a plaintiff's employment may be imputed to the decision maker if the employee without formal authority exercises "singular influence" over a decision maker who does have such power. *Rozskowiak v. Vill. of Arlington Heights,* 415 F.3d 608, 612-13 (7th Cir.2005). Singular influence is defined

as "so much influence as to basically be herself the true 'functional [ ] ... decision-maker.' " *Brewer v. Bd. of Trs. of Univ. of Ill.,* 479 F.3d 908, 917 (7th Cir.2007) (*quoting Little v. Ill. Dep't of Revenue,* 369 F.3d 1007, 1015 (7th Cir.2004)) (alteration in original)."In some situations, the influence can be exercised by supplying misinformation or failing to provide relevant information to the person making the employment decision."*Id.* Where the decision maker conducts only a perfunctory or "[m]ere paper review" of the non-decision maker's recommendation, that review will not shield the employer from liability if that recommendation was motivated by unlawful bias. *See id.* at 918.The first inquiry, therefore, is whether the evidence indicates discriminatory animus on the part of Allen; and second, if so, whether this alleged animus may be imputed to Kaderbek, who possessed the final decision-making authority for employment decisions made within the Department.

**\*22** Sebastian points to Allen's comment regarding Sebastian's national origin during their May 2004 conversation. Generally, derogatory statements based on an employee's national origin can be direct evidence of discriminatory animus if the statement is made by the decision maker (or by a person who influences the decision maker) and the remark was made around the time of and in relation to the employment decision at issue. *See Rozskowiak,* 415 F.3d at 612. The City contends that, because Allen did not explicitly say that he would not hire Sebastian on account of his national origin, Sebastian has failed to establish a sufficient link between Allen's comments and the decision not to promote Sebastian. Yet, a statement need not explicitly refer to an admission of illegal motivation for a reasonable jury to conclude that it is evidence of discriminatory motive. *See Sheehan,* 173 F.3d at 1044. According to Sebastian's account of the May 2004 conversation, Allen's statement was made during a discussion regarding Sebastian's application for the 2004 supervisor position and in response to Sebastian's narration of his qualifications with respect to the position. Further, Allen subsequently served on

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

the interview panel for the supervisor position discussed during the May 2004 meeting and, along with Kozicki, conducted Sebastian's interview for the position. Finally, the Court notes that, to the extent that the discriminatory nature of this statement is ambiguous, "the task of disambiguating ambiguous utterances is for trial, not for summary judgment." *Phelan,* 463 F.3d at 782 (internal quotations omitted). Thus, the Court, drawing all reasonable inferences in favor of Sebastian, concludes that a reasonable jury could find that Allen's alleged May 2004 statement is evidence of discriminatory animus.

This does not, however, end the Court's inquiry, as Sebastian's claim cannot survive unless a reasonable jury could conclude that the alleged animus may be imputed to the City, and to Kaderbek specifically. The City argues, without legal support or elaboration, that the alleged animus cannot be imputed because both Allen and Kozicki interviewed Sebastian for the position and Sebastian cannot show that Allen's remark influenced Kozicki's or Kaderbek's decisions. Despite such assertions, the Court concludes that Sebastian has put forth sufficient evidence to create a genuine issue of material fact as to whether and to what extent Allen was involved in the decision not to promote Sebastian and whether Allen's alleged animus motivated the employment decision.

In this case, it is undisputed that Allen and Kozicki interviewed eleven of the fifteen candidates for the supervisor position, including the three successful candidates and Sebastian. It is also undisputed that Kaderbek relied upon Allen's, Bush's, and Kozicki's interview notes, recommendations, and ratings when approving the final decision regarding the selected candidates. The record reveals questions of fact, however, as to whether and to what extent Allen: (1) manipulated the interview process in a manner adverse to Sebastian by, for instance, asking Sebastian different technical questions as compared to all of the other candidates or questions that were not included on the Code questions list; (2) in-

fluenced Kozicki's evaluation through the alleged manipulations and by telling Kozicki that Sebastian answered technical questions incorrectly when he did not; (3) met with Kozicki and Bush after all of the interviews to discuss all the candidates; and (4) ultimately affected the interview recommendations, notes, and ratings sent to Kaderbek through his alleged acts. The record also reveals a question of fact as to whether Sebastian possessed the requisite degree of "singular influence" over Kaderbek, the ultimate decisionmaker in this case. *See Brewer,* 479 F.3d at 917. While it is undisputed that Kaderbek reviewed and relied on the interviewers' recommendations, the record is unclear as to the events surrounding Ciaravino's drafting of the notification letters. Thus, while evidence indicates that Allen, Kozicki, Bush, and Kaderbek were all involved, at least peripherally, in the process that resulted in the decision not to promote Sebastian, there remains a question of fact as to the degree of Allen's influence and the adequacy of Kaderbek's independant investigations before the employment decision was made. *Compare Brewer,* 479 F.3d at 920 (independent investigation conducted where decision maker examined a parking tag that plaintiff improperly modified to confirm that it had been altered).

**\*23** Thus, the Court concludes that Sebastian has presented sufficient evidence to survive summary judgment with respect to his claim of discrimination on account of national origin.

B. *Discrimination Based on Race*

Sebastian also submits that the City denied Sebastian the promotion on account of his race. In support of this claim, Sebastian attempts to proceed under both the indirect and direct methods. Because it is dispositive, the Court will first address Sebastian's application of the burden-shifting, indirect method of proof. To establish a *prima facie* case for failure to promote under the "indirect method," the plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position sought; (3) he was denied the promotion; and (4)

Slip Copy
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

Page 26

the promoted employee was not a member of the protected class and was not better qualified than the plaintiff. *Sublett,* 463 F.3d at 737. If the plaintiff establishes the *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action against the plaintiff. *Id.* Once such a reason is given, the burden then returns to the plaintiff to show that the employer's explanation was pretextual. *Id.* In this case, the City argues that summary judgment is appropriate because Sebastian cannot establish the fourth element of the *prima facie* case or that the City's proffered reasons for the denial of the promotion are pretextual.

With respect to the fourth element of the *prima facie* case-that the promoted employees were not better qualified-the City maintains that Sebastian cannot show that Hall, Hammersmith, and Reynolds were less qualified as compared to Sebastian because Sebastian performed poorly during his interview.[FN24] In support of this proposition, the City points to the ratings of Sebastian, Hall, Hammersmith, and Reynolds. In addition, the City submits the testimony and affidavit of Kozicki and Allen in which they state that Sebastian answered interview questions poorly, that Sebastian did not respond fully to questions or provide concrete examples when specifically asked to do so, and that the successful candidates performed better as compared to Sebastian.

> FN24. In support of its Motion for Summary Judgment, the City also submits that: (1) Kozicki's and Allen's accounts of the interview are corroborated by their interview notes; (2) Sebastian admitted to an EEOC investigator that he gave short answers during his interview; and (3) unlike Sebastian, each of the successful candidates had supervisory experience in the private sector. The Court will not consider these arguments, as they are based on extrinsic evidence. *See, e.g., Divane v. Sonak Elec. Contractors, Inc.,* No. 05 C 1211,

2008 U.S. Dist. LEXIS 1901, at *2 (N.D.Ill. Jan. 9, 2008).

Generally, an employer may rely on subjective criteria, including a candidate's interview performance, when determining whether a candidate is qualified for the position at issue. *See Blise v. Antaraman,* 409 F.3d 861, 868 (7th Cir.2005). This Court has found several disputes of material fact concerning events occurring during and after Sebastian's interview that create a genuine issue of fact as to whether Allen's and Kozicki's ratings for Sebastian and subsequent explanations regarding Sebastian's interview are accurate. *See* § IV(B); *see also* § II(A). Thus, similar to the reasons that justify denying summary judgment with respect to the national origin claim against the City and the political retaliation claim against Allen, there exists a genuine issue of fact regarding Sebastian's performance during his interview for the 2004 promotion and whether Sebastian was more qualified that Hammersmith, Hall, and Reynolds.

**\*24** Sebastian has also create a genuine issue of material fact as to whether the City's proffered reason for the failure to promote is pretextual."Pretext is a 'lie, specifically a phony reason for some action.'" *Sublett,* 463 F.3d at 737. "The issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers." *Wade v. Lerner N.Y., Inc.,* 243 F.3d 319, 323 (7th Cir.2001). In this present case, the City maintains that Sebastian did not receive the promotion because Allen and Kozicki wanted to promote individuals who were knowledgeable about the Code, had ideas for the Department, could motivate and manage the employees, could communicate well, and could handle the stress of the job. Consequently, they did not promote Sebastian because he performed poorly during his interview and did not receive the highest scores. This argument essentially mirrors the City's argument regarding the fourth element of the *prima facie* case. As noted

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

above, "[the Seventh Circuit] has ... never held that a job interview must be scored according to some sort of objective criteria." *Blise,* 409 F.3d at 868. However, "the jury may, under some circumstances, reasonably consider subjective reasons as pretexts." *Giacoletto v. Amax Zinc Co.,* 954 F.2d 424, 427-28 (7th Cir.1992); *see also Healy v. City of Chicago,* 450 F.3d 732, 744 n. 16 (7th Cir.2006) ("[A] departure from [a standard list of questions] is suspicious."). In this case, the record presents several factual disputes with respect to the actions that surrounded Sebastian's interview. These factual disputes create a question of fact as to whether Allen and Kozicki honestly believed the reasons proffered. For instance, questions of material fact remain as to: (1) whether Allen asked Sebastian all eight Code questions, different technical questions as compared to all other candidates, and questions that were not included on the Code questions list; (2) whether Allen told Kozicki that Sebastian answered technical questions incorrectly when he did not; (3) whether Allen met with Kozicki and Bush after all of the interviews to discuss all the candidates; and (4) the circumstances surrounding Ciaravino's drafting of the notification letters.

In sum, the Court finds that there are genuine factual disputes as to whether Hall, Hammersmith, and Reynolds were better qualified as compared to Sebastian and whether the City's reasons for not promoting Sebastian are pretextual. Accordingly, the Court denies the City's Motion for Summary Judgment with respect to Sebastian's race discrimination claim.[FN25]

> FN25. Sebastian submits multiple theories in support of his national origin and race discrimination claims. Having concluded that Sebastian has created a triable issue as to the national origin and race discrimination claims under the direct and indirect methods, respectively, the Court need not address the merits of Sebastian's additional arguments.

### III. *Retaliation Under Title VII (Count II)*

To overcome the City's motion for summary judgment and establish a *prima facie* case of retaliation under Title VII, Sebastian may proceed under either the direct or indirect method of proof. *Sitar v. Ind. Dep't of Transp.,* 344 F.3d 720, 728 (7th Cir.2003) (*citing Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640 (7th Cir.2002)). Here, Sebastian attempts to proceed under both.

**\*25** Under the direct method, the plaintiff must establish that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action subsequent to this protected activity; and (3) a causal connection between the two. *Salas v. Wis. Dep't of Corr.,* 493 F.3d 913, 924 (7th Cir.2007) (*citing Sitar v. Ind. Dep't of Transp.,* 344 F.3d 720, 728 (7th Cir.2003)). In the absence of direct evidence, a plaintiff can succeed under the direct method by presenting sufficient circumstantial evidence such that a jury could infer retaliation. *Id.* Circumstantial evidence can include suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus, pretext, and other evidence which allows the jury to reasonably infer retaliation. *See Hemsworth v. Quotesmith.com, Inc.,* 476 F.3d 487, 491 (7th Cir.2007) (*citing Yong-Qian Sun v. Bd. of Trs.,* 473 F.3d 799, 812 (7th Cir.2007)).

To succeed under the indirect method of proof, the plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) he performed his job according to his employer's legitimate expectations; (3) despite his satisfactory job performance, he suffered an adverse action from the employer; and (4) he was treated less favorably than similarly situated employees who did not engage in the statutorily protected activity. *Sitar,* 344 F.3d at 728 (*citing Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640 (7th Cir.2002)). The failure to satisfy one element of this prima facie case is "fatal" to the retaliation claim. *Sublett,* 463 F.3d at 740 (*citing Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 560 (7th Cir.2004)). If the plaintiff establishes these

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

four elements, the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for the adverse employment action. *Sitar,* 344 F.3d at 728 (*citing Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640 (7th Cir.2002)). If the defendant does so, the burden then shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.* While the burden of production shifts between the parties under this method, " 'the burden of persuasion rests at all times on the plaintiff.'"*Id.* (*quoting Haywood v. Lucent Techs.,* 323 F.3d 524, 531 (7th Cir.2003)).

To be similarly situated, another employee must be " 'directly comparable in all material respects.'" *Sublett,* 463 F.3d at 740 (*quoting Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 558 (7th Cir.2004)). Plaintiff must show that he or she is similarly situated with respect to performance, qualifications, and conduct. *Ezell v. Potter,* 400 F.3d 1041, 1049 (7th Cir.2005). This normally includes a showing that the employee " 'dealt with the same supervisor, was subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.' " *Gates v. Caterpillar,* 513 F.3d 680, 690 (7th Cir.2008). Ultimately, the employee must show *substantial similarity,* rather than complete identity, when comparing himself to the favorably treated employee. *Humphries v. CBOCS West, Inc.,* 474 F.3d 397, 405 (7th Cir.2007).

**\*26** Neither party disputes that Sebastian engaged in protected activities: Sebastian exercised his First Amendment right to file a charge with the EEOC, which he did on September 17, 2004, and initiated the instant action on April 18, 2005. The parties disagree as to whether the fifteen sets of action identified by Sebastian in conjunction with his retaliation claim constitute materially adverse actions and, if they do, whether Sebastian can create a triable issue under one of the two methods of proof articulated above. For the sake of clarity, the Court will address each of Sebastian's claimed adverse ac-

tions individually. *See Oest v. Ill. Dept. of Corrections,* 240 F.3d 605, 612-15 (7th Cir.2001) (evaluating each alleged adverse action to test the viability of plaintiff's indirect method retaliation claim).

A materially adverse action is one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (*quoting Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C.Cir.2006)). "Context matters" for the purposes of the materially adverse action analysis. *Id.* at 69.Thus, "an act that would be immaterial in some situations is material in others."*Id.* (internal quotations omitted). In all cases, "normally petty slights, minor annoyances, and simple lack of good manners" are insufficient to dissuade an employee from reporting discrimination and are, therefore, not materially adverse. *Id.* at 68.

Sebastian points to numerous alleged examples of retaliatory conduct: (1) Hammersmith's and Hall's instructions to Sebastian to leave the office to do field work; (2) Hall's refusal of Sebastian's request to change an office day in November 2006; (3) Tom Ryan shouting at Sebastian on February 15, 2007; (4) Sebastian's difficulty reaching Hall on three occasions in 2007 when he was sick; (5) the City's requirement that Sebastian fill out paperwork to request vacation time and provide medical documentation for sick time; (6) Hall's one day assignments in 2005 and 2006 instructing Sebastian to complete inspections of citizen complaints; (7) Sebastian's negative [FN26] performance reviews; (8) unidentified people following Sebastian; (9) Hall's denial of office supplies to Sebastian on several occasions in 2005 and denial of business cards to Sebastian in 2005 and 2006; (10) Sebastian's assignments in different districts; (11) Bush's denial of Sebastian's request for educational leave; (12) Allen's assignment of Sebastian to the July 2005 skeleton crew; (13) the City's "denial" of overtime; (14) the various Department employees' four attempts to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                   Page 29
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

"discipline" Sebastian; and (15) Allen's assignment of STF shifts to Sebastian.[FN27]

> FN26. While not essential to its holding, the Court also notes that Sebastian has failed to proffer any evidence to support the proposition that any of his performance evaluations were "negative."

> FN27. Sebastian also submits that his doctor's inability to speak with or leave a message for Sebastian when he called on two occasions constitutes a materially adverse action. As discussed above, Sebastian fails to present any admissible evidence in support of this proposition. Even if the Court were to consider the argument, however, the facts presented would not create a triable issue as to whether the doctor's inability to speak with or leave a message for Sebastian constitutes a materially adverse action. There is no evidence as to who answered the phone when the doctor called and whether the person knew of Sebastian's protected activity. Similarly, Sebastian has proffered no evidence to indicate whether he was in the field and unavailable and whether it was routine to prohibit third parties from leaving messages. Absent such evidence (or any combination thereof), a reasonable jury could not infer that the action was materially adverse. *See Burlington Northern,* 548 U.S. at 68-69.

