**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **GREGORY M. PERIUS,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 07 C 1251 |
| v. | ) |
| | ) HONORABLE DAVID H. COAR |
| **ABBOTT LABORATORIES,** | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

This case concerns plaintiff Gregory Perius's claim that he was fired by Kos Pharmaceuticals, Inc., a company subsequently acquired by defendant Abbott Laboratories, Inc., because he was a whistleblower. The drug sales and marketing practices he claims to have complained about were and are the subject of a federal investigation, a fact that has posed numerous challenges for this litigation. Many of the defendant's witnesses have asserted the attorney-client privilege or the Fifth Amendment right against self-incrimination, leaving some questions—particularly those concerning the motive for Perius's termination—unanswered. But despite this significant evidentiary gap, both parties have filed cross-motions for summary judgment, asserting that the facts, even when viewed in the light most favorable to the opposing side, support a judgment in the movant's favor. Because the court agrees with Abbott that no jury could conclude that Perius is entitled to whistleblower protection under the False Claims Act, 31 U.S.C. § 3730(h), the court GRANTS Abbott's motion for summary judgment on Perius's sole claim under federal law and relinquishes its supplemental jurisdiction over the

remaining state-law claims. The court also DENIES Perius's motion for summary judgment, GRANTS in part and DENIES in part Abbott's motion to strike Perius's responses, and DENIES Perius's motion to modify Magistrate Judge Soat Brown's protective order.

## I. FACTS[1]

Both parties claim that many of the other side's facts, while labeled "undisputed," are in fact in dispute. The court has considered these arguments, along with Abbott's motion to strike Perius's responses to its statement of facts. The court has ignored "facts" that are irrelevant, argumentative, unsupported by the citations provided, or legal conclusions. The court also has considered Perius's motion to modify Magistrate Judge Brown's protective order. Because that motion is untimely, and because, in any event, the information Perius seeks does not bear on the decisive issue in this case, the motion is denied. Accordingly, the following facts, unless otherwise noted, are undisputed:

Kos Pharmaceuticals, Inc., hired Perius in 1997. He held the position of Regional Director, supervising numerous district managers who in turn supervised pharmaceutical sales representatives. (AF ¶1.)[2]

In February 2005, Kos's general counsel, Andrew Koven, received a telephone call from the general counsel of Innovex, a company that provided contract sales personnel to Kos, informing him that the FBI was questioning an Innovex employee about Kos. (AF ¶2.) Soon thereafter, in March 2005, Kos learned that the United States Department of Justice was

---

[1] Because the court's opinion is confined to the federal claim at issue, it omits facts that are relevant only to the state-law claims.

[2] The citation "AF" refers collectively to Abbott's statement of undisputed facts, Perius's response to those facts (if any), and Abbott's reply (if any). The citation "PF" refers to Perius's statement of additional facts, along with Abbott's response to those facts (if any).

investigating the company's sales and marketing practices. (*Id.*) The government initiated its investigation as a result of a *qui tam* complaint filed by a former Kos employee (not Perius). (AF ¶3.) As part of the investigation, the DOJ issued several federal subpoenas *duces tecum*, including one directed to the company and others directed to four employees, including Perius, Nick Polczinski, and Wendy Kopatich. (AF ¶2.)

As a result of the government's investigation, Koven hired the law firm of Holland & Knight LLP ("H&K") (1) to assist the company and individual employees in complying with the DOJ investigation; and (2) to conduct its own internal investigation. (PF ¶12.) Both Richard King, executive vice president of commercial operations at Kos, and John Hogan, an H&K attorney, acknowledged that, because the company was under investigation, there was a possibility of litigation. (PF ¶11.)

<u>Perius's Compliance with the Government's Subpoena</u>

Upon receiving the subpoena, Perius—who at the time did not know what a subpoena was and what was required of him—became concerned and suffered stress. (AF ¶12; PF ¶1.) And after his first interview with H&K in early March 2005, Perius became concerned that he and his district were being singled out for using sales and marketing techniques that he believed were used throughout the company. (AF ¶12.) At the same time, he did not believe that he or Kos had done anything wrong. (PF¶1.) But he was concerned enough to seek assurances from Koven and other Kos executives that he would not need his own legal counsel. (PF ¶4.)