As a preliminary matter, the Court notes that several of the actions, specifically, the first seven, cannot succeed because they either fall into the category of minor slights and annoyances or simply because there is no support in the record for them. *See Burlington Northern,* 548 U.S. at 68 ("petty slights or minor annoyances that often take place at work and that all employees experience"); *Lapka v. Chertoff,* 517 F.3d 974, 986 (7th Cir.2008) (increased work assignments that do not require the plaintiff to work extra hours or result in discipline or a loss of pay are not actionable, nor are lower performance rat-

ings unaccompanied by tangible job consequences); *Roney v. Ill. Dept. of Trans.,* 474 F.3d 455, 461 (7th Cir.2007) (it is unlikely that a reasonable employee would view a routine assignment as materially adverse); *Speer v. Rand McNally & Co.,* 123 F.3d 658, 664 (7th Cir.1997) (no materially adverse employment action where plaintiff's boss "yelled at her and did not make her feel as if she was part of the work group"). Sebastian's allegation that he is being "followed" also fails, as it is wholly unsupported and based upon speculation. *See Allen v. Am. Signature, Inc.,* No. 07-3698, 2008 U.S.App. LEXIS 7714, at *8 (7th Cir. March 31, 2008). Nor can Sebastian's assertion regarding the denial of certain office supplies and business cards sustain a claim for retaliation under the direct or indirect method because neither can constitute an action so adverse that it would have prevented a reasonable person from making or supporting a charge of discrimination. Sebastian has proffered no evidence to suggest that it was routine for an electrical inspector like Sebastian to obtain his office supplies from Hall, that Hall was Sebastian's only source of supplies, that Sebastian did not obtain the supplies from another source, or that his inability to obtain the requested supplies (such as Wite-Out or stationary material) significantly altered the terms or conditions of his employment. *See Burlington Northern,* 548 U.S. at 68.

**\*27** The Court can also quickly dispose of Sebastian's complaints regarding his coverage of a different district in either 2006 or 2007 and assignment to District 17 in 2007. Sebastian has not produced evidence from which one could infer that the assignments significantly altered his job responsibilities, caused him to work extra hours, resulted in a loss of pay or discipline, or changed the terms and conditions of his employment in any material way. *See Lapka,* 517 F.3d at 986 (more difficult and time-consuming assignments are not actionable where they do not significantly alter job responsibilities).

Sebastian also submits that the denial of his April

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                          Page 30
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

2007 request for a two-day educational leave is materially adverse for Title VII purposes. While the denial of an educational opportunity that would significantly contribute to an employee's professional advancement may, in some instances, fall into the category of materially adverse action, *see Burlington Northern,* 548 U.S. at 69, Sebastian fails to provide any details from which one could reasonably infer that the two-day seminar presented such an opportunity. Even if the Court were to assume that the denied leave was actionable, Sebastian has not met his burden on summary judgment with respect to the remaining elements of the *prima facie* case. Sebastian contends that the ambiguity surrounding when Allen signed and approved Sebastian's request for leave creates "suspicious" circumstances that would allow a jury to conclude that Allen was attempting to "mask his retaliatory conduct." However, such a conclusion would "cross the line between reasonable inference and unsupported speculation."*Davenport v. Northrop Grumman Sys. Corp.,* No. 07-3362, 2008 U.S.App. LEXIS 12625, at *6 (7th Cir. June 12, 2008). In this case, it is undisputed that Bush, rather than Allen, ultimately denied Sebastian's request. The Court further notes that subsequently, in August 2007, Allen emailed the acting Commissioner and requested approval for additional educational leave on behalf of Sebastian, as well as Hall and Reynolds. In light of such facts, a reasonable person could not conclude that the April 2007 denial of educational leave was retaliatory.

As for his assignment to the July 2005 skeleton crew assignment, even if the Court were to assume Sebastian's account of the events leading up to the assignment and adopt the dubious notion that this one and one-half hour assignment is sufficiently adverse to dissuade a reasonable employee from making or supporting a charge of discrimination, Sebastian has not presented any evidence to support a *prima facie* case under the burden-shifting method. In support of his position, Sebastian contends that no similarly situated individual worked on a skeleton crew. Sebastian does not, however, identify,

much less present, admissible evidence of any similarly situated individual outside the protected class who is directly comparable to the plaintiff "in all material respects." Absent such a showing, Sebastian's generalized assertions cannot support a retaliation claim. *See, e.g., Sublett,* 463 F.3d at 740 ("It ... [is] up to ... [plaintiff] to find others who ... [are] 'directly comparable in all material respects' ") (*citing Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 561 (7th Cir.2004)); *Oest,* 240 F.3d at 615 ("conclusory assertion[s]" that plaintiff was treated differently, without specific evidence, will not satisfy the similarly situated requirement).

**\*28** Nor does the thirteenth claimed action-that Sebastian was denied overtime in 2007-stave off dismissal of Count II.[FN28] In support of his theory, Sebastian submits only his *belief* that he was denied overtime for generator testing in 2007. According to Sebastian, this belief is founded upon the fact that he overheard four or five conversations between Department employees regarding overtime. Sebastian provides no other admissible evidence regarding the nature of those conversations, whether the individuals were similarly situated "in all material respects," or even the identity of the decision maker with respect to the delegation of overtime. To the contrary, Sebastian admitted that he was unaware of any role that Allen would have played in determining who received overtime in 2007 and that he believed that the union steward and union were "probably conspiring" against him. Such beliefs do not create a genuine issue of fact as to retaliation. *See Payne v. Milwaukee County,* 146 F.3d 430, 434 (7th Cir.1998) (subjective belief insufficient for *prima facie* case of retaliation).

> FN28. The Court notes that, although he waited until his sur-response, Sebastian did present an argument regarding the alleged denial of overtime in 2006. However, because Sebastian fails to present evidence in support of this assertion, the Court need not consider whether an actual denial of overtime would constitute a retaliatory ac-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                    Page 31
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

tion in the circumstances presented. Additionally, because Sebastian fails to present any argument regarding the delayed processing of or withhold of certain overtime payments, the Court deems this argument waived. *See Culver v. Gorman & Co.,* 416 F.3d 540, 550 (7th Cir.2005) (*quoting United States v. Turcotte,* 405 F.3d 515, 536 (7th Cir.2005)) (" 'unsupported and undeveloped arguments are waived' "); *see also Graham v. AT & T Mobility, LLC,* Nos. 06-3020, 06-3734, 2007 U.S.App. LEXIS 21598, at * 12 (7th Cir. Sept. 6, 2007) ("[T]his court is not obligated to research and construct legal arguments open to parties, especially when they are represented by counsel.' ") (*quoting John v. Barron,* 897 F.2d 1387, 1393 (7th Cir.1990)).

Next Sebastian claims he was subjected to four instances of "unsubstantiated" discipline subsequent to the filing of his EEOC charge. While Sebastian does not identify the four instances in his response brief or elaborate further on this theory, the Court assumes that Sebastian is referring to the following incidents: (1) the informal meeting in late 2005 or early 2005 regarding sick time; (2) the June 2005 predisciplinary hearing regarding Sebastian's failure to report to work; (3) the February 22, 2007 verbal counseling regarding a delayed response to Hall's calls; and (4) the July 11, 2007 disciplinary hearing and July 27, 2007 written oral reprimand regarding the March 15, 2007 incident.

As a preliminary matter, the Court notes that Sebastian has failed to present any legal authority or argument in support of his retaliation claim with respect to the first, second, and fourth incidents listed above. Thus, the Court deems these arguments waived. *See Culver v. Gorman & Co.,* 416 F.3d 540, 550 (7th Cir.2005). Regardless, although Sebastian characterizes the three actions as "factually unsubstantiated efforts to discipline," he does not dispute that he committed the actions that resulted in "discipline" or present any evidence from which

one could infer that the "discipline" was anything other than routine. *See Campbell v. Potter,* 57 Fed. Appx. 267 (7th Cir.2003). Nor can Sebastian rely on temporal proximity alone, as the first event occurred approximately nine months after Sebastian filed the EEOC charge and two months after initiating the current action. *See Kodl v. Bd. of Educ.,* 490 F.3d 558, 563 (7th Cir.2007) (*quoting Moser v. Ind. Dep't of Corr.,* 406 F.3d 895, 903 (7th Cir.2005)) (" 'Suspicious timing alone is rarely sufficient to create a triable issue' " as to the requisite causal connection); *Contreras v. Suncast Corp.,* 237 F.3d 756, 765 (7th Cir.2001) (one-month gap between EEOC charge and termination insufficient); *EEOC v. Yellow Freight Sys.,* 253 F.3d 943, 952-53 (7th Cir.2001) (en banc) (six-week gap between EEOC charge and termination insufficient). He has once again failed to put forth any specific testimony regarding the identity of any similarly situated individual who previously committed the same act, but avoided similar "discipline." Absent this showing, Sebastian's generalized assertions cannot support a retaliation claim. *See, e.g., Sublett,* 463 F.3d at 740.

**\*29** Regarding the third instance of "discipline"-the February 22, 2007 informal meeting and verbal counseling-Sebastian has also failed to create a genuine issue of material fact as to retaliation for two reasons. First, the verbal counseling and informal meeting do not rise to the level of a materially adverse action. Sebastian has presented no evidence of unsubstantiated progressive discipline, procedurally irregular warnings, or of lost compensation, assignments, or employment opportunities as a result. Further, there is no evidence from which one can infer that the verbal counseling caused any future adverse action. Given this dearth of evidence, a reasonable trier of fact could not conclude that the verbal counseling and informal meeting constituted an adverse employment action. *Compare Allen,* 2008 U.S.App. LEXIS 7714, at \*8 (written reprimand is not a materially adverse action); *Whittaker v. N. Ill. Univ.,* 424 F.3d 640, 648 (7th Cir.2005) (same); *Luera v. Heart Ctr. Med. Group,* 07 C 101, 2008 U.S. Dist. LEXIS 10191, at

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*21-22 (N.D.Ill. Feb. 8, 2008) (verbal counseling and write-ups are not actionable), *with Pantoja,* 495 F.3d at 849 (disciplinary warnings may constitute adverse employment actions). Second, Sebastian, once again, does not identify a single similarly situated individual outside of the protected class who was treated more favorably. *See Sublett,* 463 F.3d at 740. Instead, he relies primarily on the direct method of proof and submits the following two pieces of evidence: (1) Allen, rather than Hall, issued the counseling and (2) Allen did not ask Hall to substantiate the timing or obtain the phone records himself.[FN29] A reasonable jury could not conclude that the verbal counseling was retaliatory based on the mere fact that Allen, rather than Hall, issued the counseling, as such an inference would be based on speculation rather than facts. *See Hedberg v. Indiana Bell Tel. Co., Inc.,* 47 F.3d 928, 931-32 (7th Cir.1995) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue."). Nor has Sebastian proffered any admissible evidence in his Local Rule 56.1 submissions to support the proposition that Allen did not ask Hall to substantiate the timing of Sebastian's response to Hall's phone calls.[FN30] Thus, the February 22, 2007 incident does not create a triable issue as to retaliation.

> FN29. The Court notes that Sebastian makes no mention of the minor variation between Hall's and Allen's statements regarding Sebastian's response time on February 5, 2007. Accordingly, the Court deems this argument waived. *See Culver,* 416 F.3d at 550 (7th Cir.2005).

> FN30. In his sur-response, Sebastian further submits that the Defendants' failure to produce the phone records to substantiate the factual basis for Sebastian's discipline entitles Sebastian to an adverse evidentiary inference regarding the true contents of those records. This argument is unavailing for two reasons. First, as discussed above, the Court previously struck the extrinsic evidence that supports this argument. Con-

sistent with that decision, the Court also struck any argument founded upon the extrinsic evidence. Second, even if the Court were to consider this argument, Sebastian would not be entitled to the adverse evidentiary inference at this juncture. The "destruction of or inability to produce a document, standing alone, does not warrant an inference that the document, if produced, would have contained information adverse" to the City. *Park v. City of Chicago,* 297 F.3d 606, 615 (7th Cir.2002). Instead, the City must have destroyed the evidence in bad faith. *Id.* The "bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction." *Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715, 721 (7th Cir.2001). Similarly, the violation of a record retention policy "creates a presumption that the missing record[s] contained evidence adverse to the violator." *Park,* 297 F.3d at 615 (citation omitted). Here, Sebastian's counsel stated during Loeff's deposition that he never received the records. (Pl. Sur-response, Ex. 23, Loeff Dep. 66.) Sebastian has not, however, come forward with any evidence or argument indicating bad faith on behalf of Defendants or even that Sebastian ever requested the phone records during discovery. Thus, Sebastian is not entitled to an adverse inference.

Regarding Sebastian's fifteenth claimed retaliatory act-STF assignments-Sebastian contends he has created a triable issue under the direct method of proof.[FN31] In support of its position to the contrary, the City maintains that the STF assignments were not adverse employment actions and that Sebastian cannot establish a *prima facie* case of retaliation. Because it is dispositive, the Court will address the City's latter argument first. Under the dir-

Slip Copy                                                                                   Page 33
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

ect method, Sebastian proffers two admissible pieces of evidence in support of his claim. First, Sebastian argues that Allen assigned him to STF approximately nine days after Loeff "circulated" the charge to "Kozicki and others." (Pl.Resp.13.) Fatal to this argument, however, is that Loeff did not "circulate [ ]" the charge to "Kozicki and others." Instead, the record reveals that Loeff emailed the charge to Kozicki and copied Kaderbek. Thus, Sebastian cannot rely solely on the nine day lapse between Loeff's email and the STF assignment to create a triable issue. Nor has Sebastian proffered other evidence (or argument) from which one could infer that Allen knew Sebastian filed the EEOC charge prior to Sebastian's assignment to STF. A decision maker cannot retaliate against the employee if she is unaware of the complaints asserted against her. *Miller v. Am. Family Mut. Ins. Co.,* 203 F.3d 997, 1008 (7th Cir.2000). Thus, without such knowledge, Allen's decision to place Sebastian on STF could not have been retaliatory. *See Luckie v. Ameritech Corp.,* 389 F.3d 708, 715 (7th Cir.2004) ("It is not sufficient that an employer could or even should have known about an employee's complaint; the employer must have had actual knowledge of the complaints for its decisions to be retaliatory") (internal quotations and alterations omitted); *see also Davenport,* 2008 U.S.App. LEXIS 12625, at *6; *Huppert v. Potter,* 232 Fed. Appx. 576, 581 (7th Cir.2007) (summary judgment denied where the plaintiff provided no evidence that decision makers were aware of the plaintiff's EEO complaint). Second, Sebastian asserts that Allen's distribution of a memorandum indicating that inspectors would rotate through STF assignments a mere two weeks after Sebastian obtained leave from the Court to file a retaliation claim is evidence that Allen previously retaliated against Sebastian through STF assignments. This argument is also unavailing as it is undisputed that, prior to the announcement, Allen rotated sign inspectors on the STF assignment.

> FN31. Sebastian also maintains that he has met his burden under the indirect method.

In support of this theory, Sebastian submits that Allen assigned Sebastian to STF more than any other candidate for the 2004 supervisor position. This argument is based entirely upon inadmissible evidence. (City Defs. 56.1 Resp. ¶ 76; Allen 56.1 Resp. ¶ 76.) Even if the Court were to consider the statement, Sebastian's argument would be futile because Sebastian has failed to identify a sufficient set of comparators for the similarly situated inquiry. To be similarly situated, the employees must be " 'directly comparable in all material respects.' " *Sublett,* 463 F.3d at 740. A reasonable trier of fact could not conclude that Sebastian was "directly comparable in all material respects" to other electrical inspectors on the days that Allen assigned Sebastian to STF by the mere fact that, at one time, Sebastian applied for the same promotion as other electrical inspectors. *See, e.g., id.; Oest,* 240 F.3d at 615.

**\*30** Because there is no genuine issue of material fact associated with Sebastian's retaliation claim, City Defendants' motion for summary judgment as to Count II is granted.[FN32]

> FN32. It is unclear from Sebastian's submissions as to whether he also posits that these actions, in the aggregate, constitute an adverse action. Nevertheless, to the extent that Sebastian would submit such a theory, it would not stave off dismissal of Count II. Considering the actions as a whole does not cure Sebastian's failure to submit evidence establishing the *prima facie* case under the direct or indirect method. *See, e.g., Campbell v. Potter,* 57 Fed. Appx. 267, 268 (7th Cir.2003). Nor does Sebastian's argument that the alleged retaliation is "corroborated" by the alleged witness harassment stave off dismissal of his claim. Such reliance on speculation, rather than facts, will not preclude sum-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

mary judgment. *See Hedberg v. Indiana Bell Tel. Co., Inc.,* 47 F.3d 928, 931-32 (7th Cir.1995).