Koven told Perius to cooperate fully with H&K. (PF¶1; AF¶9.) Perius knew, of course, that H&K was not affiliated with the DOJ or any other governmental agency, but he did

understand the firm to be a conduit to the DOJ for documents produced by the company in response to the subpoena. (PF ¶1; AF ¶9.)

Between March and June 2005, Perius produced documents as requested over time to the DOJ, in compliance with his subpoena. (AF ¶10.) He promptly gathered documents he believed were responsive and, along with a copy of his computer hard drive, sent everything to H&K. (AF ¶10; PF ¶2.) H&K would then review the documents for any privileged communications, place them on CDs, affix bates labels, and send the disks back to Perius, who would then send the disks to Assistant United States Attorney Mel Johnson, in the U.S. Attorneys' office. (PF ¶¶2,5.) The final production of disks took place on June 9, 2005. (AF ¶13.)

The materials Perius sent included documents relating to Kos's sales and marketing practices, and they could potentially be used in a prosecution against the company. (PF ¶¶6,7.) At his deposition, Hogan asserted attorney-client privilege in response to questions about the content of the materials Perius forwarded to the government and any deletions or alterations of those documents by H&K prior to their transmittal to the government. (PF ¶8.) For summary judgment purposes, the court may assume that there was damaging information in the documents, which are the subject of a protective order.

Perius produced the documents because he was required to do so under the subpoena. (AF ¶11.) At the time, Perius did not believe that either he or Kos were breaking any laws or doing anything wrong. (AF ¶14.) And, other than the documents he produced in response to his subpoena, Perius did not tender any documents to the government during his employment at Kos, nor did he have any contact or speak with any government official or investigator. (AF ¶¶15,16.)

Perius's Participation in Kos's Internal Investigation

As part of Kos's internal investigation, which lasted from March 2005 through December 12, 2006, when Abbott acquired Kos, H&K attorneys interviewed numerous Kos employees. (AF ¶7.) Perius was among them, and he met with H&K five times, with meetings occurring in both Chicago and Miami. (AF ¶8.) Perius was advised by both Kos's legal counsel and H&K that he should communicate directly with them regarding the investigation. (PF ¶5.)

On March 4, 2005, Perius and his subordinates were interviewed by John Hogan and Michael Manthei, both H&K attorneys. Perius told them about the company's long-standing sales and marketing practices. (PF ¶3.) H&K attorneys interviewed him three or four more times between March 2005 and January 5, 2006, and on each occasion Perius advised them of the company's sales and marketing practices. (PF ¶5.)

Hogan met with AUSA Stacy Ward more than ten times regarding the DOJ's investigation of Kos's sales and marketing practices. He did not tell her or any other AUSA what he had learned from Perius regarding the company's national sales and marketing practices. (PF ¶8.)

Perius's Internal Queries and Complaints

Beginning in January 2006, Perius began to raise concerns with some of his superiors, including Mike Tilbury, senior vice president of cardio pulmonary sales, Mark Glickman, vice president of sales in the cardio-metabolic division, José Sierra, senior vice president and chief compliance officer (who also worked with H&K during its investigation), and Richard King, executive vice president of commercial operations. For the most part, he sought clarification of Kos's policy with regard to certain sales and marketing practices, including whether certain

activities were permitted. He would then report the information he learned from Kos management to his subordinates and instruct them to comply with Kos's sales and marketing policies. (AF ¶17.)

Perius saw it as part of his role to make sure his subordinates were adhering to the Kos code of conduct. (AF ¶26.) On January 14, 2006, for example, he specifically instructed district managers Mark Miller and Peter Engbretson not to provide to medical professionals Chicago Bulls tickets (which he believed had been given to them by board member Steve Jaharis). (AF ¶25.)