## IV. *Failure to Promote under § 1983 Claim (Count III)*

To establish a First Amendment retaliation claim, a plaintiff must establish: (1) that he engaged in a constitutionally protected activity and (2) that the protected conduct was a "substantial or motivating factor" in defendants' challenged action. *Hall v. Babb,* 389 F.3d 758, 762 (7th Cir.2004). If the plaintiff makes this *prima facie* showing, the burden shifts to the defendants to demonstrate that the same action would have been taken in the absence of the protected activity. *Healy,* 450 F.3d at 739. If the defendants carry this burden, the plaintiff " 'bears the burden of persuasion to show that [the defendants'] proffered reasons were pretextual and that discrimination was the real reason for the [employment action].' " *Id.*(*quoting Smith v. Dunn,* 368 F.3d 705, 708 (7th Cir.2004)) (alteration in original).

Allen and the City Defendants do not challenge Sebastian's ability to establish the first element of the *prima facie* case-that Sebastian engaged in a constitutionally protected activity. Instead, their challenge focuses on whether protected conduct was a "substantial or motivating factor" in their failure to promote Sebastian and whether Sebastian would have been denied the promotion in the absence of this protected activity. The burden in this regard is "not insignificant." *Nelms v. Modisett,* 153 F.3d 815, 818 (7th Cir.1998) (*quoting Nekolny v. Painter,* 653 F.2d 1164, 1168 (7th Cir.1981)) ("A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election."). In other words, "[i]t is not enough to show only that the plaintiff was of a different political persuasion than the decisionmakers." *Hall,* 389 F.3d at 762. Instead, the

plaintiff must present specific evidence that the defendants knew of his political affiliation and took action against him because of the political affiliation. *Id.* at 762-63.In doing so, the plaintiff cannot rely on speculation or opinions of non-decision makers as proof that the defendants acted because of political affiliation. *Nelms,* 153 F.3d at 891.Nor can he rely on "self-serving declarations based on nothing more than his own speculation."*Healy v. City of Chicago,* No. 00 C 6030, 2004 U.S. Dist. LEXIS 13553, at *17-18 (N.D.Ill. July 20, 2004) (*citing Kelly v. Mun. Ct. of Marion County, Ind.,* 97 F.3d 902, 911 (7th Cir.1996)). Additionally, to hold an individual liable, the plaintiff must establish that the individual "caused or participated in an alleged constitutional deprivation." *Rascon v. Hardiman,* 803 F.2d 269, 273 (7th Cir.1986).

*31 In this case, Sebastian asserts First Amendment retaliation claims against Kaderbek, Kozicki, Allen, and the City. Specifically, he claims he was denied the supervisor promotion based on his political affiliation and the exercise of his right to support political officials by, among other things, refusing to contribute to the political campaigns of Chicago aldermen in 2003 and 2004. (Second Am. Compl. Count III, ¶¶ 1-37; Pl. Summ. Jmt. Resp. 17-33.)

### A. *Defendants Kozicki and Kaderbek*

The "threshold question" in analyzing whether an employment decision was motivated by the plaintiff's political activities "is whether the defendants even knew about" those activities. *Hall,* 389 F.3d at 762. A decision maker cannot retaliate on account of the protected activity if he is unaware of the protected activity. *See Healy,* 450 F.3d at 740-41 (*citing Miller v. Amer. Family Mut. Ins. Co.,* 389 F.3d 708, 715 (7th Cir.2004)). Because Sebastian has failed to present evidence from which a trier of fact could reasonably infer awareness on the part of Kaderbek or Kozicki, the Court's analysis with respect to the two individuals begins and ends with this inquiry.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Sebastian invites this Court to examine several pieces of evidence that he believes establish a triable issue as to knowledge: (1) testimony from the *Sorich* trial, including Kozicki's admission that he manipulated the selection process at a prior date and time with another applicant for a different position; (2) the alleged "highly politically active" nature of the successful candidates; (3) Defendants' actual awareness of Sebastian's contributions to Alderman Allen's campaigns; and (4) Ciaravino's, Falcon's, and Molloy's invocation of their respective Fifth Amendment rights against self incrimination.

With respect to the *Sorich* trial-Sebastian maintains that an inference can be drawn from the repeated use of "unlawful political sponsorship" to make employment decisions, including the use of the "Clout List" and the similar hallmarks between the selection process in this case and the employment practices at issue in the *Sorich* trial. Yet, Sebastian has failed to connect the testimony of Molloy, Falcon, and Katalinic to the facts in this case or to a widespread practice within the Department of hiring electrical inspectors based on political affiliation. Nor does Kozicki's admission that he changed his interview scores during a 2004 building inspector hiring sequence create a triable issue as to awareness. According to Kozicki, Kaderbek did not advocate for Ryan's, as well as another candidate's, hiring because of political affiliation. Instead, he did so because the two individuals were the sons of important union officials and Kaderbek believed they would help with union negotiations. Such evidence does not create a genuine issue of fact as to whether Kaderbek and Kozicki were aware of Sebastian's political association during a separate and independent hiring process for a different position with different candidates.

**\*32** Sebastian also asserts that knowledge could be inferred because "the successful candidates were each highly politically active."(Pl.Resp.Mem.27.) The Seventh Circuit has "sometimes assumed that a person's holding of an arguably prominent party office could support a finding of common knowledge

among decisionmakers, and sometimes ... [it has] not." *Hall,* 389 F.3d at 763 (comparing cases). For instance, in *Garrett v. Barnes,* 961 F.2d 629, 632 (7th Cir.1992), the plaintiff's public activities, specifically, his membership in the Young Democrats, campaigning on behalf of (and publicly endorsing) the mayor, and his precinct captainship for the democratic party in his district, were sufficient to raise an inference that the decision makers were aware of his political affiliation. In contrast, the court in *Cusson-Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992), found it unreasonable to infer knowledge because the plaintiff failed to "provide any facts to support the conclusory statement that her political affiliation was well known-she [did] not say how her political affiliation became so well known or who knew her political affiliation."

Much like the plaintiff in *Cusson-Cobb,* Sebastian has failed to support his conclusory assertion that Hall, Reynolds, and Hammersmith were so "highly politically active" prior to the 2004 supervisor promotions that a reasonable trier of fact could infer that Kozicki and Kaderbek had knowledge of their political activity. For instance, Sebastian maintains that Hall's prominence stems from the fact that he is "a religious leader at a powerful south side Chicago Church ... where elected officials and Local 134 union members have attended service" and that he "has volunteered ... to do political work on behalf of political candidates and officials."(City Defs. 56.1 Resp. ¶ 35.) Putting to one side Sebastian's self-serving description of Hall's work, the remaining evidence reveals that Hall is an ordained minister at a Chicago church, that there have been a few occasions when an elected official has been in attendance at the church, that approximately ten or fewer non-City Local 134 electricians attend the church, and that, in the mid-90's, Hall volunteered to do some political work for a candidate named "Lightfoot." Sebastian presents no evidence from which one could infer that the church was "powerful," that an elected official has attended the church with any regularity, or that Hall has done political work in the past decade.[FN33]

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                    Page 36
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

FN33. Perhaps recognizing the disparity between Sebastian's characterization of Hall's political activity and the facts revealed by the record, Sebastian contends that the credibility of Hall's statements must be assessed in the context of additional evidence proffered by Sebastian. However, Sebastian bears the ultimate burden of proof and cannot meet this burden " 'by relying on the hope that the jury will not trust the credibility of ... [the] witnesses.'" *Cichon v. Exelon Generation Co., LLC,* 401 F.3d 803, 815 (7th Cir.2005) (*quoting Perfetti v. First Nat'l Bank of Chicago,* 950 F.2d 449, 456 (7th Cir.1991)).

Similarly, while Sebastian submits that Reynolds grew up in the same neighborhood as State Representative Kevin Joyce and has known Kevin Joyce since the 1970's, this mere affiliation, without more, does not create a triable issue as to whether Reynolds was politically active or whether Kozicki and Kaderbek were aware of Reynolds' political affiliation. *See, e.g., Boehl v. DeLuca,* No. 04 C 5606, 2007 U.S. Dist. LEXIS 11670, at *33-42 (N.D.Ill. Feb. 16, 2007) (no evidence to support inference of awareness). Nor does the fact that Reynolds began his political activity in 2002, without any details regarding the nature or frequency of the activity, create such an inference. *See Cusson-Cobb,* 953 F.2d 1081.To the extent that Sebastian attempts to rely on Reynolds' position as a precinct captain and South Side Irish Parade coordinator, the Court notes that Reynolds assumed these duties in 2005 and 2006 respectively, *after* the 2004 promotions process.

*33 Finally, while Sebastian provides at least some vague details regarding Hammersmith's political activities, the strained inferences are also insufficient to stave off summary judgment. As before, Sebastian has failed to present any actual details to explain how his political affiliation became so well known or who knew of his political affiliation. Fur-

thermore, while Kozicki and Kaderbek were appointed to their positions, the parties present no additional evidence from which one could infer that the two defendants were politically active during the relevant period such that they would otherwise be aware of Hammersmith's, Reynolds', and Hall's political affiliations.

Ultimately fatal to Sebastian's claims against Kaderbek and Kozicki, however, is the absence of any evidence from which one could reasonably infer that either defendant was *aware* of Sebastian's political affiliation or activity. Sebastian contends that all the individual defendants had knowledge of his political affiliation based on his alleged contributions to Alderman Allen's campaigns. The record does not, however, support his assertion. While the parties dispute whether Allen and Sebastian discussed Sebastian's contributions, the parties' Local Rule 56.1 submissions provide no indication that Sebastian ever discussed the nature of his contributions with anyone other than Allen. Nor is there evidence that Allen, if he was aware of Sebastian's contributions, discussed the matter with Kozicki, Kaderbek, or any other City employee. Again, Sebastian's argument is based on speculation rather than the record.

Finally, Sebastian proffers as evidence against Kozicki and Kaderbek that, when Sebastian's counsel attempted to depose Molloy, Falcon, and Ciaravino in conjunction with this action, all three individuals asserted their rights to remain silent. As Sebastian correctly notes, a trier of fact may draw an adverse inference against a party to a civil action who refuses to testify under his Fifth Amendment right. *See LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 390 (7th Cir.1995). In the present case, however, the Court is not confronted with a party's refusal to testify. Instead, Sebastian attempts to use the refusal of three nonparty witnesses' invocations of the right as admissible evidence against parties in the current action. "In order to impute a third-party's Fifth Amendment invocation to another party, the party seeking to use the invocation must

establish some relationship of loyalty between the other two parties."*State Farm Mut. Auto. Ins. Co. v. Abrams,* No. 96 C 63656, 2000 U.S. Dist. LEXIS 6837, at * 21 (N.D.Ill. May 11, 2000) (citing *LiButti v. United States,* 107 F.3d 110, 122 (2d Cir.1997)). Ultimately, the question of whether a nonparty's refusal to testify may be used against a party is determined on a case-by-case basis and depends on whether such an " 'adverse inference is trustworthy under all of the circumstances and will advance the search for truth.'" *Kontos v. Kontos,* 968 F.Supp. 400, 406 (S.D.Ind.1997) *(quoting LiButti v. United States,* 107 F.3d 110, 124 (2nd Cir.1997)). Most courts that have imputed an adverse Fifth Amendment inference from a nonparty to a party have done so where there is a close family relationship between the party and the nonparty or a business relationship, such as an agency or employer-employee relationship. *See State Farm Mut. Auto Ins. Co.,* 2000 U.S. Dist. LEXIS 6837, at *22 (collecting cases); *Kontos,* 968 F.Supp. at 408.

**\*34** Citing only to the general rule that an adverse inference may be drawn by a party's invocation of the Fifth Amendment right, Sebastian does not make the necessary arguments or provide the necessary supporting facts to draw an adverse inference with respect to Molloy and Falcon. *See generally State Farm Mutual Auto. Ins. Co.,* 2000 U.S. Dist. LEXIS 6837, at *17-26; *Kontos,* 968 F.3d at 408-09.Sebastian proffers no evidence that either individual worked for the Department or in a manner that created a business or agency relationship with Kaderbek or Kozicki. Sebastian's application of Ciaravino's invocation of the Fifth Amendment as against Kozicki fails for similar reasons. *See Kontos,* 968 F.3d at 408-09.

The record presents a closer question with respect to Ciaravino and Kaderbek. While the parties dispute whether Ciaravino was the director of personnel or the Director of Administration for the Department, it is undisputed that Ciaravino was a City employee in the Department, that Kaderbek was the Commissioner of the Department, and that Kader-

bek retained final decision-making authority for employment decisions made within the Department during the time period at issue. Nevertheless, the Court need not determine whether such facts are sufficient to establish a relationship of loyalty because the resulting adverse inference could not create a question of fact as to Kaderbek's requisite awareness. "Before an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege."*Kontos,* 968 F.3d at 408-09.Thus, a moving party must introduce actual independent, material evidence that the elements of the party's case exists; he cannot rely solely on the adverse inference associated with the invocation of the Fifth Amendment right. *See LaSalle Bank Lake View,* 54 F.3d at 390-91;*State Farm Mutual Auto. Ins. Co.,* 2000 U.S. Dist. LEXIS 6837, at * 18-20. As noted above, Sebastian proffers no actual evidence to support his assertion that Kaderbek was aware of Sebastian's political affiliation or the affiliation of Hall, Reynolds, and Hammersmith. In fact, the evidence is to the contrary-the interviewers did not review political affiliation and work prior to the interviews. In the absence of such evidence, Sebastian cannot rely on speculation as evidence. *See Hedberg,* 47 F.3d at 931-32;*Kontos,* 968 F.3d at 408-09.

The Court concludes that Sebastian has failed to satisfy the "threshold question" of whether Kaderbek and Kozicki had the necessary awareness of Sebastian's political affiliation or the political affiliation of Hall, Reynolds, and Hammersmith. *See Hall,* 389 F.3d at 762. Because Sebastian fails to present any evidence from which a reasonable jury could infer the requisite awareness, summary judgment is appropriate on Sebastian's claim of political retaliation against Kozicki and Kaderbek.[FN34] *See Cusson-Cobb,* 953 F.2d at 1081;*Downey v. Shonkwiler,* No. 05-3001, 2007 U.S. Dist. LEXIS 73505, at *11 (C.D.Ill. Oct. 2, 2007) (no awareness when no evidence that political affiliation was a factor in the decision, let alone a substantial or motivating

Slip Copy                                                                                             Page 38
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

factor).

> FN34. Kozicki and Kaderbek also contend
> that they are entitled to qualified immunity
> with respect to Sebastian's § 1983 claim. In
> light of the Court's determination that a
> reasonable trier of fact could not conclude
> that Kozicki or Kaderbek violated Sebasti-
> an's First Amendment rights, the Court
> need not address the issue of qualified im-
> munity.

**B. Defendant Allen**

**\*35** Unlike his claims against Kaderbek and Ko-
zicki, Sebastian has presented sufficient evidence to
survive summary judgment with respect to his §
1983 political retaliation claim against Allen. Spe-
cifically, a genuine issue of material fact exists as
to whether Allen was aware of Sebastian's political
affiliation, whether the political affiliation was a
substantial or motivating fact in the decision not to
promote him, and whether Sebastian would not
have been promoted even if he had not engaged in
the constitutionally protected activity.

Allen initially contends that he cannot be liable un-
der § 1983 because he was unaware of Sebastian's
constitutionally protected activity. Yet, the record
reveals factual disputes regarding: (1) the extent to
which Allen encouraged Sebastian to donate to Al-
derman Allen's campaign; (2) whether Allen told
Sebastian that his 2001 contribution was insuffi-
cient; (3) whether Allen told Sebastian he was a
"cheap Indian"; and (4) whether Allen told Sebasti-
an that he would not be promoted because he was
"not politically involved." A reasonable juror could
conclude that Allen was aware of Sebastian's polit-
ical affiliation during the 2004 supervisor interview
process.