On January 26, 2006, Sierra and Koven led a training session on compliance with sales and marketing laws. (PF ¶10.) After receiving compliance training, Perius gave his team explicit orders to follow scrupulously the practices outlined in the compliance training. (PF ¶10.) But the presentation raised many questions in Perius's mind. According to Perius, "[t]hings that we had always been taught and encouraged to do, we were now being told were illegal and could land us in jail." Because Perius and members of his sales team had many questions following the meeting, he sought clarification in emails to Tilbury, Sierra, and King. (AF ¶19.) For example, on February 6, 2006, Perius received an email from Bob Kron, one of his subordinates, regarding the Minnesota Gift Law, which restricts gifts by pharmaceutical companies to doctors. Kron wrote, "For the purpose of wanting to make sure we are doing the right thing in Minnesota, I wanted to bring this to your attention." Perius then forwarded this email to Sierra, Tilbury, and King "looking to get some guidance on this law." Perius's purpose in forwarding this email was to get additional clarification regarding the issue his subordinate had raised. (AF ¶24.)

In April 2006, Sierra and Koven prepared and produced a Question & Answer document addressing the questions that were raised after their January presentation. (The parties dispute whether the document answered all of the employees' questions.)[3] Perius received the document from Tilbury on April 13, 2006. (AF ¶20.) Perius did not find the document adequate in addressing his and his subordinates' concerns. (AF ¶21.) He continued to receive questions from his subordinates about compliance issues, including questions about whether the use of certain studies ("the HAT study, the admin study") was permitted. Further, subordinates continued to raise questions "about advanced lipid testing being used across the country[.]" Perius emailed Koven, Sierra, and Tilbury to seek clarification and to inform them of possible violations of Kos policies in other regions. (AF ¶22.)

Perius also reported (primarily via email, but sometimes in person) to Tilbury, Glickman, Sierra, and King, what his district managers were reporting to him anecdotally: that other regions were engaging in sales and marketing activities not permitted under Kos policy. Perius testified that the purpose of his emails was both to seek clarification regarding compliance and to ensure compliance by reporting any ongoing potential violations. (AF ¶¶18,26.) Perius felt that his superiors were not adequately addressing these concerns, and that they were growing short with him for raising them. (PF ¶9.)

From time to time, again mostly in early 2006, Perius also repeated messages from his

---

[3] The parties dispute whether Sierra and Koven violated the company's Document Retention Policy and the DOJ's subpoena by failing to account for index cards containing employees' questions about compliance issues from the January 26, 2006 training session. Sales team members wrote their questions on the cards, and Sierra and Koven later compiled questions from the cards, along with their responses, in an electronic document. Koven and Sierra testified that they were unsure what happened to the index cards. But Sierra testified that, because the questions on the cards were reproduced in an electronic document, they were never discarded. The whereabouts of the index cards, in any event, are unknown. (PF ¶24.)

subordinates or attempted to bring to the attention of Tilbury, Sierra, and King what he believed to be violations of Kos policies and certain applicable laws. (AF ¶23.) Specifically, on multiple occasions between March and October 2006, Perius expressed concern to King, Tillbury, and Glickman, that recommending Kos drugs for the treatment of conditions based on certain studies could be considered selling drugs for off-label purposes, which he understood to be illegal. (PF ¶9.)

At no time during his employment, however, did Perius allege or inform anyone that Kos was falsely collecting funds from the government, nor did he ever claim that Kos was committing fraud on the government. (Abbott Facts ¶¶29, 30.) Perius also never told anyone at Kos that he was considering filing a *qui tam* complaint. (AF ¶30.) And, indeed, Perius did not file a *qui tam* suit while he was a Kos employee. (AF ¶31.) During his employment with Kos, moreover, Perius never met or spoke with anyone affiliated with the DOJ or U.S. Attorney's Office. (AF ¶32.) He also did not speak or meet with any officer or employee of the state of Illinois. (AF ¶33.)

    The Document Retention Policy

On March 2, 2005, as part of Kos's response to the investigation, Kos issued a "Document Retention and Preservation Notice" ("Document Retention Policy") to all employees, including Perius. (AF ¶¶4,5.) The Document Retention Policy required, among other things, that employees "NOT DELETE, DESTROY, OR ALTER ANY . . . DOCUMENTS" related to the company's sales and marketing practices. (AF ¶6.)

Although Perius did not think he had ever done anything wrong, he became concerned about how a certain PowerPoint presentation addressing certain sales and marketing activities

would be viewed by the government. The PowerPoint presentation, dated May 6, 2003, had been prepared at Perius's direction by Mark Miller, one of his subordinates, in Spring 2003. (AF ¶37.)