A reasonable trier of fact could conclude that "not
politically involved" statement was "causally re-
lated to the [employment] decision making process"
and, therefore, probative of retaliation. See Willi-

ams v. Seniff, 342 F.3d 774, 790 (7th Cir.2003) (cit-
ing Geier v. Medtronic, Inc., 99 F.3d 238, 242 (7th
Cir.1996)). To the extent that the retaliatory nature
of this statement is ambiguous, the issue is for the
jury. Phelan, 463 F.3d at 782 (internal quotations
omitted).

In addition to this statement, Sebastian also proffers
evidence of irregularities during and after Sebasti-
an's interview that create a question of fact as to Al-
len's true intentions. The parties dispute whether
Allen: (1) asked Sebastian all eight Code questions;
(2) asked Sebastian different technical questions as
compared to all of the other candidates; (3) asked
Sebastian different questions than those included on
the Code questions list; (4) met with Kozicki and
Bush after all of the interviews to discuss all the
candidates; and (5) conveyed false information to
Kozicki regarding Sebastian's interview.. The Court
is mindful that is does not "sit as a superpersonnel
department" and that an employer may employ a
subjective analysis when assessing an applicant
during the interview process. See Blise, 409 F.3d at
868. In this case, however, the departure from the
standards with respect to Sebastian and the multiple
disputes regarding Allen's alleged manipulation of
Sebastian's interview creates a genuine issue of ma-
terial fact for the jury. See, e.g., Healy, 450 F.3d at
744 n. 16 ("[A] departure from [a standard list of
questions] is suspicious."). Thus, for the reasons set
forth above, Sebastian has also carried his burden
on summary judgment with respect to the second
element of the prima facie case.

**\*36** Because Sebastian has provided sufficient
evidence of a prima facie case to survive summary
judgment, the burden shifts to Allen to produce
evidence that Sebastian would not have received
the promotion in the absence of his political affili-
ation. See Healy, 450 F.3d at 739. Here, Allen as-
serts that Sebastian would not have received the
promotion because Allen ranked Sebastian eleventh
out of eleven candidates and Kozicki ranked Se-
bastian tenth out of fifteen candidates. In addition,
Allen submits that Kozicki and Allen both believed

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

Page 39

that Sebastian performed poorly in his interview and did not provide detailed remarks or examples in response to the questions posed.

Assuming Allen has provided sufficient evidence, Sebastian must "show that [Allen's] proffered reasons were pretextual and that discrimination was the real reason for the [employment action]."*Id.*(internal quotations omitted). Sebastian has put forth sufficient evidence to clear this hurdle at summary judgment. While objective scores resulting from the interview process may, in some instances, serve as a legitimate, non-discriminatory reason for an employment decision, *see, e.g., Healy*, 450 F.3d at 741, the pretextual nature of the process (and the results) may be called into question when "the hiring decision was manipulated by one member who possessed" retaliatory motive, *see Hall*, 389 F.3d at 763. In this case, Sebastian has created a triable issue as to whether and to what extent Allen's alleged retaliatory animus motivated the promotion decision. *Compare Healy,* 450 F.3d at 741 (plaintiff failed to present sufficient evidence that the interview panel acted as the defendant's " 'cat's paw' "). Allen, along with Kozicki, interviewed Hall, Hammersmith, Reynolds, and Sebastian. In addition, as noted above, the record reveals multiple factual disputes regarding Sebastian's interview, the information conveyed to Kozicki (and, ultimately, Kaderbek) regarding Sebastian's interview, and Ciaravino's drafting of notification letters. Finally, to the extent that Allen relies on the subsequent explanations regarding Sebastian's performance to substantiate his proffered reason, any decision regarding the merits of the claim and the weight of such evidence is best left to the finder of fact. *See McGreal v. Ostrov,* 368 F.3d 657, 677 (7th Cir.2004) ("It is rarely appropriate on summary judgment for a district court to make a finding on a state of mind."). Thus, for the reasons stated above, Allen's Motion for Summary Judgment is denied with respect to Count III.

*C. Municipal Liability*

The doctrine of respondeat superior cannot be utilized to hold local governmental units liable for § 1983 violations. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality may only be held liable under § 1983 when its policy or custom results in a constitutional injury to the plaintiff. *See id.* at 694.To establish a policy or custom, a plaintiff must allege either: (1) " 'an express policy that, when enforced, causes a constitutional deprivation' "; (2) the act of a person with final policymaking authority caused the constitutional injury; or (3) " 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *McTigue v. City of Chicago,* 60 F.3d 381, 382 (7th Cir.1995) (*quoting Baxter by Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 734-35 (7th Cir.1994)). In the present case, Sebastian does not argue that the City had an express policy of retaliating against persons on account of their political affiliation; nor does he claim that the alleged constitutional deprivation was committed by an individual with final policymaking authority. Instead, Sebastian maintains that the City is liable because: (1) the City has a widespread practice that constitutes a "custom and usage" with the force of law and (2) the individual defendants had sufficient input into the selection process such that the selection process was "poisoned" by discriminatory motivation. Because Sebastian has not created a triable issue under either theory, the Court grants summary judgment in favor of the City with respect to Count III.

*i. Widespread Practice*

*37 To support widespread practice, Sebastian proffers: (1) the testimony from the *Sorich* trial; (2) Kozicki's admission that he previously changed his interview ratings during a 2004 building inspector hiring sequence; and (3) Molloy's, Falcon's, and Ciaravino's invocation of their respective Fifth Amendment rights. At the criminal trial, Molloy, who worked as Sorich's secretary at the IGA, testi-

fied extensively about the "Clout List" and the index card files compiled during her tenure. Similarly, Falcon, who served as the personnel director for the Department of Sewers from 1994 through 2003 and the Department of Water Management from 2003 through 2005, testified about the corruption within the City's hiring process for the Department of Sewers and Department of Water Management. Finally, Katalinic, who served as the Deputy Commissioner of Street Operations for the Streets & Sanitation Department also testified regarding his requests for city jobs and promotions for his political workers. Noticeably absent from this evidence is any testimony from the three individuals regarding the hiring process employed in the Department of Buildings in 2004. Molloy's, Falcon's, and Katalinic's testimony is largely irrelevant to this case, as the events described occurred in departments that are not at issue in this case, for different positions, and with different decision makers. *Cf. Collello v. City of Chicago,* No. 06 C 6243 (N.D.Ill. Jan. 4, 2008) (Holderman, J.). Absent such evidence, the Court is unwilling to paint municipal liability with such a broad brush.

Nor does Kozicki's admission that he previously changed his interview ratings scores for candidate Ryan establish this link. Sebastian submits that Kozicki admitted to manipulating the selection process for other Department hiring sequences to ensure that politically favored candidates received the positions. In doing so, Sebastian overstates the evidence provided in his Local Rule 56.1 submissions. Kozicki changed his interview scores for one individual during a hiring process for a building inspector position because the individual was the son of an important union official and Kaderbek allegedly believed that hiring the individual as well as one other candidate would help with union negotiations and other Department goals. The evidence proffered provides no indication that Kozicki manipulated the scores on account of political affiliation, but rather, union affiliation. Nor is there any indication that the union affiliation at issue in the 2004 building inspector hiring sequence was related

to a political purpose. *See Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir.1996) (the idea that membership in a union is a political affiliation is "a dubious notion at best"). Further, the Court notes that, even if a trier of fact unreasonably assumed that Kozicki changed the ratings on account of political affiliation, "proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer v. Marion County,* 327 F.3d 588, 595-96 (7th Cir.2003).

*38 Finally, Sebastian relies on Molloy's, Falcon's, and Ciaravino's invocation of their Fifth Amendment right. While Sebastian may impute the adverse inference associated with their Fifth Amendment invocations to the City because of the agency relationship between the three individuals and the City, *see State Farm Mut. Auto. Ins. Co.,* 2000 U.S. Dist. LEXIS 6837, at *22, such adverse inferences do not stave off dismissal of the municipal liability claim for two reasons. First, with respect to Molloy and Falcon, Sebastian has failed to present evidence, through their testimony at the *Sorich* trial or otherwise, that either individual had personal involvement in or knowledge regarding corrupt hiring processes within the Department of Buildings during the relevant time period. *See Hall,* 389 F.3d at 764. Second, with respect to all three nonparty witnesses, Sebastian has failed to present independent corroborative evidence that the elements of the claim exist. *See State Farm Mut. Auto. Ins. Co.,* 2000 U.S. Dist. LEXIS 6837, at *18-20. As noted above, a party cannot rely solely on the adverse inference associated with invocation of the Fifth Amendment right to establish a claim. *See LaSalle Bank Lake View,* 54 F.3d at 390-91.

Thus, because Sebastian has failed to proffer competent evidence from which a reasonable trier of fact could infer that City final policymakers knew of a widespread practice and acquiesced in a pattern of unconstitutional conduct such that the City was deliberately indifferent to an obvious or known consequence of the practice, the Court grants the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

City's motion for summary judgment with respect to Sebastian's widespread practice claim of municipal liability.

*ii. Tainted Selection Process*

Sebastian does not dispute the City's contention that Kaderbek did not have final policymaking authority, nor does he argue that the ultimate decision maker delegated final policymaking authority to Kaderbek or ratified the unconstitutional conduct of a subordinate.[FN35] Instead, Sebastian argues that the City may be liable because the individual defendants "poisoned" the selection process with discriminatory motivation through its critical "input" in the decision making process. In doing so, Sebastian relies primarily on *Waters v. City of Chicago,* 416 F.Supp.2d 628 (N.D.Ill.2006). In *Waters,* the court analogized and applied the well-established "cat's paw" theory of Title VII liability to a § 1983 municipal liability claim against the City of Chicago. *See Waters,* 416 F.Supp.2d at 630-31. Specifically, the *Waters* court noted "that if the ultimate decision is poisoned by discriminatory or retaliatory motivation on the part of another person whose input is critical to the ultimate decision, it does not matter that the ultimate decisionmaker is as pure as driven snow-Section 1983 liability can be imposed."*Id.* at 631-32.

> FN35. While Sebastian cites to *Waters v. City of Chicago,* 416 F.Supp.2d 628 (N.D.Ill.2006), which discusses ratification and delegation, Sebastian's argument centers upon the theory of a selection process "poisoned" by the "input" of the individual defendants. Thus, the Court will not consider whether the ultimate decision maker delegated final policymaking authority to Kaderbek or ratified the unconstitutional conduct of a subordinate. *See Culver,* 416 F.3d at 550;*see also Graham,* 2007 U.S.App. LEXIS 21598, at *12.

The Court respectfully declines to adopt the *Waters*

approach. While the Court has recognized and applied this theory in the context of Title VII liability, Sebastian has not cited, nor is the Court aware of, any binding legal authority that supports the application of this theory in the context of § 1983 municipal liability claims. To the contrary, the Seventh Circuit has emphasized that "[n]either respondeat superior nor negligent supervision of subordinates is an authorized ground of liability in a suit under 42 U.S.C. § 1983,"*see Wilson v. City of Chicago,* 6 F.3d 1233, 1240 (7th Cir.1993), and that a plaintiff cannot establish municipal liability under § 1983"by simply alleging that the municipality failed to investigate an incident," *Baskin v. City of Des Plaines,* 138 F.3d 701, 705 (7th Cir.1998).*See also Monell,* 436 U.S. at 691.

**\*39** In light of the foregoing, the Court grants the City's motion for summary judgment with respect to Count III.

*IV. Indemnification (Count IV)*

Finally, the City [FN36] moves for summary judgment on Sebastian's claim for indemnification. In Count IV, Sebastian asserts a demand of judgment pursuant to 745 ILCS 10/9-102 against the City for any amount awarded to Sebastian for the acts of Allen, Kozicki, and Kaderbek. (Pl. Sec. Am. Compl., Count IV ¶¶ 1-37.) Section 10/9-102 of the Illinois Tort Immunity Act directs a local public entity "to pay any tort judgment ... for compensatory damages ... for which it or an employee while acting within the scope of his employment is liable."745 ILCS 10/9-102. Under Section 10/2-109, however, "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable."745 ILCS 10/2-109. Having concluded that neither Kaderbek nor Kozicki retaliated against Sebastian in violation of § 1983, the Court grants summary judgement in favor of the City on Sebastian's claim for indemnification with respect to Kaderbek and Kozicki. *See*745 ILCS 10/2-109.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
(Cite as: 2008 WL 2875255 (N.D.Ill.))

FN36. In his reply memorandum, Allen submits that he is also entitled to summary judgment with respect to Count IV. The allegations within Count IV of Sebastian's Second Amended Complaint are directed solely at the City, not the individual defendants. Thus, Allen need not move for summary judgment with respect to Count IV as the Second Amended Complaint does not contain such a claim against him in his individual capacity.

Still at issue, however, is whether the City may be held liable for the actions taken by Allen with respect to Sebastian's § 1983 claim. The City may be held liable for actions taken by its employee while acting within the scope of his employment. *See* 745 ILCS 10/9-102. Sebastian must establish that Allen was acting within the scope of his employment when he engaged in the activities underlying Sebastian's political retaliation claim. *See Pyne v. Witmer,* 129 Ill.2d 351, 135 Ill.Dec. 557, 543 N.E.2d 1304, 1309 (Ill.1989). To be within the scope of employment, an employee's acts must be: (a) the kind he is employed to perform; (b) substantially within the authorized time and space limits; and (c) actuated, at least in part, by a purpose to serve the master. *Id.*

The City maintains that Allen was not acting within the scope of his employment because the City prohibits the use of political factors in employment decisions affecting career service employees. Sebastian submits, however, that the conduct was within the relevant scope because it was part of the culture of the City. Neither argument, both of which are noticeably deficient with respect to analysis and legal authority, is persuasive. An intentional tort is considered to be within the scope of employment when it is committed, at least in part, to serve or further the employer's business, despite its illegality or violation of employer policy. *See Prothro v. Nat'l Bankcard Corp.,* No. 04 C 7857, 2006 U.S. Dist. LEXIS 57553, at *19 (N.D.Ill. Aug. 3, 2006) (*citing* Restatement (Second) of Agency § 219(1));

*see also Taboas v. Mlynczak,* 149 F.3d 576, 582-83 (7th Cir.1998) (an employment decision motivated by ill will or bad faith may still be within the scope of employment). Summary judgment "is generally inappropriate when scope of employment is at issue. Only if no reasonable person could conclude from the evidence that an employee was acting within the course of employment should a court hold as a matter of law that the employee was not so acting." *Pyne,* 135 Ill.Dec. 557, 543 N.E.2d at 1309 (internal citations omitted).

**\*40** In the present case, there remains a question of fact as to whether Allen was acting within the scope of his employment with respect to Sebastian's § 1983 claim. According to Sebastian's version of the events at issue, Allen was Sebastian's superior in the EB Department. Sebastian approached Allen while the two individuals were at work and proceeded to discuss the supervisor position when Allen allegedly commented on Sebastian's lack of political activity. Kozicki subsequently asked Allen to participate in the interview process in his capacity as a City employee, which he did in a number of ways, including creating the Code questions, directly interviewing the candidates, discussing the candidates' interviews, and scoring the candidates. Such facts present a genuine issue of material fact as to whether Allen was acting within his scope of employment and, more specifically, whether he was motivated, at least in part, to serve the City's interests. Accordingly, summary judgment is denied with respect to Count IV. *See id.* at 1309-11.

### CONCLUSION AND ORDER

For the reasons stated herein, Defendant Allen's Motion For Summary Judgment is denied with respect to Count III and granted with respect to Counts I and II. Defendants City of Chicago, Kaderbek and Kozicki's Motion For Summary Judgment is granted in part and denied in part. Specifically, summary judgment is denied as to Counts I and IV, but granted with respect to Counts II and III. Finally, Sebastian's Motion to Strike portions of

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 43
Slip Copy, 2008 WL 2875255 (N.D.Ill.)
**(Cite as: 2008 WL 2875255 (N.D.Ill.))**

Defendants' reply pleadings is granted in part and
denied in part consistent with this Opinion.

So ordered.

N.D.Ill.,2008.
Sebastian v. City of Chicago
Slip Copy, 2008 WL 2875255 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
**(Cite as: 1999 WL 543166 (N.D.Ill.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern
Division.
FUJISAWA PHARMACEUTICAL CO., LTD. and
Fujisawa USA, Inc., Plaintiffs,
v.
John N. KAPOOR, Defendant.
**No. 92 C 5508.**

July 21, 1999.