On or about March 9, 2005, shortly after Perius received his subpoena, he told one of his subordinates, Dan Niedbalski, that the government's investigation of the company's preceptorships and grant activities concerned him because he had just recently learned that those activities were possibly prohibited under some of Kos's newer compliance policies. (AF ¶38.) He then told Niedbalski, "The fact is, you know, some presentations that are out there, such as Mark Miller's presentation, had a lot of these types of activities, managed care presentations." He further said, "There is [sic] presentations out there like managed care presentations from people like Mark Miller and Scott Patry that had all these types of activities in them." And he told Niedbalski that he had forwarded the Miller presentation to all district managers, directors, and vice presidents of the company. He said he "was concerned who still had that in their computers." (AF ¶39.) At the same time, Perius told Niedbalski not to worry about being subpoenaed, and to follow the Document Retention Policy. (AF ¶39.) According to Perius, Niedbalski asked whether he should reach out to the other district managers, and Perius said, "you can talk to anybody you want to. Just be sensitive to what you say, be sensitive to the fact that the retention document [sic] in terms of deleting things, throwing things out, whatever it might be." (AF ¶40.)

Niedbalski proceeded to place phone calls later that day to other district managers in Perius's region, including Joseph Hennessy. (AF ¶41.) (Niedbalski has refused to testify about those calls, however, asserting his Fifth Amendment right against self-incrimination.) (AF ¶41.)

Perius's Termination

Nearly 18 months after Perius's conversation with Niedbalski, Kos learned about it and investigated Perius's conduct through its outside counsel. (AF ¶42.) The parties dispute many of the facts related to that investigation, largely because Abbott's witnesses have refused to answer questions on the grounds of attorney-client privilege. (AF ¶¶43-47; PF ¶¶22-27.) The parties have stipulated, however, that the PowerPoint presentation was delivered unaltered to the government. Whether the company's representatives believed that Perius told Niedbalski to alter the presentation, and whether that was the reason for his termination, however, are disputed issues. (AF ¶¶43-47.) Although Sierra and Koven testified that they believed Perius had violated the Document Retention Policy and potentially obstructed justice, they and Adrian Adams, Kos's CEO, refused to answer many questions about how they reached that conclusion. (AF ¶46.) Meanwhile, Perius testified that he believed he was terminated because he brought certain sales and marketing practices to the attention of Kos's upper management. (AF ¶48.)

## II. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

The nonmoving party, in turn, may not rest on the allegations in his pleadings or conclusory statements in affidavits; he must support his contentions with evidence that would be admissible at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). To avoid summary judgment, the nonmovant must do more than raise a "metaphysical doubt" as to the material facts. *See Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted). And "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

### III. ANALYSIS

The "whistleblower" provision of the False Claims Act provides in relevant part: "Any employee who is discharged . . . or in any other manner discriminated against in the terms and conditions of employment by his or her employer *because of lawful acts done by the employee . . . in furtherance of an action under this section,* including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole." 31 U.S.C. § 3730(h). The Seventh Circuit has explained that the statute requires a plaintiff to show that: "(a) his actions were taken 'in furtherance of' an FCA enforcement action and were therefore protected by the statute; (b) his employer had knowledge that he was engaged in this protected conduct; and (c) his discharge was motivated, at least in part, by the protected conduct." *Fanslow v. Chicago Manufacturing Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004); *Brandon v. Anesthesia & Pain Management Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002).

The court begins (and ends) with the first element of a whistleblower-retaliation claim under the FCA: whether Perius took action "in furtherance of" an FCA enforcement action. This element requires consideration of (1) the type of activity he engaged in, and (2) his purpose in engaging in the activity. *Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, (N.D. Ill. 1998) (Castillo, J.) ("*Luckey I*"), *aff'd*, 183 F.3d 730 (7th Cir. 1999) ("*Luckey II*"). Non-exclusive examples of activities covered are in the statutory text itself: investigation for, initation of, testimony for, and assistance in, an FCA action. *See* 31 U.S.C. § 3730(h). Because the purpose of the statute was to "assure those who may be considering exposing fraud that they are legally protected from retaliatory acts," *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998) (quoting Senate Judiciary Committee, S.REP. No. 99-345, at 34, *reprinted* in 1986 U.S.C.C.A.N. at 5299), the statute requires that a plaintiff's purpose involve "at least some ingredient of uncovering fraudulent activity." *Luckey I*, 2 F. Supp. 2d at 1051-52 (collecting cases). At the same time, though, there is no requirement that the plaintiff know that the activities under investigation could lead to an FCA prosecution, nor even that he know of the FCA. To satisfy the purpose requirement, the plaintiff must show only that he had a reasonable, good faith belief that the employer was committing fraud against the government. *Fanslow,* 384 F.3d at 480.