*MEMORANDUM OPINION AND ORDER*

BUCKLO, J.

*1 The plaintiffs, Fujisawa Pharmaceutical Co.,
Ltd. ("Fujisawa"), and Fujisawa USA, Inc.
("FUSA"), sued the defendant, John N. Kapoor, un-
der the Racketeer Influenced and Corrupt Organiza-
tions Act, 18 U.S.C. § 1961 *et seq.,* and on various
state law grounds. Before me are the motions in
limine of both sides plus four additional, related
motions by Dr. Kapoor. For the reasons set forth
below, the motions are granted in part and denied in
part.

*Motions in Limine*

*Defendant Dr. Kapoor's Motions*

1. Defendant's Motion in Limine to Bar Evidence of
Alleged ANDA Discrepancies Not Identified as
Material in Plaintiffs' Expert Report.

Dr. Kapoor moves to bar evidence of alleged AN-
DA discrepancies that Fujisawa's expert, C. Greg
Guyer, did not consider material to the approvabil-
ity of 35 ANDAs that were withdrawn by Fujisawa.
He argues that evidence of such nonmaterial dis-
crepancies is irrelevant and would result in undue

delay and waste of time, and would confuse and
mislead the jury. He also contends any probative
value of those alleged discrepancies is substantially
outweighed by the danger of undue prejudice be-
cause of his expert's reasonable reliance on the al-
leged discrepancies that Dr. Guyer considered ma-
terial.

The evidence at issue here is relevant to Fujisawa's
reasons for withdrawing the ANDAs, as well as its
attempt to establish Dr. Kapoor's *scienter.*Under
Fed.R.Evid. 403, relevant evidence "should only be
excluded if its probative value is *substantially* out-
weighed by any of the listed concerns in Rule 403."
*United States v. Kramer,* 955 F.2d 479, 490 (7th
Cir.1992) (citations omitted). In this instance, the
probative value of this evidence is not substantially
outweighed by concerns such as danger of unfair
prejudice, [FN1] confusion of the issues, or waste of
time. On the contrary, the probative value of the
evidence clearly outweighs those other concerns.
There is no indication the evidence "will induce the
jury to decide the case on an improper basis."
*United States v. Curry,* 79 F.3d 1489, 1496 (7th
Cir.1996). The motion is denied.

> FN1. Dr. Kapoor's argument that he would
> be prejudiced because his expert, Joel Dav-
> is, limited his written report to Dr. Guyer's
> report, (Def.'s Mem. in Supp. of Mot. in
> Limine at 5), is undercut by Mr. Davis' as-
> sertion that "if Fujisawa attempts ... to
> raise reasons for the withdrawal of AN-
> DA's [sic] other than those noted in Dr.
> Guyer's report, I will be prepared to ad-
> dress them as well," (Def.'s Mem. in Supp.
> of Mot. in Limine Ex. C at 11 n. 1).

2. Motion in Limine Relating to FDA "Findings."

Dr. Kapoor moves to bar evidence the FDA found
fraud, or false or misleading information in the
Lyphomed ANDAs at issue in this case. Dr. Kapoor

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
(Cite as: 1999 WL 543166 (N.D.Ill.))

focuses on four documents: a Form 483 issued by the FDA on November 7, 1991, stating that there were discrepancies between certain raw data and the data submitted in various Lyphomed ANDAs, and that documentation needed to support data in some applications was unavailable or incomplete; a February 28, 1992, letter in which the FDA advised FUSA that it was "preparing to initiate proceedings to withdraw approval" of several drug applications held by FUSA because of "serious questions about the reliability of the data ... submitted to support ... the applications"; a March 12, 1992, letter notifying FUSA that the Center for Drug Evaluation and Research found that "Lyphomed has submitted false or misleading information in applications filed with [FDA]"; and a letter to FUSA dated February 16, 1994, stating that the FDA "has determined that potential serious problems exist with respect to" certain drug products "because the applications for those products contain false or misleading statements."

*2 Dr. Kapoor contends the Form 483 is barred by Fed.R.Evid. 1002 ("Best Evidence Rule"). He also argues the Form 483 and the three FDA letters are hearsay not subject to any exception, and that they should be excluded under Fed.R.Evid. 403.

The Form 483, though hearsay, is subject to the Rule 803(8)(B) public records and reports exception. It is a report by a public agency of "matters observed pursuant to duty imposed by law as to which matters there was a duty to report."Fed.R.Evid. 803(8)(B). Dr. Kapoor contends the Form 483 is inadmissible under Rule 803(8)(B) because it is based on a "fragmented documentary record," (Reply in Supp. of Mot. in Limine at 3), and not on the FDA investigators' personal knowledge, *see Wetherill v. University of Chicago,* 518 F.Supp. 1387, 1390 (N.D.Ill.1981) (Shadur, J.). Nevertheless, the Form 483 was based on a nine-month investigation of FUSA's Lyphomed R & D facility, and I find that such an on-site investigation satisfies Rule 803(8)(B)'s "personal knowledge" requirement in this instance.

In addition, Dr. Kapoor has failed to meet his burden of showing the Form 483 is untrustworthy. *See United States v. Loyola-Dominguez,* 125 F.3d 1315, 1318 (9th Cir.1997) (documents that fall under public records exception "are presumed trustworthy, placing 'the burden of establishing untrustworthiness on the opponent of the evidence' "). Despite his criticisms as to the timeliness of the investigation, the alleged bias of one of the investigators, and that same investigator's alleged lack of special skill or expertise, Dr. Kapoor falls far short of showing the Form 483 in this instance is untrustworthy.[FN2]Neither is the Form 483 inadmissible under Fed.R.Evid. 403. Its probative value is not substantially outweighed by the concerns listed in Rule 403. Accordingly, the motion is denied as to the Form 483.[FN3]

> FN2. Dr. Kapoor also argues no hearing was conducted prior to issuance of the Form 483, but he concedes that a formal evidentiary hearing is not required in every instance. (Reply in Supp. of Mot. in Limine at 8.) In this instance it is not.

> FN3. Dr. Kapoor also contends the Form 483, if admitted, would be used to prove the content of Lyphomed's ANDAs and supporting data, and thus would run afoul of Fed.R.Evid. 1002. That argument is without merit. The purpose of introducing the Form 483 would be to show discrepancies between the ANDAs and underlying data, and though the content of those documents undoubtedly would come into play, proving that content is not the primary aim. An "over-technical and strained application of the best evidence rule" is to be avoided. *United States v. Manton,* 107 F.2d 834, 845 (2nd Cir.1939); *see* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 1002[02], at 1002-8 (1990).

The three letters are admissible under Fed.R.Evid. 803(8)(C). They present "factual findings resulting

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
(Cite as: 1999 WL 543166 (N.D.Ill.))

Page 3

from an investigation made pursuant to authority granted by law."Fed.R.Evid. 803(8)(C). Dr. Kapoor contends the letters lack trustworthiness,[FN4] but his arguments are similar to those made as to the Form 483 and are also rejected. Dr. Kapoor also argues the letters contain inadmissible conclusions. However, "portions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion." *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 170 (1988); *United States v. Romo,* 914 F .2d 889, 896 (7th Cir.1990). The letters also are not inadmissible under Fed.R.Evid. 403. Their probative value is not substantially outweighed by the Rule 403 concerns, even though two of the letters state findings or determinations that the applications contain "false or misleading" information. (Def.'s Mem. in Supp. of Mot. in Limine Ex. C, Ex. D.) Such statements do not predetermine the issue or tell the jury how to decide the case, *see Tulloss v. Near North Montessori School, Inc.,* 776 F.2d 150, 154 (7th Cir.1985), which depends not solely on whether the applications were false or misleading but also on Dr. Kapoor's knowledge of their alleged falsity or misleading nature. To state that the applications contained false or misleading information is not to conclude the applications were fraudulent. The motion is denied as to the three letters as well.

> FN4. Dr. Kapoor points to *Nachtsheim v. Beech Aircraft Corp.,* 847 F.2d 1261 (7th Cir.1988), which upheld the exclusion of a Forestry Service bulletin and the redaction of a statement from a Forestry Service pilot's report, both on trustworthiness grounds. 847 F.2d at 1271-74.However, the bulletin was excluded because no information was provided about the author, and the redaction was done because the pilot testified he was not the author of the disputed statement. That is not the case here.

3. Defendant's Motion in Limine to Bar Evidence that Dr. Kapoor Eliminated Certain Stability Testing on Research and Development Samples after Three Months of Room Temperature Testing While Purportedly Directing that Lyphomed Represent to the FDA that Such Testing Continued.

*3 Dr. Kapoor moves to bar evidence that he eliminated certain stability testing on R & D samples after three months of room temperature testing while allegedly directing that Lyphomed represent to the FDA that such testing continued. Dr. Kapoor contends such evidence is irrelevant to any of the issues in this case and that its probative value is substantially outweighed by the danger of unfair prejudice and confusion of the issues. Therefore, Dr. Kapoor argues, it should be barred under Fed.R.Evid. 403. Nevertheless, such evidence is relevant to Fujisawa's attempt to establish Dr. Kapoor's *scienter.*In addition, its probative value is not substantially outweighed by the Rule 403 factors, particularly considering the relative strength of the material presented in support of it (notwithstanding Dr. Kapoor's claims that it is weak). (Kasubick Dep. at 38-49; Opp'n to Mot. in Limine Ex. C.) The motion is denied.

4. Defendant's Motion in Limine to Bar Plaintiffs from Introducing Evidence and Damage Calculations Relating to the Ten ANDAs which Fujisawa Has Conceded Had Non-Material ANDA Discrepancies.

Dr. Kapoor moves to bar introduction (for purposes of liability) of evidence as to the 10 ANDAs that Fujisawa defended to the FDA stating discrepancies were immaterial to approvability. He also moves to bar introduction (for purposes of damages) of calculations showing losses stemming from withdrawal of products covered by those ANDAs. Dr. Kapoor argues that because Fujisawa in 1992 believed those ANDAs did not contain material discrepancies, Dr. Kapoor could not have misled Fujisawa as to those products. He also contends he is thus not responsible for damages allegedly stemming from withdrawal of those ANDAs.

Fujisawa asserts statements included in its defenses of those ANDAs were arguments or positions "advanced in an effort to salvage some of the company's most commercially important products."(Opp'n to Mot. in Limine ¶¶ 10-11.) Moreover, those defenses were rejected by the FDA, which recommended voluntary withdrawal of the ANDAs because it had determined they contained "false or misleading statements." *Id.* Ex. C.

Even though Fujisawa may have believed the discrepancies in those ANDAs were immaterial, they were material to FDA approval. I decline to bar Fujisawa from arguing liability and damages stemming from those discrepancies simply because Fujisawa presented an unsuccessful defense that the discrepancies were immaterial. *See Ezekiel v. Michel,* 66 F.3d 894, 904 (7th Cir.1995) (litigant "not forever bound to a losing argument"). The motion is denied.

5. Motion in Limine to Exclude Certain Speculative Testimony from Melissa Wilson.

Dr. Kapoor moves to exclude testimony of Melissa Wilson, a chemist at Lyphomed from 1983 to 1986, about an alleged Lyphomed policy of not reporting out-of-specification data to the FDA. Dr. Kapoor argues that because Ms. Wilson's deposition testimony on that subject makes no mention of him and is somewhat inconclusive, (Wilson Dep. at 55, 57-58, 120-21), her live testimony at trial on that topic should be barred on grounds it is irrelevant, lacks foundation and is speculative. Nevertheless, some parts of Ms. Wilson's deposition testimony on the reporting of data to the FDA are clearer than others. (Wilson Dep. at 37-39.) Further, it is not clear at this point that her trial testimony on that subject would be inadmissible. Therefore, the motion is denied. *See United States v. Rusin,* 889 F.Supp. 1036, 1038 (N.D.Ill.)

6. Defendant's Motion in Limine to Bar the Testimony of Richard Cooper.

*4 Dr. Kapoor moves to bar the testimony at trial of Richard Cooper, a former FDA General Counsel retained by Fujisawa in 1991 shortly after it received the Form 483 from the FDA. Dr. Kapoor argues that because Mr. Cooper was brought in only after the Form 483 was received he has no firsthand knowledge of the events in dispute, including events underlying the alleged discrepancies in Lyphomed's ANDAs. However, Fujisawa points to deposition testimony showing Mr. Cooper did have direct involvement in several aspects of Fujisawa's response to the FDA. He reviewed audit reports, (Cooper Dep. at 57-61, 89, 113-14, 188-89); he met with the FDA to discuss the drugs identified in the Form 483 and the issues raised as to those drugs, *id.* at 44-51; and he evaluated the company's defenses of its ANDAs, looking at the logic and strength of the arguments in an effort to advise Fujisawa as to the likelihood the defenses would be successful, *id.* at 263-65.Fujisawa asserts Mr. Cooper's testimony "will be based on his *own* participation in Fujisawa's 1991 investigation and his advice given to Fujisawa during the time the company operated under the AIP," not on what occurred in the 1980s. (Pls.' Opp'n to Mot. in Limine at 6, 8.)

Dr. Kapoor's contention that Mr. Cooper lacks personal knowledge of any matter to which he would testify is therefore denied (obviously without prejudice to objections to specific questions at trial). I also reject Dr. Kapoor's argument that, as a matter of law, I should decide that Mr. Cooper's testimony would concern matters as to which Dr. Kapoor was unable to elicit deposition testimony due to the assertion of the attorney client privilege. The motion is denied.

7. Motion in Limine to Exclude Certain Testimony from Anne O'Connor.

Dr. Kapoor moves to bar deposition testimony from former Lyphomed chemist Anne O'Connor that Lyphomed generally did not report out-of-specification data to the FDA. Dr. Kapoor contends Ms. O'Connor lacks personal knowledge to

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
**(Cite as: 1999 WL 543166 (N.D.Ill.))**

make such a statement. He points to portions of Ms. O'Connor's deposition in which she acknowledged there was never a meeting in R & D to announce a change in standard deviation analysis (O'Connor Dep. at 183) and in which she conceded that, as to her belief that Lyphomed did not report out-of-specification data, she did not know "what every other scientist was doing,"*id.* at 233.

Nevertheless, Ms. O'Connor also testified she talked to other people in R & D about how they handled out-of-specification data, (O'Connor Dep. at 184), and that she "had access to other people's data through finished product specs" and so "had an idea what other people were doing,"*id.* at 183-84.Even though Ms. O'Connor may not have known what *every* other scientist was doing, and even though there was no stated policy of not reporting out-of-specification data, *id.* at 112, Ms. O'Connor could have been in a position to conclude that such data generally were not being reported. Given the content of other portions of Ms. O'Connor's deposition, (O'Connor Dep. at 54-55, 56-61, 111-12, 146-48, 197-98), such a conclusion could have been "rationally based" on her perceptions and would be "helpful to the development of the evidence at trial." *United States v. Giovannetti,* 919 F.2d 1223, 1226 (7th Cir.1990) (discussing Fed.R.Evid. 602 and 701). The motion is denied.

8. Defendant's Motion in Limine to Bar Dr. Hayes' Expert Report and Testimony.

**\*5** Dr. Kapoor moves to exclude the testimony and report of Fujisawa expert Dr. Arthur Hayes on grounds that Dr. Hayes is not qualified to render an expert opinion in this case and that his testimony thus would provide no assistance of substance to the trier of fact. Under Fed.R.Evid. 702, expert testimony must "assist the trier of fact in understanding the evidence or determining a fact in issue," and the expert witness must be "properly qualified to give the testimony sought." *United States v. Hall,* 93 F.3d 1337, 1342 (7th Cir.1996) (citation omitted).

Dr. Hayes conceded in his deposition that he did not know what type of testing the FDA required for ANDAs for generic drugs, (Hayes Dep. at 108), nor did he know if there were particular requirements in the 1980s for parenteral (injectable) drugs, *id.* at 108-09.In addition, Dr. Hayes's deposition testimony showed he was unclear as to what standards or guidelines the FDA had for retesting of products, a subject he conceded is "serious." *Id.* at 249-50.Moreover, Dr. Hayes indicated he had no specific knowledge of the FDA's recordkeeping requirements for drug manufacturers in the 1980s, *id.* at 78, nor is he expert in the subject of Good Manufacturing Practices, *id.* at 341-42.