Here, Perius contends he engaged in three protected activities: (1) compliance with the government's subpoena; (2) alerting H&K during its internal investigation to sales and marketing practices; and (3) complaining to upper-level management.

**1. Compliance with the Government's Subpoena *Duces Tecum*.**

Perius contends that, by sending documents to the government between March and June 2005, in compliance with the subpoena, he engaged in protected activity. Without addressing his purpose in responding to the subpoena, Perius simply asserts that, because it was a lawful activity that may have assisted the government's investigation, it is protected. Abbott responds that, because it is undisputed that Perius did not believe that Kos was committing fraud against the government, his compliance with the subpoena cannot be considered protected activity under the FCA. And Abbott contends that no court has held that simple compliance with a legal obligation to produce documents is "whistleblower" activity.

On both scores, the court agrees with Abbott. First, there is simply no evidence that Perius believed that Kos was committing fraud against the government when he responded to the subpoena, and this dooms his claim that his activity was "in furtherance of" the government's investigation. *See Fanslow*, 384 F.3d at 480. It is undisputed that Perius did not believe that he or Kos had done anything wrong at the time he responded to the subpoena. Viewed in the light most favorable to Perius, the record shows that he was, at most, worried that his region was being singled out for scrutiny. That is a far cry from the employee in *Fanslow*, who believed that his organization was defrauding the federal government by diverting its nonprofit funds to a for-profit entity in which the executives had a personal stake, and who told a federal official as much. 384 F.3d at 480. Here, there is no evidence that Perius had formed any belief that unlawful activity was afoot, let alone a fraud on the government, when he complied with the subpoena. And Perius's subsequently formed belief that some practices were illegal—which was

not articulated until after the January 26, 2006 compliance training—came long after his final response to the government's subpoena.

Perius's inability to satisfy the purpose requirement is enough to distinguish his case from *Childree v. UAP/GA AG Chem, Inc.,* 92 F.3d 1140 (11th Cir. 1996), the only other FCA case he cites to support this claim. In *Childree*, the employee refused to participate in a customer's billing scheme and then vocalized to her superiors her concern that the scheme would defraud the government. A month later, a government official came to her office and spoke to the employee about the customer. The employee told the official about the customer's request and later sent a written statement memorializing her account. She also made copies of the customer's billing request. *Id.* at 1142-43. Four years later, she was subpoenaed in an administrative hearing. Although she was hesitant to participate because she feared retaliation, she ultimately testified and provided documents at that hearing, including the photocopied billing request. *Id.* at 1143. Within a week of her testimony she was suspended, and within two weeks she had been fired. *Id.*

Unlike the employee in *Childree,* Perius did not believe that his employer had done anything wrong when he responded to the subpoena. Perius, moreover, did not take any affirmative steps (beyond what he was legally obligated to do) to assist the government.

The other cases Perius cites involved the application of different laws. *Tesch v. Txport, Inc.*, No. 93 C 4367, 1995 U.S. Dist. LEXIS 13432 (N.D. Ill. Sept. 13, 1995) (Williams, J.), a retaliatory-discharge case under Illinois law, involved an employee who filed a wage claim against his employer and later refused to disregard a subpoena for documents. *Id.* at *9. According to the employee, his supervisor had instructed him not to produce certain documents

in response to the subpoena. Despite that command, the employee appeared in court and produced all of the subpoenaed documents. *Id.* at *2-3. The court concluded that, if the employee was fired for having done so, he would have a viable retaliatory discharge claim because "allowing employers to coerce their employees to interfere with the judiciary's truth finding process" would contravene Illinois's law and public policy. *Id.* at *17.