Fujisawa contends Dr. Hayes would not testify as to any of those areas but instead would focus on his "principal opinion," which is "that FDA reviewing scientists rely on the truth and completeness of all the information submitted in support of a new drug application."(Fujisawa's Resp. to Mot. in Limine at 2.) As to this opinion at least, and the underlying reasons why this is so, Dr. Hayes appears qualified to testify. Thus, the motion to exclude is denied.

9. Motion in Limine to Exclude Any Theory of Liability or Exposure of Dr. Kapoor Other Than Those Pled.

Dr. Kapoor moves to exclude any evidence that he has liability, responsibility or exposure under any theory not arising from the claims stated in Fujisawa's second amended complaint. In the deposition of William Weaver (one of Dr. Kapoor's experts), Fujisawa questioned Mr. Weaver about a Food, Drug, and Cosmetic Act ("FDCA") requirement that drug company executives "seek out and remedy violations" of the FDCA. *United States v. Park,* 421 U.S. 658, 672 (1975); (Weaver Dep. at 112-17.) Dr. Kapoor contends liability under such a "positive duty" goes beyond the counts stated in Fujisawa's complaint and thus evidence of such liability should be excluded. Fujisawa concedes it has not asserted claims under such a strict liability theory and asserts it will not seek to impose such li-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
**(Cite as: 1999 WL 543166 (N.D.Ill.))**

Page 6

ability. However, Fujisawa asserts it should not be precluded from cross-examination of Dr. Kapoor and his experts regarding the duty discussed in *Park,* depending on how they testify at trial. Whether such questioning would be appropriate will depend on the context in which the questions arise at trial. As set forth in Fujisawa's responsive memorandum, however, the questioning would appear appropriate. The motion therefore is denied.

10. Defendant's Motion in Limine to Bar Any and All Evidence That The Drug Products at Issue in This Case Were Unsafe or Ineffective.

*6 Dr. Kapoor moves to exclude any evidence or argument by Fujisawa that the pharmaceutical products at issue in this case were unsafe or ineffective. At a 1995 hearing before Magistrate Judge Martin Ashman on Dr. Kapoor's motion to compel compliance with Fed.R.Civ.P. 30(b)(6), Fujisawa's counsel unequivocally stated that the products at issue were safe, (Hr'g Tr. at 7, 12), and that Fujisawa would not claim, try to prove, or offer any evidence that the products were ineffective, *id.* at 18-19. When Judge Ashman construed the Fujisawa's position to mean it would "not take any exception to any objection to any evidence on the grounds that the evidence is brought for the purpose of showing it is the ineffectiveness of the product" and that it agreed that such evidence "is not relevant," Fujisawa's counsel stated: "I agree with that." *Id.* at 19-20.

Those statements are a judicial admission that the products are safe and that plaintiffs will not offer evidence at trial that they are ineffective because such evidence is irrelevant in this case. Fujisawa asserts correctly that it did not state at the April 6, 1995 hearing that the products *were* effective; it merely stated it would not prove they were ineffective or offer any evidence to that effect. However, in this instance that is a distinction without a difference, and it does not render Fujisawa's statements ineffective as a judicial admission. "Judicial admissions are formal concessions in the pleadings, or

*stipulations by a party or its counsel,* that are binding on the party making them." *Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995) (emphasis added). Judicial admissions also are " 'any "deliberate, clear and unequivocal" statement, either written or oral, made in the course of judicial proceedings." ' *Medcom Holding Co. v. Baxter Travenol Lab., Inc.,* 106 F.3d 1388, 1404 (7th Cir.1997) (quoting *In re Lefkas Gen. Partners,* 153 B.R. 804, 807 (N.D.Ill.1993)). Fujisawa's statements as to safety and evidence of ineffectiveness are formal stipulations made in the course of a judicial proceeding, and as such they "may not be controverted at trial or on appeal." *Keller,* 58 F.3d at 1198 n. 8. Further, because Fujisawa conceded the irrelevance of evidence as to safety or ineffectiveness, that evidence also is barred by Fed.R.Evid. 402.

The motion is granted as to any and all evidence offered by Fujisawa that the products at issue were unsafe or ineffective, including any evidence to that effect in Fujisawa's expert testimony and reports.

11. Defendant's Motion in Limine to Bar Evidence Offered, Expressly or Impliedly, Pursuant to a Theory of Secondary or Vicarious Liability.

Dr. Kapoor moves to exclude evidence of indirect, secondary or vicarious liability for regulatory and securities fraud. Dr. Kapoor points to two of my prior rulings in this case as support for his motion. In one, I denied Fujisawa's motion for leave to amend its complaint to add a Section 20(a) "controlling person" liability claim. *Fujisawa Pharm. Co. v. Kapoor,* 165 F.R.D. 79 (N.D.Ill.1996) [hereinafter *Fujisawa I* ]. In the other, I found that the so-called "Kapoor Policies" were not "persuasive to show Dr. Kapoor should have been aware ANDA fraud was occurring at Lyphomed." *Fujisawa Pharm. Co. v. Kapoor,* 16 F.Supp.2d 941, 950 (N.D.Ill.1998) [hereinafter *Fujisawa II* ]. Despite Dr. Kapoor's contentions, neither of those rulings precludes admission at trial of circumstantial evidence that might go to prove

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
**(Cite as: 1999 WL 543166 (N.D.Ill.))**

Page 7

Dr. Kapoor's *scienter,* one of the elements of the alleged Rule 10b-5 violations that form the predicate of Fujisawa's civil RICO claim. *See Fujisawa II,* 16 F.Supp.2d at 945.The motion is denied.[FN5]

> FN5. Dr. Kapoor also argues that "recklessness, although sufficient to satisfy Rule 10b-5's intent element if [the Rule 10b-5 claim were] brought as a separate cause of action, is insufficient when violation of Rule 10b-5 is litigated [as here] solely as predicate racketeering activity in a RICO claim." (Def.'s Reply Mem. in Supp. of Mot. in Limine ¶ 8.) However, I already held in *Fujisawa II* that, for purposes of Fujisawa's RICO claim, *scienter* could be established with evidence of recklessness. 16 F.Supp.2d at 945;*see also United States v. Biasucci,* 786 F.2d 504, 512 (2nd Cir.1986) ("RICO imposes no additional *mens rea* requirement beyond that found in the predicate crimes").

12. Motion in Limine to Bar the Testimony and Report of Dr. Guyer.

*7 Dr. Kapoor moves to exclude the testimony and report of Fujisawa's expert Dr. Greg Guyer on grounds that Dr. Guyer is not qualified to provide an expert opinion on the issues at bar, and that his testimony would be unfairly prejudicial under Fed.R.Evid. 403. Under Fed.R.Evid. 702, expert testimony is admissible only if it "could assist the trier of fact in understanding the evidence or determining a fact in issue," and if the expert witness himself "is properly qualified to give the testimony sought." *United States v. Hall,* 93 F.3d 1337, 1342 (7th Cir.1996). Dr. Guyer is qualified to give the testimony sought here. He holds a doctorate in analytical chemistry from American University in Washington, D.C., and has ten years experience with the FDA in various roles, including two years in the FDA's Office of Generic Drugs where he led "a group of 27 scientists in evaluating the approvability ... of Abbreviated New Drug Applications

(ANDAs) and Abbreviated Antibiotic Drug Applications (AADAs)." (Guyer Report at 1.) In addition, his testimony would assist the jury in understanding how the FDA would have viewed the allegedly false or misleading ANDAs that are a focus of this case. The motion is denied.

13. Defendant's Motion in Limine to Bar Evidence that Dr. Kapoor was an Inventor of Certain Patents.

Dr. Kapoor moves to exclude evidence that he was listed as an inventor on three patent applications. The applications, which apparently were filed during the time Dr. Kapoor was at Lyphomed, are for drugs other than those at issue in this case. Dr. Kapoor believes Fujisawa would use this evidence to try to show that Dr. Kapoor was involved in R & D laboratory work at Lyphomed and thus "must have been involved in the generation of data for submission in ANDAs."(Def.'s Mot. in Limine ¶ 1.) Dr. Kapoor contends his listing as a joint inventor on those applications is not necessarily an indication he did laboratory work, and thus it has no probative value or relevance in this case.

Under patent law, conception, which is "the touchstone of inventorship," does not necessarily require laboratory work. *Burroughs Wellcome Co. v. Barr Labs., Inc.,* 40 F.3d 1223, 1227 (Fed.Cir.1994). That is particularly true where, as here, the patent lists joint inventors. *See Lert v. A.C. Nielsen Co.,* No. 92 C 2216, 1993 U.S. Dist. LEXIS 4277, at *13- *14 (N.D.Ill. Mar. 31, 1993) (one who merely "makes suggestions of practical value" may be joint inventor if his contribution is original). Nevertheless, Fujisawa is entitled to attempt to show that Dr. Kapoor's claim that he was involved only in the business side of the company is untrue. The fact that he is an inventor of three drugs during the relevant time period is arguably evidence to the contrary. Thus the evidence will not be excluded.

14. Defendant's Motion in Limine to Bar Plaintiff's Damages Expert from Testifying about Damages

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
(Cite as: 1999 WL 543166 (N.D.Ill.))

Page 8

Apart from Certain Designated Consequential Damages.

**\*8** Dr. Kapoor moves to bar testimony or evidence about damage calculations other than certain consequential damages, and to bar the introduction of Fujisawa expert Dr. Frederick Dunbar's damages reports except for a certain portion. Dr. Kapoor argues that Dr. Dunbar's method for calculating all damages other than certain consequential damages is "junk science" and that his results therefore are unreliable and do not meet the test for admissibility under Fed.R.Evid. 702 as set forth in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).*Daubert* lists several factors that might "bear on [such an] inquiry," including: (1) whether a theory or technique "can be (and has been) tested"; (2) whether it has been "subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether there is "general acceptance" of the theory or technique within a "relevant scientific community." 509 U.S. at 592-94;*see also Kumho Tire Co. v. Carmichael,* 119 S.Ct. 1167, 1175 (1999). Fujisawa has satisfactorily met its burden of showing its damages evidence meets those criteria. The motion is denied.[FN6]

> FN6. Dr. Kapoor also moves to strike the declaration of Dr. A. Craig MacKinlay that was attached as Exhibit D to Fujisawa's memorandum in opposition to Dr. Kapoor's Dunbar motion. Dr. Kapoor also moves to strike any portions of that memorandum related to the declaration, to bar Dr. MacKinlay from testifying at trial, and to bar Dr. Dunbar from relying on Dr. MacKinlay's declaration. Dr. Kapoor contends the declaration was untimely filed and therefore should be excluded pursuant to Fed.R.Civ.P. 26(a) and 37(c)(1). However, those rules apply (in this context) to persons "who may be used at trial to present evidence,"Fed.R.Civ.P. 26(a)(2)(A), and Fujisawa has indicated

Dr. MacKinlay "will not be called as a witness by Fujisawa to testify in any capacity at trial," (Fujisawa's Mem. in Opp'n to Def.'s Mot. in Limine at 8 n. 8). The motion to strike is denied.

15. Defendant's Motion in Limine To Bar Evidence of Conspiracy To Defraud, Particularly Hearsay Testimony Offered Pursuant to Federal Rule of Evidence 801(d)(2)(E).

Dr. Kapoor moves to bar evidence that he joined a conspiracy to engage in regulatory fraud, to violate the securities laws or to engage in a pattern of racketeering activity. Dr. Kapoor's motion appears aimed at a statement by former Lyphomed research chemist Bob Brown that Abu Alam told him "John [Kapoor] said" to normalize stability data. (Brown Dep. 428-29; Def.'s Mot. in Limine ¶ 2.) Fujisawa contends that statement is admissible under Fed.R.Evid. 801(d)(2)(E), which provides that a statement is not hearsay if it is made by "a coconspirator of a party during the course and in furtherance of the conspiracy."Dr. Kapoor argues that the 801(d)(2)(E) hearsay exception cannot be used because Fujisawa has not pleaded the existence of a conspiracy to commit regulatory fraud, nor does Fujisawa have corroborating evidence of a conspiracy (in addition to the statement at issue) as required under Fed.R.Evid. 801(d)(2).

Rule 801(d)(2)(E)'s coconspirator exception contains no requirement that conspiracy be alleged in the complaint. *United States v. Godinez,* 110 F.3d 448, 454 (7th Cir.1997); *United States v. Conn,* 769 F.2d 420, 423 (7th Cir.1985). Further, Fujisawa points to several items of circumstantial evidence, *see United States v. Marquez,* 686 F.Supp. 1354, 1359-60 (N.D.Ill.1988), that it plans to introduce at trial to show that Dr. Alam and Dr. Kapoor were involved in a conspiracy to normalize data and submit fraudulent ANDAs to the FDA. That proffer of evidence is enough to warrant a preliminary determination of admissibility under Rule 801(d)(2)(E).*See id.* at 60.Actual admissibility will

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
(Cite as: 1999 WL 543166 (N.D.Ill.))

depend on sufficient evidence of a conspiracy. The motion is denied.

16. Defendant's Motion in Limine To Bar Evidence of Dr. Kapoor's Invocation of the Fifth Amendment in a Prior Separate Proceeding and Evidence of Non-Parties' Invocations of the Fifth Amendment.

*9 Dr. Kapoor moves to bar evidence of his invocation of the Fifth Amendment to the United States Constitution in his testimony before a congressional subcommittee investigating the generic drug approval process. Dr. Kapoor also moves to exclude evidence that former Lyphomed employees Dulal Chatterji, Diane Komos, and Dilip Shah asserted their Fifth Amendment privileges in their depositions in this case.

In a civil action the Fifth Amendment permits adverse inferences to be drawn against parties "when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976). The implication is that this rule applies to Fifth Amendment invocations that take place in the proceeding at hand, not in a separate proceeding. *See National Acceptance Co. v. Bathalter,* 705 F.2d 924, 929-30 (7th Cir.1983) (adverse inference would be appropriate if case went to trial and defendant "declined to answer a question and invoked his Fifth Amendment privilege"). However, Dr. Kapoor's invocation of the Fifth Amendment came in March 1991 during a congressional hearing that was prior to and separate from the instant case. Further, the questions put to Dr. Kapoor during that hearing are not "evidence" within the meaning of *Baxter.See id.* at 930 (holding that complaint not evidence for purposes of *Baxter* rule). Moreover, Dr. Kapoor was deposed at length by Fujisawa in the instant case. Hence, Fujisawa is not disadvantaged by being "unable to obtain discovery." *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 390 n. 4 (7th Cir.1995). The motion is granted as to Dr. Kapoor's invocation of the Fifth Amendment.

As to the Fifth Amendment invocations of former Lyphomed employees in their depositions, adverse inferences may be drawn in such instances even though the persons invoking the privilege are non-parties. *Daniels v. Pipefitters' Ass'n Local Union No. 597,* 983 F.2d 800, 802 (7th Cir.1993); *FDIC v. Fidelity & Deposit Co.,* 45 F.3d 969, 977 (5th Cir.1995). However, the question of whether a non-party's refusal to testify may be used against a party is determined on a case-by-case basis, and depends on whether such an " 'adverse inference is trustworthy under all of the circumstances and will advance the search for truth." ' *Kontos v. Kontos,* 968 F.Supp. 400, 406 (S.D.Ind.1997) (quoting *LiButti v. United States,* 107 F.3d 110, 124 (2nd Cir.1997)). In this instance, that test is not met. *See Kontos,* 968 F.Supp. at 407-08 (identity of interests is important element in trustworthiness of inference). The motion is granted as to the former Lyphomed employees' Fifth Amendment evidence as well.

17. Defendant's Motion in Limine to Bar Plaintiffs' Damages Expert from Testifying about his "Back-of-the-Envelope" Discounted Cash Flow Calculations in the Calculation of Damages for Purposes of Plaintiffs' RICO, Common Law Fraud and Warranty Claims.

Dr. Kapoor moves to bar use of Fujisawa expert Dr. Frederick Dunbar's Discounted Cash Flow ("DCF") calculations as themselves being damage calculations or as yielding damage numbers for Fujisawa's RICO, common law fraud, and breach of warranty claims. Dr. Kapoor also moves to bar related portions of Dr. Dunbar's rebuttal report.