The court did not have occasion to consider whether the employee's actions were "in furtherance" of an investigation, as the case involved an entirely different law. But even leaving that issue aside, Perius's actions are simply not comparable to the employee in *Tesch* because there is no evidence that anyone at Kos discouraged him from complying with the subpoena. Unlike the employee in *Tesch*, Perius does not contend that his compliance with the subpoena was in defiance of a contrary command from his employer—a missing ingredient that could, in other cases, qualify an employee for whistleblower protection.

Finally, Perius's reliance on *Evans v. City of Houston*, 246 F.3d 344 (5th Cir. 2001), a Title VII case, is misplaced. *Evans* involved an employee who appeared pursuant to a subpoena at a grievance hearing and testified on behalf of a coworker who had alleged race and age discrimination. The court concluded that she had engaged in "protected activity" under Title VII, which protects an employee who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" under Title VII. *Id.* at 352-53. But Title VII's broad antiretaliaton provision, unlike the FCA, does not include a parallel requirement that the employee act "in furtherance of" a Title VII action.

The court leaves open the possibility that, under different circumstances, simply complying with a subpoena could be considered "protected activity" under the

-15-

FCA—particularly if, as in *Tesch*, the employer discouraged the employee from complying. But under these facts—where an employee does not believe that his employer has committed fraud on the government and does not comply with a subpoena with the purpose of uncovering such fraud— the employee cannot be said to have engaged in protected activity under the FCA.

**2. Participation in the H&K Investigation**

Perius contends that his participation in the internal investigation conducted by H&K attorneys was protected activity. He says that, because he told H&K about company-wide sales and marketing practices (which, he now contends, are illegal), he engaged in protected activity. Abbott responds that, in speaking to H&K, Perius was simply complying with the company's internal investigation, and he knew that H&K was not affiliated with the government.

Even assuming, for summary judgment purposes, that the information Perius provided to H&K about Kos's sales and marketing practices would show that those practices were illegal (and even a fraud on the government), Perius faces the same hurdles in this claim: First, when he provided information to H&K in interviews between March 2005 and January 2006, he did not believe that the company had done anything wrong. Perius testified, rather, that his concern was only that his region was being singled out for employing company-wide practices.

Second, there is no evidence that, in participating in the investigation, Perius sought to uncover fraudulent activity. That fact distinguishes Perius's actions from the employee's in *Neal v. Honeywell, Inc.*, 33 F.3d 860 (7th Cir. 1994), on which Perius relies. The employee in *Neal* had concluded that her coworkers were falsifying ammunition test data, and she told the company's legal counsel as much. Company counsel then notified the government. *Id.* at 860. In conveying her conclusion that her coworkers had engaged in fraudulent activity, the

employee's actions spurred the government's investigation. *Id.* at 864. Here, however, there is no evidence that Perius intimated to H&K that he believed fraudulent activity was afoot. Viewing the facts in the light most favorable to Perius, he simply informed H&K that the sales and marketing practices they were inquiring about were not confined to his sales region. As Judge Castillo has explained, the FCA's whistle blower protections "are aimed at employees 'exposing fraud' or attempting to 'expose fraud,' not employees with concerns wholly detached from the purportedly fraudulent activity." *Luckey I*, 2 F. Supp. 2d at 1051.

### 3. Internal Complaints

Perius contends that his internal complaints to upper management, along with his refusal to engage in illegal sales and marketing practices, constituted protected activity. Abbott responds that Perius's internal complaints are not protected under the FCA, and that, in any event, he never complained that the company was committing a fraud on the government or falsely collecting government funds.

The Seventh Circuit has suggested, without deciding, that internal complaints could constitute protected activity under the FCA, noting that protecting only employees who lodge complaints directly to the government would be a disincentive to use an internal complaint mechanism, thereby rendering less effective corporate efforts to self-police. *See Fanslow*, 384 F.3d at 481-82. And in *Neal*, the court rejected the argument that a plaintiff must raise her concerns directly to the government to qualify for protection. 33 F.3d at 865. But the Seventh Circuit has never suggested that an internal complaint that does not include an allegation of fraud on the government is protected activity. *See also Yesudian*, 153 F.3d at 740 ("Nor is an employee's investigation of nothing more than his employer's noncompliance with federal or

state regulations [enough] . . . . To be covered by the False Claims Act, the plaintiff's investigation must concern 'false or fraudulent' claims.")