*10 Dr. Dunbar used an Event Study Approach ("ESA") to determine Fujisawa's out-of-pocket damages arising from its purchase of Lyphomed stock, and he used a DCF analysis to validate the ESA results. Dr. Kapoor argues that in Dr. Dunbar's original and revised reports and in his deposition testimony, Dr. Dunbar indicated his DCF calculations were merely "back-of-the-envelope" calculations [FN7] and that he would not use a DCF ap-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
**(Cite as: 1999 WL 543166 (N.D.Ill.))**

Page 10

proach to calculate any damages other than "impairment of assets" damages in the breach of fiduciary duty claim. (Def.'s Mot. in Limine ¶ 20.) Dr. Kapoor then argues that in Dr. Dunbar's (June 10, 1996) rebuttal report, he "made a complete turnabout" and "now seeks to introduce the [DCF] calculations" as "damage numbers." *Id.* ¶ 9. Dr. Kapoor points to portions of the rebuttal report indicating the DCF analysis captures a subset of Fujisawa's total damages and that it establishes a minimum or lower bound for those damages, and he contends it would be prejudicial to admit such an "about-face" as evidence.

> FN7. Dr. Kapoor argues that because Dr. Dunbar refers to his DCF calculations as "back-of-the-envelope" calculations, they are therefore unsound. There is nothing other than such references that so indicate.

Dr. Kapoor's arguments are unpersuasive. The portions of the rebuttal report he finds objectionable give no indication Fujisawa plans to introduce DCF calculations as damages. Further, they are essentially consistent with his earlier position that the DCF analysis did not capture all the effects on the value of Lyphomed and that it was therefore used as a benchmark to validate the ESA results. (Dunbar [January 10, 1996] Report at 18; Dunbar Dep. at 35.) The motion is denied.

18. Defendant's Motion in Limine to Bar Evidence of Alleged "Kapoor Policies" Not Delineated in Fujisawa's Complaint.

Dr. Kapoor moves to exclude evidence pertaining to any purported "Kapoor policies" not specifically mentioned in Fujisawa's complaint, on grounds such evidence would be irrelevant and its probative value would be outweighed by the danger of undue prejudice. Amendment of a complaint to add claims or issues not previously mentioned should not be allowed after the close of discovery. See *Knapp v. Whitaker,* 757 F.2d 827, 848-49 (7th Cir.1985). However, it is questionable whether the addition of

new "Kapoor policies" in this case would constitute a new claim or issue.[FN8] Further, granting Dr. Kapoor's request to bar "evidence of any management directive or ... 'Kapoor Policy' " not mentioned in Fujisawa's complaint. (Def.'s Mot. in Limine at 8), could conceivably exclude directives such as the one described in Lyphomed employee David Noll's (April 4, 1986) note, (Fujisawa's Opp'n to Kapoor's Mot. in Limine ¶¶ 2-4); *Fujisawa Pharm. Co. v. Kapoor,* 16 F.Supp.2d 941, 946 (N.D.Ill.1998). That note could be relevant to Dr. Kapoor's *scienter.* The motion is denied.

> FN8. Fujisawa has not indicated it plans to introduce evidence pertaining to new "Kapoor policies." The instant motion is based on Dr. Kapoor's concern that "Fujisawa *may* seek to introduce" such evidence. (Def.'s Mot. in Limine ¶ 2.)

19. Defendant's Motion in Limine to Bar Reference to Third Party Shah Indictment.

Dr. Kapoor moves to bar any use of a 1993 indictment of former Lyphomed employee Dilip Shah to suggest Dr. Kapoor's fraudulent *scienter.* A federal grand jury in Maryland indicted Mr. Shah for FDA fraud based (in part) on his alleged normalization of data in 1985 or 1986 while he was at Quad Pharmaceuticals, Inc. ("Quad").[FN9] Another former Lyphomed employee, Dulal Chatterji, was named as an unindicted coconspirator. Mr. Shah and Mr. Chatterji were cofounders of Quad, a Lyphomed rival.

> FN9. There was no conviction of Mr. Shah on the count in which normalization was alleged as an overt act.

*11 "It is hornbook law that indictments cannot be considered as evidence," *United States v. Cox,* 536 F.2d 65, 72 (5th Cir.1976), especially in a civil case, *McGhee v. Joutras,* No. 94 C 7052, 1996 WL 706919, at *7 (N.D.Ill.Dec. 5, 1996) (Shadur, J.), and even more so where the defendant is not the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
(Cite as: 1999 WL 543166 (N.D.Ill.))

Page 11

person indicted, *id.*

Fujisawa asserts it does not intend to use the indictment "to establish or prove [Dr.] Kapoor's fraud or even to lay a foundation for his fraud."(Fujisawa's Mem. in Opp'n to Def.'s Mot. in Limine at 1-2.) However, Fujisawa indicates it does plan to use the indictment on cross-examination or in rebuttal to counter any argument Dr. Kapoor might make that normalizing data is acceptable. The motion is granted.

20. Defendant's Motion in Limine to Bar Bennett & Co. Reports and Testimony.

Dr. Kapoor moves to exclude the reports and testimony of consultants Bennett & Co. ("Bennett") and its employees, Dean Barlow and Martha Bennett, concerning Lyphomed's drug applications. Following its receipt of the FDA's (November 7, 1991) Form 483, Fujisawa hired Bennett to audit Lyphomed's drug applications. Dr. Kapoor claims the resulting audit reports were prepared in anticipation of litigation and therefore are not subject to the business records hearsay exception. He also claims any testimony from Ms. Bennett and Mr. Barlow should be excluded because they lack "personal knowledge of the evidence underlying their opinions."(Def.'s Reply in Supp. of Mot. in Limine at 13.)

Although the Bennett reports may have had some usefulness in litigation, they were prepared in response to an FDA requirement that companies placed under the FDA's Applications Integrity Policy ("AIP") conduct a "credible internal review." Fraud, Untrue Statements of Material Facts, Bribery, and Illegal Gratuities, 56 Fed.Reg. 46191, at 46200 (1991). For purposes of Fed.R.Evid. 803(6), the reports were not prepared in anticipation of litigation. *See United States v. Frazier,* 53 F.3d 1105, 1110 (10th Cir.1995). Nevertheless, the Bennett reports do not meet the test for the business records exception under Rule 803(6). They were prepared in response to an abnormal circumstance

and thus not in the normal course of Fujisawa's business. *See United States v. Lemire,* 720 F.2d 1327, 1350-51 (D.C.Cir.1983); *Datamatic Services, Inc. v. United States,* 909 F.2d 1029, 1032 (7th Cir.1990). Nor were they prepared in the normal course of Bennett's business. *See Paddack v.. Dave Christensen, Inc.,* 745 F.2d 1254, 1258 (9th Cir.1984); *cf. Frazier,* 53 F.3d at 1109-10 (report prepared by auditor *under contract to U.S. Labor Department* admitted under Rule 803(6) exception). Further, the reports were prepared several years after most of the alleged ANDA discrepancies occurred. *See Datamatic Services,* 909 F.2d at 1032.

Nor are the Bennett reports admissible under Fed.R.Evid. 1006. It is undisputed that the reports contain (at least in part) inadmissible hearsay. Thus they cannot be admitted under Rule 1006. *Paddack,* 745 F.2d at 1260; *Needham v. White Lab., Inc.,* 639 F.2d 394, 403 (7th Cir.1981).

**\*12** Moreover, neither Ms. Bennett nor Mr. Barlow (who are presented as fact witnesses, not experts) may testify about the audit reports. They lack the requisite personal knowledge and thus cannot meet the requirements of Fed.R.Evid. 602 and 701. *See Visser v. Packer Eng'g Associates, Inc.,* 924 F.2d 655, 659 (7th Cir.1991); *Kaczmarek v. Allied Chem. Corp.,* 836 F.2d 1055, 1060-61 (7th Cir.1987). The motion is granted.

21. Defendant's Motion in Limine to Bar Evidence of the FDA's and Fujisawa's Investigation of Regulatory Violations and Fujisawa's Conduct Relating to the FDA's Applications Integrity Policy.

Dr. Kapoor moves to bar evidence of the FDA's investigation of Fujisawa for regulatory violations, and of actions taken by Fujisawa from 1991-1994 in response to being placed under the FDA's Application Integrity Policy ("AIP"). As a result of an investigation that began in 1991, the FDA found that several ANDAs submitted by Lyphomed (Fujisawa's predecessor) contained false or misleading information. That investigation led to

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
(Cite as: 1999 WL 543166 (N.D.Ill.))

Fujisawa's being placed under the FDA's AIP, which prompted Fujisawa to conduct its own review of Lyphomed ANDAs. Dr. Kapoor now argues that evidence of the FDA investigation and Fujisawa's AIP actions is irrelevant to this case as well as prejudicial.

The FDA and AIP evidence is relevant to whether Lyphomed submitted false or misleading data to the FDA, which is a central issue in this case. Further, the evidence is not barred by Fed.R.Evid. 403, under which relevant evidence "may be excluded if its probative value is *substantially* outweighed by the danger of *unfair* prejudice."(emphasis added). That is not the case here. The motion is denied.

22. Defendant's Motion in Limine to Limit Evidence Relating to Kapoor's Involvement in ANDAs to Those that are "At Issue."

Dr. Kapoor moves to limit Fujisawa's evidence of Dr. Kapoor's involvement in fraud to the 35 ANDAs "at issue" as identified by Fujisawa in its second amendment complaint. Dr. Kapoor contends such evidence is irrelevant and lacking in probative value, and would be unfairly prejudicial in part because Dr. Kapoor has not had "full discovery" on those other ANDAs. Dr. Kapoor also claims that such "other ANDA" evidence is impermissible propensity evidence that is barred by Fed.R.Evid. 404(b).

Dr. Kapoor's motion sweeps with too broad a brush. It is conceivable that evidence relating to ANDAs other than the 35 withdrawn by Fujisawa could go to establish Dr. Kapoor's *scienter. See Fujisawa Pharm. Co. v. Kapoor,* 16 F.Supp.2d 941, 945 (N.D.Ill.1998) ("Circumstantial evidence is sufficient to prove scienter"). Further, Fujisawa asserts that all of the exhibits it plans to offer in evidence were produced. In addition, so-called "other crimes" evidence is admissible under Fed.R.Evid. 404(b) to show intent, knowledge or common scheme or plan. *See Jannotta v. Subway Sandwich Shops, Inc.,* 125 F.3d 503, 517 (7th Cir.1997);

*United States v. Scop,* 940 F.2d 1004, 1008-09 (7th Cir.1991). Moreover, in this case the probative value of such evidence is not substantially outweighed by the danger of unfair prejudice. The motion is denied.

Plaintiff Fujisawa's Motions

1. Fujisawa's Motion in Limine to Preclude Kapoor from Arguing that Lyphomed's 1987-88 GMP Problems Put Fujisawa on Notice of its Claims or are Relevant to Issues of Materiality and Reliance.

**13** Fujisawa moves to exclude arguments that Lyphomed's 1987-88 Good Manufacturing Practices ("GMP") problems put Fujisawa on notice of its claims or that they are relevant to materiality or reliance. Fujisawa contends I already noted "the distinction between Lyphomed's 1987-88 *manufacturing problems* and the later-discovered *ANDA fraud,"* and ruled that the manufacturing problems "did not put Fujisawa on notice of its fraud claims as a matter of law."(Fujisawa's Mot. in Limine ¶¶ 2, 3); *Fujisawa Pharm. Co. v. Kapoor,* 16 F.Supp.2d 941, 944 & n. 6, 950 (N.D.Ill.1998). That argument lacks merit. In *Fujisawa,* I held there were genuine issues of material fact as to notice, reliance and materiality, and so denied much of Dr. Kapoor's motion for summary judgment. *Fujisawa,* 16 F.Supp.2d at 945, 950.Further, in upholding the granting of summary judgment on Fujisawa's Rule 10b-5 claim, the Seventh Circuit pointed to several of Lyphomed's 1987-88 problems that it found gave Fujisawa "reason to believe that Kapoor had deliberately concealed from it serious problems with ANDAs." *Fujisawa Pharm. Co. v. Kapoor,* 115 F.3d 1332, 1335-36 (7th Cir.1997). The evidence Fujisawa seeks to exclude here might very well be relevant to (and probative of) notice, materiality and reliance. The motion is denied.

2. Fujisawa's Motion in Limine to Preclude Reference to Certain Post-Acquisition Events.

Fujisawa moves to bar evidence of (1) the June

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
**(Cite as: 1999 WL 543166 (N.D.Ill.))**

1998 sale of the Fujisawa USA, Inc. ("FUSA") generic division to American Pharmaceutical Partners, Inc. ("APP"); (2) any expressions of interest or "offers to purchase" FUSA's generic division prior to the June 1998 sale to APP; and (3) the alleged mismanagement of FUSA's generic division by Takashi Aoki following Fujisawa's acquisition of Lyphomed. Fujisawa argues that such evidence is irrelevant to damages and is not probative of that or any other issue in this case.

In securities fraud cases, damages usually are measured by "the difference between the price of the stock and its value on the date of the transaction if the full truth were known." *Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc.,* 3 F.3d 208, 214 (7th Cir.1993); *see also Katz v. Comdisco, Inc.,* 117 F .R.D. 403, 408 (N.D.Ill.1987) ("out-of-pocket rule [is] standard measure of damages in securities fraud litigation"). Further, "[a]ny fluctuations in price following the transaction do not affect the calculation of damages." *Katz,* 117 F.R.D. at 408; *cf. Cant v. A.G. Becker & Co.,* 379 F.Supp. 972, 975 (N.D.Ill.1974) (under "common sense" rule, plaintiff cannot "avail himself of any further decrease in the value of the security" after date when fraud discovered, and "defendant should not be able to avail itself of any increase in the value of the stock after that date"). Hence, the 1998 sale of FUSA's generic division to APP, occurring at least eight years after Fujisawa's purchase of Lyphomed and long after the alleged fraud was discovered, has no relevance to Fujisawa's out-of-pocket damages.[FN10]

> FN10. For the same reason, Magistrate Judge Ashman denied Dr. Kapoor's motion to compel documents related to Fujisawa's sale of its generic drug division. Dr. Kapoor has moved to review and set aside that ruling. However, Dr. kapoor does not argue (nor do I conclude) that Judge Ashman's ruling was "clearly erroneous or contrary to law."Fed.R.Civ.P. 72(a); 28 U.S.C. § 636(b)(1)(A). That motion is

denied. *See Weeks v. Samsung Heavy Indus. Co.,* 126 F.3d 926, 943 (7th Cir.1997).

**\*14** For the same reason, offers to purchase Fujisawa's generic drug division also are irrelevant to Fujisawa's damages. That is all the more true because they are merely offers, which are "indirect evidence" that "do[es] not tend to show value." *Sharp v. United States,* 191 U.S. 341, 348-49 (1903).

Evidence of the alleged mismanagement of FUSA's generic division by Takashi Aoki also is not relevant to damages, but it might be relevant to other issues. At this point, it cannot be said that such evidence "is clearly inadmissible for any purpose." *United States v. Rusin,* 889 F.Supp. 1036, 1038 (N.D.Ill.1995).

The motion is granted as to the use, for purposes of showing damages, of the June 1998 sale of FUSA's generic division and of any expressions of interest or offers to purchase that division prior to the 1998 sale. The motion also is granted as to the use of mismanagement evidence to show damages, but not for other purposes.[FN11]

> FN11. Dr. Kapoor also raises the issue of evidence relating to Gallium Nitrate. Fujisawa does not seek to exclude such evidence, so that point is moot. Evidence of post-acquisition laboratory practices, also raised in Dr. Kapoor's response, is dealt with in a separate motion in limine.

3. Fujisawa's Motion in Limine to Preclude Kapoor from Offering Certain "Expert" Testimony at Trial.

Fujisawa moves to bar (1) the testimony of Lowell Sachnoff and William Weaver; (2) portions of the testimony of Joel Davis and Dr. Gregg Jarrell; and (3) any expert testimony of Dr. Raymond Warrell. As to Dr. Warrell, Fujisawa contends his expert testimony should be barred because Dr. Kapoor did not identify him as an expert until October 9, 1998, more than two years after the deadline. Dr. Kapoor

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
**(Cite as: 1999 WL 543166 (N.D.Ill.))**

asserts that Dr. Warrell will testify only as a lay witness and not as an expert. That portion of Fujisawa's motion is therefore denied as moot.

Messrs. Sachnoff's and Weaver's opinions, however disguised, are in reality legal opinions-indeed in some parts contrary to rulings of this court. They are excluded. This court will instruct the jury on the applicable law.