Here, the record shows that, following the January 26, 2006, compliance presentation, Perius began to think the old sales and marketing practices his region had used were illegal. He repeatedly sought clarification of the compliance policy to ensure that his district was acting lawfully, he relayed his district managers' concerns that other regions were using off-limits techniques, and on a few occasions he directly suggested that some practices that he said were encouraged by top management—specifically, the use of certain studies to encourage off-label uses of drugs—were illegal. But there is no evidence that Perius ever suggested to his superiors that the company was committing a fraud on the government. That fact distinguishes his situation from the cases he relies upon.

As noted above, *Yesudian*, a D.C. Circuit case upon which Perius heavily relies, made clear that a plaintiff's internal investigation must involve some element of uncovering fraud. And, unlike Perius, the employee in that case satisfied the requirement by, among other things, repeatedly advising superiors that he had evidence that his supervisor falsified time and attendance records, provided inside information to favored vendors to aid them in the bidding process, accepted bribes from vendors, permitted payments to vendors who did not provide services to the University, and took University property home for personal use. He also collected evidence to corroborate his claim. *Yesudian*, 153 F.3d at 740.

Perius's conduct bears more similarity to the employee in *Brandon v. Anesthesia & Pain Management Assocs., Ltd.*, 277 F.3d 936 (7th Cir. 2002). There, a doctor who became concerned that his associates were falsifying the bills they submitted to Medicare alerted his

organization's shareholders of the doctors' conduct and contacted Medicare for information about its billing rules. *Id.* at 944. The court concluded that the doctor would not have a viable FCA retaliation claim because "simply trying to convince the shareholders to comply with the Medicare billing regulations . . . is usually not protected by the FCA." *Id.* at 945. The court rejected, in particular, the notion that such activity would put his employer on notice of potential FCA litigation, as simply alerting supervisors about the "the possibility of non-compliance with the rules would not necessarily put them on notice that he was planning to take a far more aggressive step and bring a *qui tam* action against them or report their conduct to the government." *Id.* at 945.

Indeed, like the employee in *Brandon*, who's job involved, in part, ensuring compliance with Medicare rules and regulations, Perius's complaints were made immediately after the company announced broad changes to the compliance rules, and his purpose was to ensure that his region, and the entire company, were following the new rules. That is not enough to trigger whistleblower protection. *See United States ex rel. Batty v. Amerigroup Ill., Inc.*, 528 F. Supp. 2d 861, 877 (N.D. Ill. 2007) (Castillo, J.) (collecting cases for proposition that spotlighting compliance issues, and urging compliance, are not enough to warrant whistleblower protection).

Perius's behavior bears an even more striking resemblance to the pharmaceutical-company employee in *United States ex rel. Kennedy v. Aventis Pharmaceuticals, Inc.*, 512 F. Supp. 2d 1158 (N.D. Ill. 2007) (Kennelly, J.). Like Perius, her internal complaints included claims that the company was allowing off-label marketing of drugs. The court concluded that such complaints were insufficient to survive a motion to dismiss because there was no indication that she informed the company that she suspected it was defrauding the government, nor that she

was pursuing or assisting in making an FCA claim. *Id.* at 1168. In short, "[a]n employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation." *Luckey II*, 183 F.3d at 733. Perius has not shown that his complaints were anything more than that.

## IV. CONCLUSION

Because Perius has not presented sufficient evidence upon which a jury could conclude that he engaged in protected activity under the False Claims Act, the court **GRANTS** Abbott's motion for summary judgment and relinquishes its jurisdiction over the state-law claims. Perius's motion for summary judgment is **DENIED**, Abbott's motion to strike Perius's responses is **GRANTED in part and DENIED in part**, and Perius's motion to modify Magistrate Judge Brown's protective order is **DENIED**.

**Enter:**
/s/ David H. Coar
_____
David H. Coar
United States District Judge

Dated: **June 26, 2009**