Fujisawa objects to two portions of Mr. Davis' testimony. Both are well taken. In his expert report, Mr. Davis concludes: "Fujisawa appears to have acquiesced in the FDA's initial position on withdrawal of the ANDAs and asserted no significant challenge either in the agency or in court."(Davis Report at 10.) He adds that, "Based on my experience, had Fujisawa more strongly asserted and maintained its position, Fujisawa likely would have prevailed."*Id.* Fujisawa argues correctly that Mr. Davis has no special skill, experience, training or education that would qualify him to draw such a conclusion. Fed.R.Evid. 702; (Davis Dep. at 286-87, 289, 363-65, 370-72, 374-76); *see Benson*, 941 F.2d at 604 (expert's opinion helpful "only to the extent the expert draws on some special skill, knowledge or experience").

At another point in his Rule 26 report, Mr. Davis states he has "found no evidence indicating that Dr. Kapoor directed, condoned or was aware of any misrepresentation or discrepancy in any ANDA at issue in this case."(Davis Report at 10.) Fujisawa contends correctly that it will be up to the jury to make this determination based on its evaluation of the evidence following the court's instruction. Mr. Davis' testimony on this part is neither necessary nor likely to be helpful.

**\*15** In Dr. Jarrell's rebuttal report, he criticizes the damages reports of Fujisawa's expert, Dr. Frederick Dunbar, and notes at one point: "The methodological flaws and errors in Dr. Dunbar's Event Study Approach preclude it from meeting the criteria set down by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 113

S.Ct. 2786 (1993), for purportedly scientific or technical evidence which will assist the trier of fact ."(Jarrell Report at 3.) Admitting such a statement would allow the witness in effect to instruct the jury on a question of law. *See Bammerlin v. Navistar Int'l Transp. Corp.,* 30 F.3d 898, 900 (7th Cir.1994); *Harbor Ins.,* 922 F.2d at 366. The motion is granted.

4. Fujisawa's Motion in Limine to Exclude Evidence of Harman Release.

Fujisawa moves to bar evidence of a release executed by Fujisawa in settlement of a 1988 class action lawsuit ("Harman suit") against Lyphomed and Dr. Kapoor, on the ground that the release is irrelevant. I have previously ruled that the Harman release is irrelevant to this suit. *Fujisawa Pharm. Co. v. Kapoor,* 16 F.Supp.2d 941, 951 (N.D.Ill.1998).

Fujisawa also seeks to bar evidence regarding the Harman litigation itself. I previously denied Dr. Kapoor's motion for summary judgment with respect to the statute of limitations on the RICO claim, concluding that there was an issue of fact as to whether Fujisawa was on notice of the ANDA violations earlier than August, 1988. Dr. Kapoor may still present this evidence at trial. Part of that evidence involves the Harman suit. The motion is therefore denied, except as to the release.

5. Fujisawa's Motion in Limine to Preclude Kapoor from Calling Eleven Character Witnesses at Trial.

Fujisawa moves to bar Dr. Kapoor from calling eleven witnesses that Fujisawa says Dr. Kapoor's counsel indicated are character witnesses. While Dr. Kapoor disputes that they are character witnesses, the description of their testimony indicates their purpose is to show that Dr. Kapoor will not act criminally in the future and whether he generally acts as alleged in the complaint. *E.g. Continental Casualty Co. v. Howard,* 775 F.2d 876 (7th Cir.1985), *cert. denied,* 475 U.S. 1122 (1986). As such, their testimony is not admissible.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
(Cite as: 1999 WL 543166 (N.D.Ill.))

6. Fujisawa's Motion in Limine to Preclude Reference to Certain Terms and Proposed Terms of the Merger Agreement.

Fujisawa moves to bar reference to Section 1.01 of the merger agreement (for the purchase of Lyphomed) and a proposed Section 4.15 that was not included in the final agreement. Fujisawa contends that, contrary to Dr. Kapoor's assertions, those sections are not relevant to materiality or reliance and therefore should be barred under Fed.R.Evid. 402 and 403. I have previously agreed. *Fujisawa v. Kapoor, supra,* 16 F.Supp.2d at 948-49.The motion is granted.

7. Fujisawa's Motion in Limine to Preclude Argument Regarding Contributory Negligence, Inadequate Due Diligence, Assumption of Risk, or Recklessness.

**\*16** Fujisawa moves to bar argument that it was contributorily negligent, failed to exercise due diligence, assumed the risk or acted recklessly as to Dr. Kapoor's alleged fraud. Fujisawa notes correctly that the defense of the buyer's contributory negligence or failure to exercise due diligence is not available in a securities fraud case. *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 527, 528 (7th Cir.1985); *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1040 (7th Cir.1977). However, independent of that rule, where the plaintiff is "chargeable with the omitted information," *Sundstrand,* 553 F.2d at 1048, as where he "close[s] his eyes to a known risk," *Angelos,* 762 F.2d at 530, he cannot claim "he relied on or was deceived by the [seller's] lie,"*id.*In order to establish that sort of "gross conduct" on the part of the plaintiff, recklessness must be shown. *Id.* at 529; *Sundstrand,* 553 F.2d at 1048.Therefore, the motion is denied as to recklessness.[FN12]This ruling does not, however, bar evidence related to Dr. Kapoor's statute of limitations defense.

> FN12. Fujisawa argues that Dr. Kapoor may not offer evidence of recklessness be-

cause he did not plead recklessness as an affirmative defense in his answer. However, Dr. Kapoor did plead a "reasonable care" (due diligence) defense, which may be amended to a recklessness defense. *See Elco Indus. v. Hogg,* 713 F.Supp. 1215, 1218 (N.D.Ill.1989) (Grady, J.)

8. Fujisawa's Motion in Limine to Preclude Evidence Regarding Post-Acquisition Laboratory Practices.

Fujisawa moves to bar evidence of the laboratory practices employed by Fujisawa USA, Inc. ("FUSA") after the acquisition of Lyphomed, and of FUSA's FDA submissions following that date. I need more information before this motion can be decided because the parties do not agree on the relevant dates and I am unsure what is included in Dr. Kapoor's evidence. By August 10, 1999, Dr. Kapoor shall provide the court with a list of all documents that he seeks to introduce on this issue, list the date of the document, and explain, if it is not self-evident from the date (Fujisawa says any such evidence came about in the year after it took control-before it could change ongoing practice-and the documents attached to the motion papers appear to substantiate that statement), how these documents prove his argument that Fujisawa continued prior practice after sufficient time to change the practice.

9. Fujisawa's Motion in Limine to Preclude Kapoor from Arguing that the *Medco* Decision Held Lyphomed's FDA Fraud to be "Reasonably Foreseeable."

Fujisawa moves to preclude argument that the court in *Medco Research, Inc. v. Fujisawa USA, Inc.,* Nos. 93 C 2705, 93 C 2724, 1994 WL 719220 (N.D.Ill.Dec. 21, 1994), held Lyphomed's alleged FDA fraud to be reasonably foreseeable. In that case, Medco Research, Inc. ("Medco") sought to terminate a 1988 contract with Fujisawa

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
**(Cite as: 1999 WL 543166 (N.D.Ill.))**

(Lyphomed) for joint development of the drug Adenoscan on grounds that Lyphomed failed to disclose information about its FDA regulatory problems. In granting Fujisawa's motion for preliminary injunction, the court in *Medco* held that Fujisawa's (Lyphomed's) "additional regulatory problems with the FDA resulting in delay to the Adenoscan" application were "reasonably foreseeable." *Medco,* 1994 WL 719220, at *12. However, the *Medco* court did not hold that the specific ANDA fraud in this case was reasonably foreseeable. *Fujisawa Pharm. Co. v. Kapoor,* 16 F.Supp.2d 941, 950 n. 20 (N.D.Ill.1998). The motion is granted.[FN13]

> FN13. Dr. Kapoor also argues that Fujisawa's Rule 36 responses to requests for admission in *Medco* are admissible in this case. That argument is unpersuasive. Rule 36 states that "[a]ny admission made by a party under this rule is for the purpose of the pending action only and is not an admission for any other purpose nor may it be used against the party in any other proceeding."Fed.R.Civ.P. 36(b).

10. Fujisawa's Motion in Limine to Preclude Reference to Statements Made in Settlement Negotiations.

*17 Fujisawa moves to bar any reference to statements made by Fujisawa representatives during settlement negotiations. Fujisawa's motion is aimed at a 1992 meeting between Dr. Kapoor and Takashi Aoki, then the president and CEO of Fujisawa USA, Inc. ("FUSA"), during which Fujisawa says it requested "a certain payment from [Dr .] Kapoor in settlement of its claims against him."(Fujisawa's Mot. in Limine ¶ 1.) Fujisawa contends evidence of statements made during that meeting are barred by Fed.R.Evid. 408, which excludes evidence of conduct or statements made during "compromise negotiations." Dr. Kapoor claims the meeting was an attempt by Fujisawa to extort $15 million from him in return for not reporting his alleged misconduct to authorities, and that it therefore cannot be termed

settlement negotiations. Hence, Dr. Kapoor contends statements made during that meeting are not excluded by Rule 408. The meeting was held before the suit was filed in this case and the fact that Dr. Kapoor did not have counsel with him at the meeting is some indication that there had been no earlier discussion of a settlement of a dispute. The testimony in the record also tends to support Dr. Kapoor's view. Thus, Fujisawa has not made the requisite "substantial showing" that the meeting was part of a settlement attempt. *See Raybestos Products Co. v. Younger,* 54 F.3d 1234, 1241 (7th Cir.1995). However, even if Fujisawa did threaten to expose Dr. Kapoor if he did not make the requested payment to Fujisawa, Dr. Kapoor has not shown that evidence is relevant to any issue in this case. The motion is granted.

11. Fujisawa's Motion in Limine to Preclude Reference to Crimes or Bad Acts.

Fujisawa moves to bar evidence of: (1) its 1998 guilty plea in a price-fixing conspiracy involving sodium gluconate, an organic chemical used as an industrial cleaning agent; and (2) a 1983 industrial espionage investigation in which several Fujisawa employees reportedly were arrested on charges of illegally obtaining drug development data from Fujisawa's competitors. Fujisawa contends such evidence is inadmissible under Fed.R.Evid. 404(b), which bars evidence of prior bad acts to show a propensity to engage in wrongdoing. Fujisawa notes that the 1983 industrial espionage matter involved conduct and employees unrelated to the instant case, and that the antitrust plea focused on events that took place long after Fujisawa acquired Lyphomed, and involved a product and a division (Chemicals Division) separate from the instant case. Fujisawa thus argues that the purpose for introducing such evidence could only be to show Fujisawa's alleged propensity to commit wrongdoing. *See United States v. Brooks,* 125 F.3d 484, 499-500 (7th Cir.1997).

However, Dr. Kapoor asserts such evidence would

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
(Cite as: 1999 WL 543166 (N.D.Ill.))

be offered only to impeach the credibility of Fujisawa's witnesses who testify as Fujisawa's representatives, and thus would be admissible under Fed.R.Evid. 608(b) and 609(a). The difficulty with such an assertion is that Rule 608(b) refers to "the conduct of a witness," and Rule 609(a) applies to "evidence that a witness other than an accused has been convicted of a crime."In the instant case, it is undisputed that none of Fujisawa's trial witnesses was implicated in the industrial espionage incident and that none has been convicted of any crime. Further, Fujisawa asserts that Fujisawa itself, as a corporation, is not a witness.[FN14] The motion is granted, with questions as to whether such evidence might be admissible under Fed.R.Evid. 405(a) to be answered at trial, depending on whether Fujisawa's witnesses testify as to the company's good character.

> FN14. Dr. Kapoor argues that high-ranking Fujisawa officials such as Takashi Aoki and Dr. Tomikochiro Fujisawa are the alter egos of the corporation and should therefore be subject to impeachment under Rules 608 and 609. There is no evidence offered to support this assertion.

12. Fujisawa's Motion in Limine to Preclude Statements Regarding the Availability of Treble Damages and Attorneys' Fees.

*18 Fujisawa moves to bar any reference to the fact that treble damages and attorneys' fees are recoverable in its claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c). RICO's treble damage provision "is irrelevant to a jury's deliberations and may confuse or prejudice the jury." Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1308 n. 7 (7th Cir.1987). Such evidence therefore is properly excluded from the jury.[FN15] Id. The motion is granted.[FN16]

> FN15. Dr. Kapoor argues that Fujisawa should not be permitted to recover both treble damages under RICO and punitive

damages under its common law fraud claim. Dr. Kapoor contends that if he is found liable under RICO and if Fujisawa then argues for punitive damages, Dr. Kapoor should be allowed to inform the jury of RICO's treble damages provision. A plaintiff may recover both RICO treble damages and state law punitive damages for the same conduct. Neibel v. Trans World Assurance Co., 108 F.3d 1123, 1131 (9th Cir.1997). Accordingly, that is not a basis for relaxing the rule barring evidence of RICO treble damages.

> FN16. Both parties are barred from making statements about payment of attorneys' fees.

*Additional Motions*

1. Defendant's Motion to Review and Set Aside the Magistrate's Ruling on Defendant's Motion to Compel the Deposition of Plaintiff's Expert Dr. Frederick Dunbar.

Dr. Kapoor moves to review and set aside Magistrate Judge Ashman's order denying Dr. Kapoor's motion to compel the deposition of Fujisawa expert Dr. Frederick Dunbar. As Dr. Kapoor correctly notes, the basis for Judge Ashman's denial of the original motion was that the request was untimely and Dr. Kapoor therefore waived his right to depose Dr. Dunbar. Further, the arguments Dr. Kapoor presents in the instant motion are essentially the same as those he presented to Judge Ashman. I find nothing to indicate Judge Ashman's order was "clearly erroneous or contrary to law."Fed.R.Civ.P. 72(a); 28 U.S.C. § 636(b)(1)(A). The motion is denied.

2. Defendant's Motion to Strike the "Rebuttal Report" of Plaintiffs' Expert Dr. Randolph Steer.

Dr. Kapoor seeks an order striking the rebuttal re-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)
**(Cite as: 1999 WL 543166 (N.D.Ill.))**

Page 18

port of Fujisawa expert Dr. Randolph Steer, or in the alternative permission to take his deposition. Dr. Kapoor argues that Dr. Steer's rebuttal report does not state clearly which of Dr. Kapoor's expert witness opinions it is meant to rebut, and hence fails to satisfy Rule 26, which requires "a complete statement of all opinions to be expressed and the basis and reasons therefor."Fed.R.Civ.P. 26(a)(2)(B). However, under Rule 26 there is no requirement that a rebuttal report identify the specific expert meant to be rebutted. Second, Dr. Steer's report focuses on due diligence exercised by acquirers of drug companies in the 1980s. It is not difficult to see that Dr. Steer's report is meant to rebut Dr. Kapoor's experts (William Weaver and Dr. Christopher Rhodes) who opine on that subject. Further, contrary to Dr. Kapoor's contention, Dr. Steer's report does provide a complete statement of the opinions to be expressed "and the basis and reasons therefor."Fed.R.Civ.P. 26(a)(2)(B). Dr. Kapoor emphasizes the brevity of Dr. Steer's report, but conciseness is not necessarily an indication that the report is incomplete.

Dr. Kapoor also contends his August 1998 request to depose Dr. Steer was not untimely, but his arguments are essentially the same as those in his motion to compel the deposition of Fujisawa expert Dr. Frederick Dunbar (and in his motion to reverse the denial of that motion). Both Dr. Dunbar's and Dr. Steer's rebuttal reports were served in June 1996. It is understandable that Dr. Kapoor did not pursue the depositions of either Dr. Dunbar or Dr. Steer following the (July 25, 1996) granting of summary judgment for Dr. Kapoor and the dismissal of Fujisawa's claims. *Fujisawa Pharm. Co. v. Kapoor,* 936 F.Supp. 455 (N.D.Ill.1996), *rev'd in part,* 115 F.3d 1332 (7th Cir.1997). However, Fujisawa's RICO and state law claims were reinstated in July 1997, and 13 months elapsed before Dr. Kapoor's request to depose Dr. Steer. The request is untimely. The motion is denied.

*Conclusion*

\*19 For the foregoing reasons, the motions in limine and Dr. Kapoor's additional motions are granted in part and denied in part.

N.D.Ill.,1999.
Fujisawa Pharmaceutical Co., Ltd. v. Kapoor
Not Reported in F.Supp.2d, 1999 WL 543166 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.